1   LINDA WENDELL HSU   (SBN 162971)
    SELMAN BREITMAN LLP
2   33 New Montgomery, Sixth Floor
    San Francisco, CA  94105
3   Telephone: (415) 979-0400
    Facsimile: (415) 979-2099
4   Email:    lhsu@selmanbreitman.com

5   Attorney for Defendant
    Scottsdale Indemnity Company
6

7               UNITED STATES DISTRICT COURT

8             NORTHERN DISTRICT OF CALIFORNIA

9

10  CLARENCE JONATHON WOOD and HEIDI    CASE NO.   CV 08 3335 SBA
    COLLINGWOOD,
11                                      **DEFENDANT SCOTTSDALE INDEMNITY
                                        COMPANY'S INDEX OF EXHIBITS IN
12            Plaintiffs,               SUPPORT OF ITS MOTION TO DISMISS
                                        COMPLAINT**
13       v.

14  SCOTTSDALE INDEMNITY CO.; and       Date  : September 23, 2008
    DOES 1 to 100, inclusive,           Time  : 1:00 p.m.
15                                      Ctrm. : No. 3, 3rd Floor
              Defendants.               Judge : Hon. Saundra Brown
16                                                Armstrong

17

18

19       DEFENDANT SCOTTSDALE INDEMNITY COMPANY hereby submits the

20  following Index of Exhibits in support of its motion to dismiss

21  plaintiffs' complaint:

22  ///

23  ///

24  ///

25  ///

26  ///

27  ///

28

Selman Breitman LLP
ATTORNEYS AT LAW

154136.1 380.25532

**DEFENDANT SCOTTSDALE INDEMNITY COMPANY'S
INDEX OF EXHIBITS IN SUPPORT OF ITS MOTION TO DISMISS COMPLAINT- CV 08 3335 SBA**

| EXHIBIT | DESCRIPTION |
|---------|-------------|
| A | Complaint styled *Wood, et al. v. Scottsdale Indemnity Co., et al.*, Humboldt County Superior Court case number DR080473 (removed to this Court). |
| B | Pertinent portions of Appellants' Combined Opening Brief submitted by Plaintiffs in the underlying action to the Court of Appeal, State of California, First Appellate District, Division 4, Appeal numbers A107462 and A107463 (consolidated) dated December 29, 2004. |
| C | Pertinent portions of Respondents' Brief submitted by the Lindstroms in the underlying case dated April 22, 2005. |
| D | Plaintiff Heidi Collingwood's Complaint for wrongful death and exemplary damages against the Lindstroms and Holz Lindstrom, Humboldt County Superior Court case number DR020419. |
| E | Plaintiff Clarence Jonathon Wood's Complaint for General Negligence against the Lindstroms and Holz Lindstrom, Humboldt County Superior Court Case Number DR020685. |
| F | Humboldt County Superior Court's Judgment After Court Trial issued on August 30, 2006. |
| G | Relevant dictionary definitions as defined by the American Heritage College Dictionary, Third Edition |
| H | Scottsdale Policy No. PUI0020229, a "Personal Umbrella Liability Policy," issued to Ralph L. and Pamela W. Lindstrom, effective May 31, 2001 to May 31, 2002. |

Selman Breitman LLP
ATTORNEYS AT LAW

DEFENDANT SCOTTSDALE INDEMNITY COMPANY'S
INDEX OF EXHIBITS IN SUPPORT OF ITS MOTION TO DISMISS COMPLAINT- CV 08 3335 SBA

154136.1 380.25532

| | | |
|---|---|---|
| I | Meet and confer correspondence dated July 12, 2008 from Linda Wendell Hsu to David P. Dibble, counsel for Plaintiff Clarence Jonathon Wood, and Zachary E. Zwerdling, counsel for Plaintiff Heidi Collingwood with confirmation of facsimile transmittal. | |
| J | Meet and confer correspondence dated July 22, 2008 from Linda Wendell Hsu to David P. Dibble, counsel for Plaintiff Clarence Jonathon Wood, and Zachary E. Zwerdling, counsel for Plaintiff Heidi Collingwood with confirmation of facsimile transmittal. | |
| K | Correspondence dated July 28, 2008 from David Dribble, Esq. | |

DATED: July 29, 2008          SELMAN BREITMAN LLP

By: _____
    LINDA WENDELL HSU   (SBN 162971)
    Attorney for Defendant
    SCOTTSDALE INDEMNITY COMPANY

**Selman Breitman LLP**
ATTORNEYS AT LAW

154136.1 380.25532

DEFENDANT SCOTTSDALE INDEMNITY COMPANY'S
INDEX OF EXHIBITS IN SUPPORT OF ITS MOTION TO DISMISS COMPLAINT- CV 08 3335 SBA

# **EXHIBIT A**

06/12/2008 09:31 FAX                                                    ☑003/010

1   David P. Dibble, Esq. #73938
   LAW OFFICES OF DAVID P. DIBBLE
2   123 F Street, Ste. D
   Eureka, CA 95501
3   (707) 444-9330
   Attorneys for Plaintiff Clarence Jonathon Wood
4
   Zachary E. Zwerdling, Esq. #73288
5   LAW OFFICE OF ZACHARY E. ZWERDLING
   123 F St., Ste. C
6   Eureka, CA 95501
   (707) 445-9628
7   Attorneys for Plaintiff Heidi Collingwood

*FILED*

Olga & MAY 2 3 2008

SUPERIOR COURT OF CALIFORNIA
COUNTY OF HUMBOLDT

8

9           SUPERIOR COURT OF THE STATE OF CALIFORNIA

                   COUNTY OF HUMBOLDT
10

11   CLARENCE JONATHON WOOD and   NO. **DR 080473**
   HEIDI COLLINGWOOD,

12        Plaintiff,             **COMPLAINT FOR DAMAGES;**
                        **BREACH OF CONTRACT; TORTIOUS**
13   vs.                    **BREACH OF THE COVENANT OF**
                        **GOOD FAITH AND FAIR DEALING**
14   SCOTTSDALE INDEMNITY CO., and
   DOES 1 through 100, inclusive,      RECEIVED
15
       Defendants.            JUN 1 1 2008
16   _____/
                      CLAIMS LEGAL
17                 **GENERAL ALLEGATIONS**

18          1.     Plaintiffs are unaware of the true names or capacities of the defendants named

19   herein as "DOE", and therefore sue said defendants by such fictitious names and will amend and insert

20   the true names of said defendants when the true names, identities and acts giving rise to their liability

21   in regard to the above-entitled action become known to plaintiffs. Plaintiffs are informed and believe

22   and thereon allege that each of the defendants designated as a "DOE" is responsible, in some manner,

23   for the events and happenings herein referred to, and caused injuries and damages proximately thereby

24   to plaintiffs as hereinafter set forth.

25          2.     At all times herein mentioned, defendants, and each of them, were the agents,

26   servants and employees of each of the remaining defendants, and in doing all of the things herein

27   mentioned were acting in the scope of such agency with the consent of each of the remaining

28   defendants.

Complaint for Damages - Breach of Contract; Tortious Breach of the Covenant of Good Faith and Fair Dealing 1

1        3.    At all times herein mentioned, plaintiffs Clarence Jonathan Wood and Heidi

2  Collingwood were the natural parents and sole surviving heirs at law of Kayla Wood, deceased.

3        4.    At all times herein mentioned, defendants Scottsdale Indemnity Co. and Does

4  1 through 10, and each of them, were and are corporations authorized to do business in the State of

5  California in the business of insurance.  At all times herein mentioned, defendants Scottsdale

6  Indemnity Co. and Does 1 through 10 and each of them conducted the business of insurance in the

7  State of California.

8        5.    On or about June 15, 2001, defendants Scottsdale Indemnity Co. and Does

9  1 though 10, and each of them, issued a policy of insurance entitled "Personal Umbrella Liability

10  Policy", policy number PUI 0020229, with liability limits in the amount of $1,000,000.00 to Ralph

11  L. and Pamela W. Lindstrom, residents of Humboldt County, California (hereinafter referred to as

12  "the Scottsdale policy").  The Scottsdale policy provides that the insurer will pay on behalf of its

13  insureds the sums said insureds become legally obligated to pay in excess of the underlying limits

14  because of bodily injury caused by an occurrence.  The Schedule of Underlying Insurance in the

15  Scottsdale policy references a homeowners policy issued to Ralph and Pamela Lindstrom by Hartford

16  Casualty Insurance Co. with policy limits in the amount of $500,000.  In addition to the Hartford

17  policy, although not listed as underlying coverage in the Scottsdale policy, was a homeowners policy

18  issued to Ralph and Pamela Lindstrom by Foremost Insurance Company with limits of $300,000.00.

19  The Scottsdale excess policy was in effect from May 31, 2001 to May 31, 2002.

20        6.    At all times herein mentioned, under the provisions of the above-mentioned

21  insurance policy, defendants Scottsdale Indemnity Co. and Does 1 through 10, and each of them, had

22  the duty to the insureds thereunder to defend them against any action brought against them and to

23  pay indemnity for liability within the scope of the coverage of said insurance policy.

24        7.    At all times herein mentioned, there was implied by law in said insurance

25  contract a covenant, promise and duty that defendants, and each of them, would deal in good faith

26  with the insureds thereunder.

27  ///

28

---

Complaint for Damages - Breach of Contract; Tortious Breach of the Covenant of Good Faith and Fair Dealing 2

8.      At all times herein mentioned, Kimberly Holz Lindstrom was an insured within the definitions of the Scottsdale policy with respect to the allegations of the complaints filed against her by Clarence Jonathon Wood and Heidi Collingwood in the underlying action as hereinafter set forth.

9.      A condition of liability under the Scottsdale policy was that the underlying limits shall have been paid or the insured have become legally obligated to pay the limits of the underlying Hartford homeowners policy.

10.     On or about May 25, 2002, within the policy period, while staying with and under the control of the insureds Ralph L. and Pamela W. Lindstrom and their daughter Kimberly Holz Lindstrom, Kayla Wood, age 12 at that time, drowned in the Trinity River while on an inner tubing trip. Kimberly Holz Lindstrom was the sole responsible adult on that trip.

11.     On or about July 12, 2002, Kayla Wood's mother, plaintiff herein Heidi Collingwood, filed an action in Humboldt County Superior Court against Ralph and Pamela Lindstrom and Kimberly Holz Lindstrom for damages for negligently causing the death of Kayla Wood. On or about November 7, 2002, Kayla Wood's father, plaintiff herein Clarence Jonathon Wood, filed an action for damages against Ralph and Pamela Lindstrom and Kimberly Holz Lindstrom in Humboldt County Superior Court for negligently causing the death of Kayla Wood. Thereafter, the two actions were consolidated by the Court for all purposes and are hereinafter referred to as "the underlying action".

12.     At some time between July 12, 2002 and June 2, 2004, defendants were put on notice of the underlying action against Kimberly Holz Lindstrom.

13.     On or about June 2, 2004, the Court entered judgment in favor of Ralph and Pamela Lindstrom and against plaintiffs in the underlying action and the underlying action thereafter proceeded against defendant Kimberly Holz Lindstrom only.

14.     From and after December 16, 2005, through and including April 24, 2006, defendants Scottsdale Indemnity Co. and Does 1 through 10, and each of them, were advised that the underlying action was coming up for Settlement Conference and Trial and were provided the specific dates for those hearings. Further, defendants, and each of them, were advised that plaintiffs

Complaint for Damages - Breach of Contract; Tortious Breach of the Covenant of Good Faith and Fair Dealing 3

1   in the underlying action contended that Kimberly Holz Lindstrom was an insured under the Scottsdale

2   policy and that claims would be made against the Scottsdale policy. Defendants, and each of them,

3   were invited to participate in settlement negotiations between plaintiffs and Kimberly Holz Lindstrom

4   leading up to trial.

5            15.    At all times herein mentioned, defendants, and each of them, failed and refused

6   to participate in any manner in settlement negotiations between plaintiffs and Kimberly Holz

7   Lindstrom in the underlying action.

8            16.    On or about April 24, 2006, plaintiffs in the underlying action settled their

9   cases against Kimberly Holz Lindstrom in open court on the record. The terms of the settlement are

10  as follows:  payment of the amount of $800,000 paid by Hartford Casualty Co. and Foremost

11  Insurance Co. for their primary insurance policy limits on behalf of Kimberly Lindstrom, in exchange

12  for a covenant by plaintiffs not to execute upon any judgment against Kimberly Holz Lindstrom's

13  personal assets other than to the extent that she is afforded coverage by insurance companies other

14  than Hartford and Foremost; an assignment by Kimberly Holz Lindstrom of any and all causes of

15  action she may have against insurance carriers other than Hartford and Foremost; a stipulation that

16  Ms. Lindstrom was legally liable for and caused the damages sustained by the plaintiffs; and that the

17  Humboldt County Superior Court would determine the amount of the plaintiffs' damages after trial

18  of that issue.

19           17.    Defendants Scottsdale Indemnity Co. and Does 1 through 10 and each of them

20  were advised by plaintiffs in the underlying action on April 26, 2006 of the foregoing settlement

21  agreement and that plaintiffs contended that Kimberly Lindstrom was an insured under the Scottsdale

22  policy. Plaintiffs demanded payment of the $1,000,000.00 limits of the Scottsdale policy in full and

23  final settlement of all claims against Ms. Lindstrom and demanded that it be paid within 30 days of

24  that date. Subsequently, the time for response to that demand was extended to June 12, 2006. On

25  or about June 5, 2006, defendants expressly declined coverage and a defense to Kimberly Holz

26  Lindstrom. Further, defendants failed to offer or to pay any amounts under the policy to settle the

27  claims of plaintiffs against Kimberly Holz Lindstrom and failed and refused to provide Kimberly Holz

28  Lindstrom with a defense in the underlying g action..

---

Complaint for Damages - Breach of Contract; Tortious Breach of the Covenant of Good Faith and Fair Dealing 4

1       18.    On or about June 16, 2006, Kimberly Holz Lindstrom assigned any and all

2  causes of action she had against Scottsdale Indemnity Co. to plaintiffs Clarence Jonathon Wood and

3  Heidi Collingwood.

4       19.    On or about August 14, 2006, the underlying action proceeded to trial in

5  Department 3 of the Humboldt County Superior Court, Hon. Christopher G. Wilson presiding. On

6  or about August 30, 2006, Judge Wilson entered judgment against Kimberly Lindstrom in the amount

7  of $5 million plus recoverable costs. Thereafter, plaintiff Clarence Jonathon Wood filed a cost bill

8  in the amount of $3,686.86; plaintiff Heidi Collingwood filed a cost bill in the amount of $4,754.56.

9  Said judgment has become final against Kimberly Holz Lindstrom.

10       20.    Plaintiffs Clarence Jonathon Wood and Heidi Collingwood bring this action

11  as judgment creditors of Kimberly Holz Lindstrom pursuant to the Scottsdale policy and California

12  Insurance Code §11580(b)(2) to the extent that said insurance policy provides coverage to her, and

13  as assignees of all causes of action held by Kimberly Holz Lindstrom to the extent that defendants

14  breached said contract and the covenant of good faith and fair dealing implicit therein and caused

15  Kimberly Holz Lindstrom to suffer liability in excess of said policy limits.

16            **FIRST CAUSE OF ACTION - BREACH OF CONTRACT**

17       21.    In doing the things herein mentioned, defendants Scottsdale Indemnity Co. and

18  Does 1 through 10, and each of them, breached the contract of insurance herein mentioned. Kimberly

19  Lindstrom was at all times herein mentioned an insured within the meaning of the Scottsdale policy

20  and said policy provided personal liability insurance coverage to Kimberly Lindstrom for the acts

21  alleged in the complaints in the underlying action. Defendants, and each of them, failed and refused

22  to comply with their obligations under said contract to defend and indemnify Kimberly Holz

23  Lindstrom against the allegations of the complaint in the underlying action.

24       22.    As a direct, proximate and legal result of defendants' breach of the contract

25  of insurance as set forth herein, plaintiffs herein obtained a judgment against Kimberly Holz

26  Lindstrom in excess of the underlying insurance policy limits by $4,200,000. Plaintiffs herein thereby

27  became judgment creditors of Kimberly Holz Lindstrom in said amount and herein seek to obtain the

28  insurance policy limits of the policy issued by defendants in the amount of $1,000,000.00.

Complaint for Damages - Breach of Contract; Tortious Breach of the Covenant of Good Faith and Fair Dealing 5

23.    As a further direct, proximate and legal result of the breach of contract by defendants as set forth herein, plaintiffs have been caused and will continue to be caused to suffer costs and expenses of litigation and attorney's fees to obtain the benefits of said insurance policy in an amount according to proof.

WHEREFORE, plaintiffs pray for judgment against defendants as hereinafter alleged.

**SECOND CAUSE OF ACTION - TORTIOUS BREACH OF
THE COVENANT OF GOOD FAITH AND FAIR DEALING**

24.    Plaintiffs incorporate by reference each and every allegation contained in paragraphs 1 through 22 of this Complaint as if set forth fully herein.

25.    In doing the things herein mentioned, defendants, and each of them, breached their covenant, promise and duty to deal in good faith with their insured, Kimberly Holz Lindstrom. More specifically, defendants unreasonably and without proper cause failed and refused to comply with their obligations under said contract to defend and indemnify the insured Kimberly Holz Lindstrom and to accept a reasonable offer to settle the underlying action against her within the limits of defendant's policy as set forth herein.

26.    As a direct, proximate and legal result of the breach of the covenant of good faith and fair dealing as set forth herein, the insured Kimberly Holz Lindstrom was caused to suffer a judgment to be entered against her in excess of the limits of the underlying insurance policies in the amount of $4,200,000.

WHEREFORE, plaintiffs pray for judgment against defendants, and each of them, as follows:

1.    For the limits of the Scottsdale policy in the amount of $1,000,000.00;

2.    For the excess judgment entered against Kimberly Holz Lindstrom in the amount of $4,200,000.00, plus costs awarded in the underlying action;

3.    For attorneys fees incurred by plaintiffs in obtaining the benefits of the contract as set forth herein, according to proof;

4.    For interest on all recoverable amounts, according to proof;

5.    For costs of litigations, and;

---

Complaint for Damages - Breach of Contract; Tortious Breach of the Covenant of Good Faith and Fair Dealing 6

06/12/2008 09:33 FAX                                                            ☑009/010

6.    For such other and further relief as the Court may deem appropriate.

DATED:    May 22, 2008          LAW OFFICES OF DAVID P. DIBBLE

By: _____
David P. Dibble, Esq., attorneys for Plaintiff Clarence
Jonathon Wood

DATED:    5/22/08              LAW OFFICES OF ZACHARY E. ZWERDLING

By: _____
Zachary E. Zwerdling, Esq., attorneys for Plaintiff
Heidi Collingwood

Complaint for Damages - Breach of Contract; Tortious Breach of the Covenant of Good Faith and Fair Dealing 7

# **EXHIBIT B**

Nos. A107462 and A107463 (consolidated)

**COURT OF APPEAL**
**STATE OF CALIFORNIA**
**FIRST APPELLATE DISTRICT**
**DIVISION 4**

---

**CLARENCE JONATHAN WOOD**
**Plaintiff and Appellant,**

**v.**

**RALPH LINDSTROM and PAMELA LINDSTROM,**
**Defendants and Respondents**

---

**HEIDI COLLINGWOOD,**
**Plaintiff and Appellant,**

**v.**

**RALPH LINDSTROM and PAMELA LINDSTROM,**
**Defendants and Respondents.**

---

Appeal from the Superior Court for Humboldt County
The Honorable Christopher G. Wilson
Case Nos. DR 20419 and DR20685 (consolidated)

---

**APPELLANTS' COMBINED OPENING BRIEF**

---

| | | |
|---|---|---|
| Zachary E. Zwerdling Esq. | Harold Selan, Esq. | David Dibble, Esq. |
| (SBN 073288) | (SBN 104886) | (SBN 073938) |
| Law Office of Zachary E. | Law Office of Harold Selan | Law Offices of David Dibble |
| Zwerdling | P.O. Box 2292 | 628 H Street, |
| P.O. Box 3477 | Orinda, CA 94563 | Eureka, CA 95501 |
| 123 F Street, Suite C | Telephone: (925) 253-7600 | Telephone: (707) 444-9330 |
| Eureka, CA 95501 | Facsimile: (925) 253-7600 | Facsimile: (707) 444-8786 |
| Telephone: (707) 445-9628 | | |
| Facsimile: (707) 443-0442 | | |
| Attorney for Appellant | Attorney for Appellant | Attorney for Appellant |
| Heidi Collingwood | Heidi Collingwood | Clarence Jonathan Wood |

## INTRODUCTION

This consolidated appeal arises from the death of twelve-year old Kayla Wood, who drowned Memorial Day weekend 2002 while inner tubing on the Trinity River. During that weekend Kayla was in the care of defendant Kimberly Holz, the girlfriend of Kayla's father. Kayla, along with Holz and her two daughters, Emily and Jessica, were staying with Holz's father and stepmother, Respondents Ralph and Pamela Lindstrom, at the Lindstrom cabin bordering the Trinity River in Humboldt County.

The three adults – defendant Kimberly Holz and Respondents Ralph and Pamela Lindstrom – made a disastrous decision permitting, encouraging, and assisting Kayla to inner tube down the cold, swollen Trinity River without a life vest. According to the court below, Respondents *supported and encouraged* the inner tubing trip and placed Kayla at risk. Kayla drowned after the inner tube she was riding, which had been tied together with another girl's tube, became entangled in a "strainer," or a partially submerged portion of a tree. She was held under water by the strainer and could not escape it.

Kayla's parents, Appellants Heidi Collingwood and Clarence Jonathan Wood, are divorced and each brought separate actions against Kimberly Holz and her father and stepmother, Respondents Ralph and Pamela Lindstrom. The Lindstroms moved for summary judgment on the issue of duty. Even though the trial court correctly characterized the Lindstroms' conduct as misfeasance, that is

1

and Kayla as a matter of law, which is another basis for holding that a duty

existed.

## I.

## STATEMENT OF THE FACTS.

### A.    Kayla Wood's Trip To The Lindstrom Cabin On The Trinity River.

Respondents Ralph and Pam Lindstrom own a home on the Trinity River in

Willow Creek, Humboldt County. (A.A. 267-68.) Ralph's 43 year old daughter,

defendant Kimberly Holz ("Holz") was visiting them with her two daughters,

Emily and Jessica, during the Memorial Day weekend in 2002. (A.A. 252, 268-

69.) Accompanying them was Kayla Wood, age 12, the daughter of Appellants

Jon Wood and Heidi Collingwood. (*Id.*, see also A.A. 577). Holz was Appellant

Wood's live-in girlfriend. (A.A. 263-64.)

That weekend Kayla's father, Appellant Jon Wood, was going abalone

fishing. Kayla did not want to go and asked her father if she could go with Holz to

the family cabin at Willow Creek. (A.A. 262) Wood gave Holz permission to

take Kayla with her. (A.A. 261.) Holz took her two daughters, Emily and Jessica,

and Kayla to the cabin on Friday, May 24. (A.A. 268.) Wood intended to meet up

with them later on Saturday. (A.A. 504.)

When Jon Wood left Kayla in Holz's care for the trip to Willow Creek, he

expected Holz and her parents each be responsible for the care and safety of his

daughter and to exercise good judgment. (A.A. 505.) He did not know that Kayla

3

H1C-6/24/2005 5:01:26 PM

life jacket").) Respondent Pam Lindstrom felt that "we probably should have pushed it as far as not going in the river without a life jacket." (A.A. 394-95.)

## C. Respondents Actively Assist The Tubing Expedition Despite The Abnormally Dangerous Conditions On The River.

The Lindstroms kept about ten inner tubes at their cabin. (A.A. 271, 404.) Ralph allowed the girls to pick out the tubes that they wanted to use and then loaded the tubes in his pick-up truck. (A.A. 404-05, 416.) It was decided that the group would go to an area on the river known as Big Rock, which was not far from the Lindstrom cabin. (A.A. 405-06.) Big Rock was where the Lindstroms and Holz usually went tubing. (A.A. 265-66.)

Ralph then drove the group (Kimberly Holz and her daughters Jessica and Emily, Kayla, and Miranda) to Big Rock. (A.A. 265-66, 273.) Once at the river, Ralph unloaded the tubes from his pick-up and walked down to the beach, a few feet from the water, which was close enough to view river conditions. (A.A. 409.) As discussed below, the water at Big Rock was much higher and "very much" faster than usual. (A.A. 482, 484.) Again, Ralph said nothing to the girls about looking out for anything or being wary of any danger on the river. (A.A. 417.)

Ralph and his wife Pam have extensive experience tubing and swimming on the river for many years. (A.A. 37-38 (¶8) 40-41(¶8), 387, 390-94.) Pamela Lindstrom acknowledges that river conditions do change every year and claims the family has learned to "be pretty aware of situations that are different than the year

8

H1C-6/24/2005 5:01:26 PM

Finally, a special relationship existed as a matter of law between

Respondents and Kayla. Respondents invited Kayla into their home and then

undertook to make decisions as to her welfare.

Dated: December 29, 2004

ZACHARY E. ZWERDLING, ESQ.
LAW OFFICES OF ZACHARY E.
ZWERDLING

HAROLD SELAN, ESQ.
LAW OFFICES OF HAROLD
SELAN,

**ATTORNEYS FOR APPELLANT
HEIDI COLLINGWOOD**


DAVID P. DIBBLE, ESQ.
LAW OFFICES OF DAVID P.
DIBBLE

**ATTORNEY FOR APPELLANT
CLARENCE JONATHAN WOOD**

H1C·6/24/2005 5:01:26 PM

## CERTIFICATION OF WORD COUNT

The text of this brief consists of 15,696 words according to the word count software included in the Microsoft Word software program with which the brief was written.

HAROLD SELAN, ESQ.

H1C76/24/2005 5:01:26 PM

Re:    Wood v. Lindstrom, et al.
       Nos. A107462 and A107463 (consolidated)

## PROOF OF SERVICE
[C.C.P. §1013, C.R.C. §2008]

I, the undersigned, say:

I am, and was at the time of the service hereinafter mentioned, over the age of 18 years and not a party to the above-entitled action. I am employed in the County of Contra Costa, California and my business address is 140 Brookwood Road, Suite 200, Orinda, California, 94563.

On December 29, 2004, I caused the following document(s):

1.    **APPELLANTS' COMBINED OPENING BRIEF;**

to be served on the following interested parties in the above-entitled action at the address indicated:

Anne Rudolph, Esq.                          Attorneys for Respondents
Robers, Hill, Bragg,
Angell & Perlman LLP
434 Seventh Street
P.O. Box 1248
Eureka, CA 95502-1248

BY OVERNIGHT DELIVERY: I caused such document(s) to be served by depositing a copy of the document(s) in a box or other facility regularly maintained by the express service carrier in Orinda, California, or delivered to an authorized courier or driver authorized by the express service carrier to receive documents who regularly picks up at Perez & McNabb, in an envelope or package designated by the express service carrier with delivery fees paid or provided for, addressed to the person on whom it is to be served, at the office address as last given by that person on any document filed in the cause and served on the party making service.   [C.C.P. §1013(c).]

Supreme Court of California                 (Five Copies)
350 McAllister Street, Room 1295
San Francisco, CA 94102

BY PERSONAL DELIVERY: I caused such document(s) to be given to a commercial process server for personal service on the above-referenced individual(s).

Hon. Christopher G. Wilson
Humboldt County Superior Court
825 Fifth Street
Eureka, CA 95501

BY FIRST-CLASS MAIL: I caused such document(s) to be served by placing for collection and
deposit in the United States mail a copy of the document(s) at 140 Brookwood Road, Suite 200,
in Orinda, Contra Costa County, California, in a sealed envelope, with postage fully prepaid,
addressed to each of the above-referenced individuals. I am familiar with the practice of my
office for the collection and the processing of correspondence for mailing with the United States
Postal Service. In accordance with the ordinary course of business, the above-mentioned
document(s) would have been deposited with the United States Postal Service on the above-
mentioned date, the same day on which it was placed at my office for deposit. I understand that,
upon motion of a party served, service pursuant to C.C.P. §1013a(3) shall be presumed invalid if
the postal cancellation date or postage meter date on the envelope is more than one day after the
date of deposit for mailing contained in the affidavit. [C.C.P. §1013a(3).]

I declare under penalty of perjury under the laws of the State of California that the
foregoing is true and correct, and that this declaration was executed at Orinda, Contra Costa
County, California on December 27, 2004.

NAME: Maria Bishop        SIGNATURE: _____

# EXHIBIT C

H1C-6/24/2005 5:01:26 PM

# IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

## FIRST APPELLATE DISTRICT

### DIVISION 4

CLARENCE JONATHAN WOOD,

     Plaintiff and Appellant,

Appeal Nos.  **A107462** and **A107463** (consolidated)

vs.

RALPH LINDSTROM, PAMELA LINDSTROM,
KIMBERLY HOLZ, et al.

     Defendants and Respondents.

_____/

HEIDI COLLINGWOOD,

     Plaintiff and Appellant,

vs.

RALPH LINDSTROM, PAMELA LINDSTROM,
KIMBERLY HOLZ, et al.

     Defendants and Respondents.

_____/

Appeal from the Superior Court for Humboldt County
The Honorable Christopher G. Wilson
Case Nos. DR020419 and DR020685

---

## RESPONDENTS' BRIEF

---

ANNE M. RUDOLPH, Esq. (S.B. #201583)
RANDY S. PERLMAN, Esq. (S.B.#137862)
ROBERTS, HILL, BRAGG, ANGELL & PERLMAN LLP
434 7th Street
Eureka, CA  95501
Telephone: (707) 442-2927
Facsimile: (707) 443-2747
Attorney for Defendants/Respondents Ralph and Pamela Lindstrom

HTC-6/24/2005 5:01:26 PM

RECEIVED
SUPERIOR COURT
2005 APR 22 AM 10: 46
COUNTY OF VENTURA

## INTRODUCTION

This case arises out of a tragic accident that occurred Memorial Day weekend 2002, in the Trinity River in which 12-year old Kayla Wood ("Kayla") drowned during an innertubing trip with her father's live-in girlfriend, Kimberly [Holz] Lindstrom ("Kimberly"), and three other girls.

The day before the accident, appellant Clarence Jonathan Wood, Kayla's father, entrusted Kayla to the care and custody of 43-year old Kimberly and gave express permission for Kayla to accompany Kimberly on a trip to Ralph and Pamela Lindstrom's vacation property bordering the Trinity River. The Lindstroms are Kimberly's parents.

The evidence proves that Kayla was under the care and supervision of 43-year old Kimberly, appellant Wood's chosen guardian, during her entire visit at the Lindstrom cabin, and, more importantly, on the river during the tubing trip itself. It is undisputed that neither Ralph or Pamela Lindstrom had any contact with either of Kayla's parents prior to Kayla's visit, nor were they on the river the day of the accident. Moreover, the accident did not occur on the Lindstrom property, but occurred in a location of the river that does not border the Lindstrom property, nor is the location under their control.

In their Combined Opening Brief, appellants ignore these crucial facts and grossly misrepresent other facts in their effort to have this court create a new, expansive duty of care wherein persons can be held liable for injuries that occur to a child: 1) who is at all times under the supervision and control of her adult guardian who was making all decisions on the child's behalf; and 2) when the injury was due to a dangerous condition

///

///

///

HTC-6/24/2005 5:01:26 PM

## STATEMENT OF FACTS

Respondents Ralph and Pamela Lindstrom own property and a cabin bordering the Trinity River in Willow Creek, Humboldt County. (Appellants' Appendix 37, 40; Respondents' Appendix 50.)[3] Ralph and Pamela Lindstrom are the parents (father and step-mother) of Kimberly [Holz] Lindstrom ("Kimberly"). (A.A. 40; R.A. 56.) Kimberly was 43-years old at the time of the accident. (R.A. 18.)

Over the Memorial Day weekend 2002, Ralph and Pamela Lindstrom had a number of guests at their cabin. These guests included Kimberly and her two daughters, Emily and Jessica Holz (then ages 14 and 12), Pamela Lindstrom's sister, Mary McCarthy, and Mrs. McCarthy's two sons, R.J. and Tucker (then ages 8 and 6), Ralph and Pamela Lindstrom's granddaughter, Miranda Lindstrom (then age 9), and her school friend Miala Cheng. (R.A. 19-21, 58.) Ralph and Pamela Lindstrom were Miranda's guardians and she lived with them at the time. (R.A. 57.) In addition to her own two daughters, Kimberly brought Kayla Wood, the daughter of her live-in boyfriend, appellant Clarence Jonathan Wood. (R.A. 34-35.)

Jon Wood, who shared joint and legal custody with Kayla's mother, appellant Heidi Collingwood, gave permission for Kayla to accompany Kimberly to Willow Creek for the weekend. (R.A. 27-28.) Ralph and Pamela Lindstrom had no contact with Jon Wood or Heidi Collingwood concerning Kayla's visit to Willow Creek. (A.A. 37, 40.)

---

[3]

In their Appellants' Appendix, appellants omitted certain excerpts from depositions that were attached to the "Declaration of Anne M. Rudolph in Support of Respondents Lindstroms' Separate Statement of Undisputed Facts and Supporting Evidence in Support of Motion for Summary Judgment." (A.A. 235-313.) For ease of review, the entire Separate Statement, Declaration and exhibits are reproduced in Respondents' Appendix rather than just the missing pages.

HTC-6/24/2005 5:01:26 PM

Prior to this weekend, Kayla had visited Ralph and Pamela
Lindstrom's Willow Creek property on other occasions. On prior visits
Kayla had gone in the river, and went tubing at least once with Jon Wood
present. (R.A. 23-24; A.A. 122.) When Kayla tubed on the river before
she did not wear a life vest. (R.A. 40.)

On Friday, May 24, 2002, Kimberly drove from Eureka to her
parent's Willow Creek property with Emily, Jessica and Kayla. (R.A. 34-
35.) After lunch on Saturday May 25, 2002, Kimberly agreed to take
Kayla, Emily, Jessica and Miranda tubing from Big Rock (a popular local
entry spot into the river) and float down to the Lindstrom property. (R.A.
36-37, 59-60.) Ralph Lindstrom owned the tubes used by Kimberly and the
girls that day. (R.A. 37.) Additionally, Ralph Lindstrom drove Kimberly
and the girls from his property to the Big Rock drop off. (R.A. 37-39.)
Pamela Lindstrom did not leave the cabin. (R.A. 37-39.) Kimberly was the
only adult who entered the water with the girls on the tubing trip; neither
Ralph or Pamela Lindstrom were on the river. (A.A. 37, 40) None of the
girls were wearing life vests. (R.A. 26.)

Kimberly had tubed this stretch of river countless times before.
(R.A. 31-32.) The river appeared mellow to Kimberly when she and the
girls first started off. (R.A. 41.) A group of rafters were present at Big
Rock when Kimberly and the girls arrived and one or more members of the
rafting party assisted Kimberly and Jessica push off into the water. (R.A.
64.)

After the first couple sets of ripples (small rapids) the river flow
unexpectedly began rushing faster and Kimberly became concerned for the
girls' safety. (R.A. 41-43.) Kimberly then noticed a branch or limb
sticking out from a rock where the river bends. (R.A. 41-43.) The bend
area with the rock was familiar to Kimberly and she had never seen any

HTC-6/24/2005 5:01:26 PM

debris hung up on the rock before. (R.A. 46-47.) Kimberly became
alarmed and yelled to Emily, Kayla and Miranda to get over to the bank
and get out of the water. (R.A. 43.) Kayla and Miranda got to the side and
climbed either onto a large rock attached to the bank or onto the bank itself
and pulled their tubes out of the water. (R.A. 45, 65-67, 70-71, 74-75, 78-
79.) Kimberly saw them on the bank and yelled for the girls to stay on the
bank. (R.A. 45, 66, 72-73, 75, 79.) Instead of remaining on the bank,
Kayla and Miranda got back on their tubes and reentered the river because
they thought they heard a rattle snake on the bank. (R.A. 71-73.) Once
back in the water, their tubes hit the limb jutting from the rock, they were
flipped off their tubes and Kayla drowned. (R.A. 71-72.)

The drowning did not occur on Ralph and Pamela Lindstrom's
property, nor did it occur in the stretch of river bordering their property.
(A.A. 38, 41.) Ralph and Pamela Lindstrom have both gone tubing on this
same stretch of river many times. (R.A. 52-53.) Neither Ralph or Pamela
Lindstrom placed the limb which was protruding from the rock where
Kayla drowned, nor had they ever seen the limb or other debris in that area
before. (A.A. 38, 41.) Further, neither Ralph or Pamela Lindstrom has any
ability to control the water level or river flow in the Trinity River. (A.A.
37, 40.) Prior to May 25, 2002, neither Ralph or Pamela Lindstrom had
ever heard of anybody drowning during a tubing trip in the Trinity River.
(A.A. 37, 40.)

///

///

///

///

///

///

# **EXHIBIT D**

982.1(1)

ATTORNEY OR PARTY WITHOUT ATTORNEY (Name, state bar number, and address):
ZACHARY E. ZWERDLING, ESQ.                                   CSB# 073188
ZWERDLING & CROWLEY
P.O. Box 3477
Eureka, California 95502-3477
TELEPHONE NO: (707) 445-9628    FAX NO. (Optional): (707) 443-0442
E-MAIL ADDRESS (Optional): zdot@northcoast.com
ATTORNEY FOR (Name): Plaintiff, Heidi Collingwood

NAME OF COURT: Humboldt County Superior Court
STREET ADDRESS: 825 Fifth Street
MAILING ADDRESS:
CITY AND ZIP CODE: Eureka, California 95501
BRANCH NAME:

PLAINTIFF: Heidi Collingwood

DEFENDANT: Ralph Lindstrom, Pamela Lindstrom, Kimberly Holz

[X] DOES 1 TO        30

**COMPLAINT—Personal Injury, Property Damage, Wrongful Death**
    [ ] AMENDED (Number):
Type (check all that apply):
[ ] MOTOR VEHICLE    [ ] OTHER (specify):
    [ ] Property Damage    [X] Wrongful Death
    [ ] Personal Injury    [X] Other Damages (specify): *Exemplary*

Jurisdiction (check all that apply):
[ ] ACTION IS A LIMITED CIVIL CASE
    Amount demanded    [ ] does not exceed $10,000
                       [ ] exceeds $10,000, but does not exceed $25,000
[X] ACTION IS AN UNLIMITED CIVIL CASE (exceeds $25,000)
[ ] ACTION IS RECLASSIFIED by this amended complaint
    [ ] from limited to unlimited
    [ ] from unlimited to limited

FOR COURT USE ONLY

**FILED**

JUL 1 8 2002

SUPERIOR COURT OF CALIFORNIA
COUNTY OF HUMBOLDT

CASE NUMBER:

**DR020419**

1. PLAINTIFF (name): Heidi Collingwood

   alleges causes of action against DEFENDANT (name): Ralph Lindstrom, Pamela Lindstrom and Kimberly Holz

2. This pleading, including attachments and exhibits, consists of the following number of pages:    5

3. Each plaintiff named above is a competent adult
   a. [ ] except plaintiff (name):
      (1) [ ] a corporation qualified to do business in California
      (2) [ ] an unincorporated entity (describe):
      (3) [ ] a public entity (describe):
      (4) [ ] a minor    [ ] an adult
          (a) [ ] for whom a guardian or conservator of the estate or a guardian ad litem has been appointed
          (b) [ ] other (specify):
      (5) [ ] other (specify):

   b. [ ] except plaintiff (name):
      (1) [ ] a corporation qualified to do business in California
      (2) [ ] an unincorporated entity (describe):
      (3) [ ] a public entity (describe):
      (4) [ ] a minor    [ ] an adult
          (a) [ ] for whom a guardian or conservator of the estate or a guardian ad litem has been appointed
          (b) [ ] other (specify):
      (5) [ ] other (specify):

   [ ] Information about additional plaintiffs who are not competent adults is shown in Complaint—Attachment 3.

(Continued on reverse)

Form Approved for Optional Use
Judicial Council of California
982.1(1) [Rev. January 1, 2000]

**COMPLAINT—Personal Injury, Property
Damage, Wrongful Death**

Page one of three

Code of Civil Procedure, § 425.12

R5S-7/8/2004 8:14:57 AM

SHORT TITLE:
Collingwood vs. Lindstrom, et al.

CASE NUMBER:

4. ☐ Plaintiff (name):
   is doing business under the fictitious name (specify):

   and has complied with the fictitious business name laws.

5. Each defendant named above is a natural person
   a. ☐ except defendant (name):
      (1) ☐ a business organization, form unknown
      (2) ☐ a corporation
      (3) ☐ an unincorporated entity (describe):

      (4) ☐ a public entity (describe):

      (5) ☐ other (specify):

   b. ☐ except defendant (name):
      (1) ☐ a business organization, form unknown
      (2) ☐ a corporation
      (3) ☐ an unincorporated entity (describe):

      (4) ☐ a public entity (describe):

      (5) ☐ other (specify):

   c. ☐ except defendant (name):
      (1) ☐ a business organization, form unknown
      (2) ☐ a corporation
      (3) ☐ an unincorporated entity (describe):

      (4) ☐ a public entity (describe):

      (5) ☐ other (specify):

   d. ☐ except defendant (name):
      (1) ☐ a business organization, form unknown
      (2) ☐ a corporation
      (3) ☐ an unincorporated entity (describe):

      (4) ☐ a public entity (describe):

      (5) ☐ other (specify):

   ☐ Information about additional defendants who are not natural persons is contained in Complaint—Attachment 5.

6. ☐ The true names and capacities of defendants sued as Does are unknown to plaintiff.

7. ☐ Defendants who are joined pursuant to Code of Civil Procedure section 382 are (names):

8. This court is the proper court because
   a. ☒ at least one defendant now resides in its jurisdictional area.
   b. ☐ the principal place of business of a defendant corporation or unincorporated association is in its jurisdictional area.
   c. ☒ injury to person or damage to personal property occurred in its jurisdictional area.
   d. ☐ other (specify):

9. ☐ Plaintiff is required to comply with a claims statute, and
   a. ☐ plaintiff has complied with applicable claims statutes, or
   b. ☐ plaintiff is excused from complying because (specify):

(Continued on page three)

R55-7/8/2004 8:14:57 AM

SHORT TITLE:
Collingwood vs. Lindstrom, et al.

CASE NUMBER:

10. The following causes of action are attached and the statements above apply to each *(each complaint must have one or more causes of action attached):*

- a. ☐ Motor Vehicle
- b. ☐ General Negligence
- c. ☐ Intentional Tort
- d. ☐ Products Liability
- e. ☐ Premises Liability
- f. ☒ Other *(specify):* Wrongful Death
  - Exemplary Damages

11. Plaintiff has suffered
- a. ☒ wage loss
- b. ☐ loss of use of property
- c. ☒ hospital and medical expenses
- d. ☒ general damage
- e. ☐ property damage
- f. ☐ loss of earning capacity
- g. ☐ other damage *(specify):*

12. ☒ The damages claimed for wrongful death and the relationships of plaintiff to the deceased are
- a. ☐ listed in Complaint—Attachment 12.
- b. ☒ as follows:
  1. Medical Specials
  2. General Damages
  3. Exemplary Damages

13. The relief sought in this complaint is within the jurisdiction of this court.

14. PLAINTIFF PRAYS for judgment for costs of suit; for such relief as is fair, just, and equitable; and for
- a. ☒ compensatory damages
  - (1) ☒ (unlimited civil cases) according to proof.
  - (2) ☐ (limited civil cases) in the amount of: $
- b. ☒ other *(specify):* Pre-Judgment Interest

15. ☐ The paragraphs of this complaint alleged on information and belief are as follows *(specify paragraph numbers):*

Date: July 12, 2002

ZACHARY E. ZWERDLING
(TYPE OR PRINT NAME)

(SIGNATURE OF PLAINTIFF OR ATTORNEY)

982.1(1) (Rev. January 1, 2001)

COMPLAINT—Personal Injury, Property Damage, Wrongful Death

Page three of three

R5S-7/8/2004 8:14:57 AM

| SHORT TITLE: | CASE NUMBER: |
|---|---|
| Collingwood vs. Lindstrom, et al. | |

**First**
(number)

# CAUSE OF ACTION— WRONGFUL DEATH    Page ___4___

ATTACHMENT TO  ☒ Complaint   ☐ Cross-Complaint

(Use a separate cause of action form for each cause of action.)

GN-1. Plaintiff (name): Heidi Collingwood

alleges that defendant (name): Ralph Lindstrom, Pamela Lindstrom, Kimberly Holz

☒ Does ___1___ to ___89___

was the legal (proximate) cause of damages to plaintiff. By the following acts or omissions to act, defendant negligently caused the damage to plaintiff
on (date): May 23, 2002
at (place): Willow Creek, California

(description of reasons for liability): Ralph and Pamela Lindstrom and Kimberly Holz were responsible for the death of Kayla Wood for among other things, failing to require her to wear a life jacket.

Form Approved for Optional Use
Judicial Council of California
Effective January 1, 1993
Rule 982.1(9)

CAUSE OF ACTION—General Negligence        CCP 425.12

RSS-7/8/2004 8:14:57 AM

| SHORT TITLE: | CASE NUMBER: |
|---|---|
| CpEngwood vs. Lindstrom, et al. | |

### Exemplary Damages Attachment

Page __5__

ATTACHMENT TO ☒ Complaint ☐ Cross-Complaint

EX-1. As additional damages against defendant (name): Ralph Lindstrom, Pamela Lindstrom and Kimberly Holz

    Plaintiff alleges defendant was guilty of
    ☒ malice
    ☒ fraud
    ☒ oppression
as defined in Civil Code section 3294, and plaintiff should recover, in addition to actual damages, damages to make an example of and to punish defendant.

EX-2. The facts supporting plaintiff's claim are as follows:
Each defendant was well aware that the most basic rule of water safety is, that everyone, especially children, be required to wear life jackets when engaging in water activity. This rule is especially important when children are set loose on inner tubes in a cold, fast moving river like the Trinity.

Neither Kayla Wood nor any of the young children tubing with her at the time of the incident had a life jacket and therefore should not have been allowed to go into the river. Defendants were aware of the dangerous consequences of their conduct and deliberately failed to avoid these consequences. Defendants conduct constitutes willful and conscious disregard for the safety of Kayla Wood.

EX-3. The amount of exemplary damages sought is
    a. ☐ not shown, pursuant to Code of Civil Procedure section 425.10.
    b. ☐ $

Form Approved for Optional Use
Judicial Council of California
Effective January 1, 1985
Rule 982.9(12)

### Exemplary Damages Attachment

CEB

CCP 425.12

# **EXHIBIT E**

RBS-7/8/2004 8:14:57 AM

982.1(1)

ATTORNEY OR PARTY WITHOUT ATTORNEY (Name, state bar number, and address):

David P. Dibble, Esq.    (Bar # 73938)
LAW OFFICES OF DAVID P. DIBBLE
628 H Street
Eureka, California 95501

TELEPHONE NO. (707) 444-9330    FAX NO. (Optional) (707) 444-8786
E-MAIL ADDRESS (Optional) diblaw@aol.com

ATTORNEY FOR (Name)

NAME OF COURT    SUPERIOR COURT OF CALIFORNIA, COUNTY OF HUMBOLDT
STREET ADDRESS 825 Fifth St.
MAILING ADDRESS
CITY AND ZIP CODE    Eureka 95501
BRANCH NAME

PLAINTIFF: Clarence Jonathan Wood

DEFENDANT: Ralph Lindstrom; Pamela Lindstrom; Kimberly Holz

[X] DOES 1 TO    100

COMPLAINT—Personal Injury, Property Damage, Wrongful Death
[ ] AMENDED (Number):
Type (check all that apply):
[ ] MOTOR VEHICLE    [X] OTHER (specify):
[ ] Property Damage    [X] Wrongful Death
[ ] Personal Injury    [ ] Other Damages (specify):

Jurisdiction (check all that apply):
[ ] ACTION IS A LIMITED CIVIL CASE
Amount demanded    [ ] does not exceed $10,000
[ ] exceeds $10,000, but does not exceed $25,000
[X] ACTION IS AN UNLIMITED CIVIL CASE (exceeds $25,000)
[ ] ACTION IS RECLASSIFIED by this amended complaint
[ ] from limited to unlimited
[ ] from unlimited to limited

FOR COURT USE ONLY

FILED AT

NOV 0 6 2002

SUPERIOR COURT OF CALIFORNIA
COUNTY OF HUMBOLDT

CASE NUMBER:

DR020695

1. PLAINTIFF (name): Clarence Jonathan Wood

alleges causes of action against DEFENDANT (name): Ralph Lindstrom; Pamela Lindstrom; Kimberly Holz

2. This pleading, including attachments and exhibits, consists of the following number of pages:    4

3. Each plaintiff named above is a competent adult

a. [ ] except plaintiff (name):
(1) [ ] a corporation qualified to do business in California
(2) [ ] an unincorporated entity (describe):
(3) [ ] a public entity (describe):
(4) [ ] a minor    [ ] an adult
(a) [ ] for whom a guardian or conservator of the estate or a guardian ad litem has been appointed
(b) [ ] other (specify):
(5) [ ] other (specify):

b. [ ] except plaintiff (name):
(1) [ ] a corporation qualified to do business in California
(2) [ ] an unincorporated entity (describe):
(3) [ ] a public entity (describe):
(4) [ ] a minor    [ ] an adult
(a) [ ] for whom a guardian or conservator of the estate or a guardian ad litem has been appointed
(b) [ ] other (specify):
(5) [ ] other (specify):

[ ] Information about additional plaintiffs who are not competent adults is shown in Complaint—Attachment 3

Page 1 of 3

Form Approved for Optional Use
Judicial Council of California
982.1(1) (Rev. July 1, 2002)

COMPLAINT—Personal Injury, Property
Damage, Wrongful Death

Code of Civil Procedure § 425.12

LexisNexis® Automated California Judicial Council Forms

| SHORT TITLE. | CASE NUMBER |
|---|---|
| Wood v. Lindstrom, et al. | |

4. ☐ Plaintiff *(name):*

    is doing business under the fictitious name *(specify):*

    and has complied with the fictitious business name laws.

5. Each defendant named above is a natural person

a. ☒ except defendant *(name):*
    (1) ☐ a business organization, form unknown
    (2) ☐ a corporation
    (3) ☐ an unincorporated entity *(describe):*

    (4) ☐ a public entity *(describe):*

    (5) ☐ other *(specify):*

c. ☐ except defendant *(name):*
    (1) ☐ a business organization, form unknown
    (2) ☐ a corporation
    (3) ☐ an unincorporated entity *(describe):*

    (4) ☐ a public entity *(describe):*

    (5) ☐ other *(specify):*

b. ☐ except defendant *(name):*
    (1) ☐ a business organization, form unknown
    (2) ☐ a corporation
    (3) ☐ an unincorporated entity *(describe):*

    (4) ☐ a public entity *(describe):*

    (5) ☐ other *(specify):*

d. ☐ except defendant *(name)*
    (1) ☐ a business organization, form unknown
    (2) ☐ a corporation
    (3) ☐ an unincorporated entity *(describe):*

    (4) ☐ a public entity *(describe):*

    (5) ☐ other *(specify):*

☐ Information about additional defendants who are not natural persons is contained in Complaint—Attachment 5.

6. The true names and capacities of defendants sued as Does are unknown to plaintiff.

7. ☐ Defendants who are joined pursuant to Code of Civil Procedure section 382 are *(names):*

8. This court is the proper court because
    a. ☒ at least one defendant now resides in its jurisdictional area.
    b. ☐ the principal place of business of a defendant corporation or unincorporated association is in its jurisdictional area
    c. ☒ injury to person or damage to personal property occurred in its jurisdictional area.
    d. ☐ other *(specify)*

9. ☐ Plaintiff is required to comply with a claims statute, and
    a. ☐ plaintiff has complied with applicable claims statutes, or
    b. ☐ plaintiff is excused from complying because *(specify):*

RSS-7/8/2004 8:14:57 AM

| SHORT TITLE | CASE NUMBER |
|---|---|
| Wood v. Lindstrom, et al. | |

10. The following causes of action are attached and the statements above apply to each *(each complaint must have one or more causes of action attached)*.
    a. ☐ Motor Vehicle
    b. ☒ General Negligence
    c. ☐ Intentional Tort
    d. ☐ Products Liability
    e. ☐ Premises Liability
    f. ☐ Other *(specify)*:

11. Plaintiff has suffered
    a. ☒ wage loss
    b. ☐ loss of use of property
    c. ☒ hospital and medical expenses
    d. ☒ general damage
    e ☐ property damage
    f. ☐ loss of earning capacity
    g. ☒ other damage *(specify)*:
        Funeral and burial expenses; loss of love, care, comfort, society, earnings and services of plaintiff's daughter, Kayla Wood, deceased

12. ☒ The damages claimed for wrongful death and the relationships of plaintiff to the deceased are
    a. ☐ listed in Complaint—Attachment 12.
    b ☒ as follows:
        Hospital and other emergency care and services, funeral and burial expenses, loss of love, care, comfort, society, earnings and services of plaintiff's daughter, Kayla Wood, deceased.

13. The relief sought in this complaint is within the jurisdiction of this court.

14. PLAINTIFF PRAYS for judgment for costs of suit; for such relief as is fair, just, and equitable; and for
    a. (1) ☒ compensatory damages
       (2) ☐ punitive damages
    b. The amount of damages is (you *must check (1) in cases for personal injury or wrongful death)*.
       (1) ☒ according to proof
       (2) ☐ in the amount of: $

15. ☐ The paragraphs of this complaint alleged on information and belief are as follows *(specify paragraph numbers)*

Date: November 4, 2002

David P. Dibble, Esq.
(TYPE OR PRINT NAME)

▶ _____
(SIGNATURE OF PLAINTIFF OR ATTORNEY)

RSS-7/8/2004 8:14:57 AM

| SHORT TITLE | SE NUMBER |
|---|---|
| Wood v. Lindstrom, et al. | |

| 1 | CAUSE OF ACTION—General Negligence | Page 4 |
|---|---|---|
| (number) | | |

ATTACHMENT TO [X] Complaint   [ ] Cross-Complaint

*(Use a separate cause of action form for each cause of action.)*

GN-1. Plaintiff *(name):*

alleges that defendant *(name):*

[X] Does ___1___ to ___100___

was the legal (proximate) cause of damages to plaintiff. By the following acts or omissions to act, defendant
negligently caused the damage to plaintiff
on *(date)*   May 25, 2002
at *(place):*   Willow Creek, California

*(description of reasons for liability):*

Defendants were negligently responsible for the death of plaintiff's daughter, Kayla Wood, deceased,
for, inter alia, allowing her to be on and about the Trinity River without a life jacket or other personal
floatation device and for leaving her and failing to render assistance while she was in a condition or
state of peril that defendants were responsible for creating.

Form Approved by the
Judicial Council of California
Effective January 1, 1982
Rule 982.1(3)
Judicial Council Forms for Hotitoca

CAUSE OF ACTION — General Negligence

CCP 425.12

# **EXHIBIT F**

SEP-19-2006  11:26        F⌐ T LEGAL SF                    ⌐   415 626 4138      P.02/03

1 | David P. Dibble, Esq., Bar No. 73938
  | LAW OFFICES OF DAVID DIBBLE
2 | 123 F Street, Suite C
  | Eureka, California 95501
3 | Telephone: (707) 444-9330
  | Fax: (707) 443-0442
4 |
  | Attorney for Plaintiff Clarence Jonathan Wood
5 |

**FILED**

AUG 3 0 2006

SUPERIOR COURT OF CALIFORNIA
COUNTY OF HUMBOLDT

6
7        IN THE SUPERIOR COURT OF THE STATE OF CALIFORNIA
8             IN AND FOR THE COUNTY OF HUMBOLDT
9

10 | Clarence Jonathan Wood,            ) CONSOLIDATED CASE NO. DR020419
11 |                     Plaintiff,     ) Originally Filed as Case No. DR020685
12 | vs.                               ) JUDGMENT AFTER COURT TRIAL
13 | Ralph Lindstrom, et al.,          ) Trial Date:   August 14, 2006
   |                                   ) Time:          9:00 am
14 |                     Defendant.    ) Dept:          3
   |                                   ) Judge:        Hon. Christopher G. Wilson

15
16        This matter came on regularly for Court Trial in Department 3 of the above
17 entitled court, Hon. Christopher G. Wilson presiding, on August 14, 2006, at 9:00 am. Zachary
18 E. Zwerdling, Esq. appeared on behalf of Plaintiff Heidi Collingwood. David P. Dibble, Esq.
19 appeared on behalf of Plaintiff Clarence Jonathon Wood. No appearance was made on behalf of
20 Defendant Kim Lindstrom Holz.
21        Trial was held on the issue of damages for the wrongful death of Kayla Wood
22 only, the issues of liability and causation having been admitted by Defendant in open court at an
23 earlier proceeding. Witnesses were called and testified. Physical evidence was identified and
24 received by the Court. The parties rested and the matter was submitted to the Court for decision
25 at approximately 10:45 am.
26        Having considered all of the evidence in this case, the arguments of counsel, the
27 pleadings, files and records herein, the Court finds in favor of Plaintiffs and against Defendant in
28 the amount of $5,000,000.00. Plaintiffs shall recover costs.

**RECEIVED**

AUG 2 4 2006
DONNA W.
SUPERIOR COURT OF CALIFORNIA
COUNTY OF HUMBOLDT

_____
                Judgment After Court Trial

1    Pursuant to Code of Civil Procedure §632, the Court issued its Statement of

2  Decision orally on the record in the presence of the parties and shall not further set forth it's

3  findings herein.

4         Judgment shall be entered hereon forthwith.

5  DATED:  8/28/06

6

7                                    Hon. Christopher G. Wilson, Judge of the Superior
                                     Court
8

9  APPROVED AS TO FORM                NISSON, PINCIN, SINCLAIR, HILL & PERRINE

DATED:

10                           By: _____

11                                    Larry Hill, Esq., attorneys for Defendant Kim
                                     Lindstrom Holz
12

13  APPROVED AS TO FORM                LAW OFFICES OF ZACHARY E. ZWERDLING

14  DATED:  8/16/06

15                           By: _____

                                     Zachary E. Zwerdling, Esq., attorney for Plaintiff
16                                    Heidi Collingwood.

17

18

19

20

21

22

23

24

25

26

27

28

Judgment After Court Trial                                        2

## Superior Court of California, County of Humboldt

| | | |
|---|---|---|
| **Case Number** | DR020419 | **August 14, 2006** |
| **Case Title** | H. Collingwood v. R. Lindstrom | |

**General CAL: Court Trial: Long Cause**

Christopher G. Wilson, Judge

Clerk: Bonnie J.

Reporter: Connie Webb

Attorney Zachary Zwerdling present for the Plaintiff Heidi Collingwood, who is present, and Attorney David Dibble present for the Plaintiff Jonathan Wood, who is, present.

Attorneys for the Defendants, Kimberly Holz, Pamela Lindstrom and Ralph Lindstrom are not present. The Defendant's are not present.

The following Plaintiff's exhibits are marked for identification:
    PLT. EX. 1-PHOTO OF DECEASED (KAYLA) IN FRAME
    PLT. EX. 2-PHOTO OF DECEASED (KAYLA)
    PLT. EX. 3-LARGE PHOTO OF DECEASED (KAYLA)
    PLT. EX. 4-POSTER OF PHOTOS OF DECEASED (KAYLA)
    PLT. EX. 5-POSTER OF POEMS AND PICTURES OF DECEASED (KAYLA)
    PLT. EX. 6-DVD OF DEPOSITION OF CATALINA NOCON
    PLT. EX. 7-VIDEO OF DECEASED (KAYLA)  BY MORSE MEDIA
    PLT. EX. 8-LARGE PHOTO OF DECEASED (KAYLA) AND FATHER
    PLT. EX. 9-LARGE BLUE POSTER OF PHOTOS OF DECEASED (KAYLA) AS A BABY
    PLT. EX. 10-LARGE POSTER PHOTO OF DECEASED (KAYLA)

9:23 a.m. Plaintiff calls JOYCE FAE COLLINS, sworn and direct examination begins by Attorney Zwerdling.

9:28 a.m. Witness excused.

9:29 a.m. Plaintiff calls DENNIS REINHOLTSEN, sworn and direct examination begins.

9:35 a.m. Witness excused.

9:36 a.m.  Plaintiff calls BRAN COLLINGWOOD, sworn and direct examination begins.

9:44 a.m. Witness excused.

9:45 a.m. Plaintiff calls HEIDI COLLINGWOOD, sworn and direct examination begins.

9:47 a.m. Counsel stipulates return of evidence at conclusion of proceedings.

The following exhibits are received into evidence: PLT. EX. 1, 2, 3, 4. 5, 6 and 7.

9:57 a.m. Witness excused.

9:57 a.m. Attorney Zwerdling rests for plaintiff Heidi Collingwood.

9:58 a.m. Plaintiff calls CLARENCE JONATHAN WOOD, sworn and direct examination begins by Attorney Dibble.

The following Plaintiff's exhibits are received into evidence:  PLT. EX. 8, 9 and 10.

10:10 a.m. Witness excused.

10:10 a.m. Attorney Dibble rests for Plaintiff Jonathan Wood.

10:11 a.m. Closing arguments.

10:16 a.m.  Break to review video and CD.

11:10 a.m. Court reconvenes.  All present as above.

Court makes comments.

Court finds in favor of Plaintiffs.  Judgment in the amount of 5 million dollars, 125 thousand dollars per annum (for forty years).

Exhibits returned to offering parties by stipulation.

Submitted for judgment.

Case Number DR020419
August 14, 2006

# **<u>EXHIBIT G</u>**

# THE
# AMERICAN
# HERITAGE®
# COLLEGE
# DICTIONARY

## THIRD EDITION



HOUGHTON MIFFLIN COMPANY

*Boston • New York*

**154**

**B.M.**

**Boccaccio**



boa constrictor
*Boa constrictor*



boat
Bermuda-rigged sloop

Stress marks:
ˈ (primary);
ˌ (secondary), as in
dictionary (dĭkˈshə-nĕrˌē)

| | |
|---|---|
| ă pat | oi boy |
| ā pay | ou out |
| âr care | oͦo took |
| ä father | oͦo boot |
| ĕ pet | ŭ cut |
| ē be | ûr urge |
| ĭ pit | th thin |
| ī pie | th this |
| îr pier | hw which |
| ŏ pot | zh vision |
| ō toe | ə about, |
| ô paw | item |

---

**B.M.** *abbr.* **1.** Bachelor of Medicine. **2.** Bachelor of Music.
**B.M.E.** *abbr.* **1.** Bachelor of Mechanical Engineering. **2.** Bachelor of Mining Engineering. **3.** Bachelor of Music Education.
**B** movie *n.* See **B picture.**
**BMR** *abbr. Physiol.* Basal metabolic rate.
**B.M.S.** *abbr.* Bachelor of Marine Science.
**B.Mus.** *abbr.* Bachelor of Music.
**BMX** *Sports.* Bicycle motocross.
**Bn.** *or* **bn.** *abbr.* **1.** Baron. **2.** Battalion.
**Bʼnai Bʼrith** (bə-nī′ brĭth′) *n.* A Jewish international service organization. [Heb. *bĕnê bĕrîth,* sons of the covenant.]
**bo·a** (bō′ə) *n.* **1.** Any of various large, nonvenomous, chiefly tropical snakes of the family Boidae, which coil around and suffocate their prey. **2.** A long fluffy scarf made of soft material, such as fur. [ME < Lat. *boa,* a large water snake.]
**Bo·ab·dil** (bō′əb-dēl′, bō′ăb-*thēl*?). d. c. 1527. Last Moorish king of Granada (1482–83 and 1486–92).
**boa constrictor** *n.* A large boa *(Boa constrictor)* of tropical America that kills its prey by constriction.
**Bo·ad·i·ce·a** (bō′ăd-ĭ-sē′ə). See **Boudicca.**
**boar** (bôr, bōr) *n.* **1.a.** An uncastrated male pig. **b.** The adult male of any of several mammals, such as the beaver or raccoon. **2.** The wild boar. [ME *bor* < OE *bār.*]
**board** (bôrd, bōrd) *n.* **1.** A long flat slab of sawed lumber; a plank. **2.** A flat piece of wood or similarly rigid material adapted for a special use. **3.** *Games.* A surface on which a game is played. **4.** The hard cover of a book. **5. boards.** A theater stage. **6.a.** A table, esp. one set for serving food. **b.** Food or meals considered as a whole. **7.** A table at which official meetings are held; a council table. **8.** An organized body of administrators or investigators. **9.** An electrical equipment panel. **10.** *Comp. Sci.* A circuit board. **11.** *Sports.* **a.** A scoreboard. **b.** *Basketball.* A backboard. **c. boards.** The wooden structure enclosing an ice hockey rink. **d.** A diving board. **e.** A surfboard. **12.** *Naut.* The side of a ship. **b.** A centerboard. **13.** *Obsolete.* A border or an edge. — *v.* **board·ed, board·ing, boards.** — *tr.* **1.** To cover or close with boards: *board up a window.* **2.a.** To furnish with meals for pay. **b.** To house where board is furnished. **3.** To enter or go aboard (a vehicle or ship). **4.** *Obsolete.* To approach. — *intr.* To receive meals for pay. — *idiom.* **on board. 1.** Aboard. **2.** On the job. [ME *bord* < OE.]
**board·er** (bôr′dər, bōr′-) *n.* One who boards, esp. one who pays for regular meals or for meals and lodging.
**board·er** (bôr′dər, bōr′-) *n. Sports.* **1.** A person who skis. **2.** One who skateboards. **3.** One who snowboards.
**board foot** *n., pl.* **board feet.** A unit of cubic measure for lumber, equal to one foot square by one inch thick.
**board game** *n. Games.* A game of strategy, such as chess or backgammon, played by moving pieces on a board.
**board·ing house** *also* **board·ing·house** (bôr′dĭng-hous′, bōr′-) *n.* A house where paying guests are provided with meals and lodging.
**boarding school** *n.* A school where pupils are provided with meals and lodging.
**board of education** *n., pl.* **boards of education.** A school board.
**board of trade** *n., pl.* **boards of trade.** An association of bankers and business people to promote common interests.
**board·room** (bôrd′rōōm′, -rŏŏm′, bōrd′-) *n.* The room where the members of a board meet.
**board rule** *n.* A measuring stick for determining board feet.
**board·sail·ing** (bôrd′sā′lĭng, bōrd′-) *n. Sports.* See **windsurfing.** — **board sailor** *n.*
**board·walk** (bôrd′wôk′, bōrd′-) *n.* **1.** A walk made of wooden planks. **2.** A promenade, esp. of planks, along a beach or waterfront.
**boar·fish** (bôr′fĭsh, bōr′-) *n., pl.* **boarfish** *or* **-fish·es.** Any of several marine fishes of the genus *Antigonia,* having a deep flattened body, a projecting snout, and bright red coloring.
**boar·hound** (bôr′hound′, bōr′-) *n.* A large dog, such as the Great Dane, used originally for hunting wild boars.
**Bo·as** (bō′ăz), **Franz.** 1858–1942. German-born Amer. anthropologist who emphasized the systematic analysis of culture and language structures.
**boast¹** (bōst) *v.* **boast·ed, boast·ing, boasts.** — *intr.* To glorify oneself in speech; talk in a self-admiring way. — *tr.* **1.** To speak of with excessive pride. **2.** To possess or own (a desirable feature). **3.** To contain; have. — *n.* **1.** The act or an instance of bragging. **2.** A source of pride. [ME *bosten* < *bost,* a brag.] — **boast′er** *n.* — **boast′ful** *adj.* — **boast′ful·ly** *adv.* — **boast′ful·ness** *n.*
**boast²** (bōst) *tr.v.* **boast·ed, boast·ing, boasts.** To shape or form (stone) roughly with a broad chisel. [?]
**boat** (bōt) *n.* **1.** *Naut.* **a.** A relatively small, usu. open craft of a size that might be carried aboard a ship. **b.** An inland vessel of any size. **c.** A ship or submarine. **2.** A dish shaped like a boat. — *intr.v.* **boat·ed, boat·ing, boats.** *Naut.* **1.** To travel by boat. **2.** To ride a boat for pleasure. — *idiom.* **in the same boat.** In the same situation as another or others. [ME *bot* < OE *bāt.* See **bheid-**\*.]

---

**boat·bill** (bōt′bĭl′) *n.* A tropical American wading bird *(Cochlearius cochlearius)* having a large bill shaped like an inverted boat.
**boat-billed heron** (bōt′bĭld′) *n.* See **boatbill.**
**boat·er** (bō′tər) *n.* **1.** *Naut.* One that drives or rides in a boat, esp. a pleasure craft. **2.** A stiff straw hat with a flat crown.
**boat hook** *n.* A pole with a point and hook at one end used to maneuver logs, rafts, and boats.
**boat·house** (bōt′hous′) *n.* A building at the water's edge in which boats are kept.
**boat·lift** (bōt′lĭft′) *n.* An unofficial system of transporting supplies and people, esp. refugees, by boats or ships. [BOAT + (AIR)LIFT.] — **boat′lift′** *v.*
**boat·load** (bōt′lōd′) *n.* The number of passengers or the amount of cargo that a boat can hold.
**boat·man** (bōt′mən) *n.* One who works on or operates boats. — **boat′man·ship′** *n.*
**boat·swain** *also* **bo's·n** *or* **bos'n** *or* **bo·sun** (bō′sən) *n.* A warrant officer or petty officer in charge of a ship's rigging, anchors, cables, and deck crew. [ME *botswein:* bot, boat; + BOAT + *swein,* mate; see SWAIN.]
**boat·swain's chair** (bō′sənz) *n. Naut.* A short board secured by ropes and used as a seat by sailors when working aloft or over a ship's side.
**boat train** *n.* A train that regularly carries passengers between a city and a port.
**Bo·az** (bō′ăz). In the Bible, the husband of Ruth.
**bob¹** (bŏb) *v.* **bobbed, bob·bing, bobs.** — *tr.* **1.** To hit lightly and quickly; tap. **2.** To cause to move up and down. — *intr.* **1.** To move up and down: *a cork bobbing on the water.* **2.** To grab at floating or hanging objects with the teeth: *bobbed for apples.* **3.** To curtsy or bow. — *n.* **1.** A tap or light blow. **2.** A quick, jerky movement of the head or body. — *phrasal verb.* **bob up.** To appear or arise unexpectedly or suddenly. [ME *bobben.*]
**bob²** (bŏb) *n.* **1.** A small knoblike pendent object, such as a plumb bob. **2.** A fishing float or cork. **3.** A small lock or curl of hair. **4.** A woman's or child's short haircut. **5.** *Printing.* Surgical shortening or reshaping of the nose. **6.** The docked tail of a horse. **7.a.** A bobsled. **b.** A bob skate. — *v.* **bobbed, bob·bing, bobs.** — *tr.* **1.** To fish with a bob. — *tr.* To short or reshape. [ME *bobbe,* cluster of fruit.] — **bob′ber** *n.*
**bob³** (bŏb) *n., pl.* **bob.** *Chiefly British.* A shilling. [?]
**bob·bin** (bŏb′ĭn) *n.* **1.** A spool or reel that holds thread or yarn. **2.** Narrow braid formerly used as trimming. [Fr. *bobine.*]
**bob·bi·net** (bŏb′ə-nĕt′) *n.* A machine-woven net fabric with hexagonal meshes. [BOBBI(N) + NET².]
**bob·bin lace** *n.* A handmade lace made by interlacing thread around small notched pins or bobbins stuck into a pillow.
**bob·ble** (bŏb′əl) *v.* **-bled, -bling, -bles.** — *tr.* To bob up and down. — *tr.* To lose one's grip on (a ball, for example), esp. mentarily. — *n.* A mistake or blunder. [< BOB¹.]
**bob·by** (bŏb′ē) *n., pl.* **-bies.** *Chiefly British.* A police officer. [After Sir Robert Peel, home secretary of England when the Metropolitan Police Force was created in 1829.]
**bobby pin** *n.* A small metal hair clip with the ends pressed tightly together. [< BOB².]
**bobby socks** *also* **bobby sox** *pl.n. Informal.* Ankle socks worn by girls or women. [Poss. < BOB² (influenced by BOBBY).]
**bob·by·sox·er** *also* **bobby sox·er** (bŏb′ē-sŏk′sər) *n. Informal.* A teenage girl.
**bob·cat** (bŏb′kăt′) *n.* A wild cat *(Lynx rufus)* of North America having spotted reddish-brown fur, tufted ears, and a short tail. [BOB(TAIL) + CAT.]
**bob·o·link** (bŏb′ə-lĭngk′) *n.* An American migratory songbird *(Dolichonyx oryzivorus),* the male of which has black, white, and yellowish plumage. Also called regionally *ricebird.* [Imit. of its song.]
**Bo·bruisk** (bə-brōō′ĭsk). A city of S Belorussia SE of Minsk founded in the 16th cent.. Pop. 223,000.
**bob skate** *n. Sports.* An ice skate with two parallel beveled edges. [Poss. BOB(SLED) + SKATE².]
**bob·sled** (bŏb′slĕd′) *Sports. n.* **1.** A long racing sled with steering mechanism controlling the front runners. **2.** A sled made of two shorter sleds joined in tandem. — *intr.v.* these two smaller sleds. [BOB² + SLED.] — **bob′sled′er** *n.*
**bob·stay** (bŏb′stā′) *n. Naut.* A rope or chain used to steady the bowsprit of a ship.
**bob·tail** (bŏb′tāl′) *n.* **1.** A short or shortened tail. **2.** An animal, such as a horse, having a short or shortened tail. **3.** Something that has been cut short or abbreviated. — **bob′tailed′** *adj.*
**bob·white** (bŏb-hwīt′, -wīt′) *n.* A small North American quail *(Colinus virginianus)* having brown plumage with white markings. [Imit. of its call.]
**bo·cac·cio** (bə-kä′chō, -chē-ō′) *n., pl.* **-cios.** A large rockfish *(Sebastes paucispinis)* of American Pacific waters. [Ital. *bocaccio,* ugly mouth, dim. of *bocca,* mouth < Lat. *bucca.*]
**Bo·ca Ra·ton** (bō′kə rə-tōn′). A city of SE FL on the Atlantic Ocean S of Palm Beach. Pop. 61,492.
**Boc·cac·cio** (bō-kä′chē-ō′, -chō′), **Giovanni.** 1313–

Case 4:08-cv-03335-SBA    Document 14    Filed 07/29/2008    Page 47 of 89

weights. — *v.* crabbed, crab·bing, crabs. — *intr.* 1. To hunt or catch crabs. 2. To scurry sideways in the manner of a crab. 3. To drift diagonally or sideways. 4. To direct an aircraft into a crosswind. — *tr.* 1. To direct (an aircraft) partly into a crosswind to eliminate drift. 2. To cause to move or to scurry sideways. — *idiom.* catch a crab. To strike the water with an oar in recovering a stroke or miss it in making one. [ME *crabbe* < OE *crabba*. See **gerbh-**.] — **crab'ber** *n.*

**crab²** (krăb) *n.* 1. A crab apple tree or its fruit. 2. A quarrelsome, ill-tempered person. — *v.* crabbed, crab·bing, crabs. — *intr. Informal.* To find fault; criticize someone or something. — *tr.* 1. *Informal.* To interfere with and ruin; spoil. 2. *Informal.* To find fault with; complain about. 3. To make ill-tempered or sullen. [ME *crabbe*, poss. < *crabbe*, crab (shellfish). See CRAB¹.] — **crab'ber** *n.*

**Crab** (krăb) *n.* See **Cancer.**

**crab apple** also **crab·ap·ple** (krăb'ăp'əl) *n.* 1. Any of several deciduous trees of the genus *Malus*, native to North America and Eurasia. 2. The small tart fruit of such a tree.

**crab·bed** (krăb'ĭd) *adj.* 1. Irritable and perverse in disposition; ill-tempered. 2. Difficult to understand; complicated. 3. Difficult to read. [ME < *crabbe*, crab (influenced by CRAB²). See CRAB¹.] — **crab'bed·ly** *adv.* — **crab'bed·ness** *n.*

**crab·by** (krăb'ē) *adj.* **-bi·er, -bi·est.** *Informal.* Grouchy; ill-tempered. — **crab'bi·ly** *adv.* — **crab'bi·ness** *n.*

**crab·grass** or **crab grass** (krăb'grăs') *n.* Any of certain grasses of the genus *Digitaria*, esp. *D. sanguinalis* or *D. ischaemum*, widely naturalized in North America.

**crab louse** *n.* A sucking louse (*Phthirus pubis*) that generally infests the pubic region and causes severe itching.

**crab·meat** (krăb'mēt') *n.* The edible flesh of a crab.

**crab's eye** (krăbz) *n.* See **rosary pea.**

**crab·stick** (krăb'stĭk') *n.* 1. A stick made of crab apple wood. 2. A crabby, ill-tempered person.

**crab·wise** (krăb'wīz') *adv.* 1. Sideways. 2. In a furtive or circumspect manner; indirectly.

**crack** (krăk) *v.* cracked, crack·ing, cracks. — *intr.* 1. To break or snap apart. 2. To make a sharp snapping sound. 3. To break without complete separation of parts; fissure. 4. To change sharply in pitch or timbre, as from hoarseness or emotion. Used of the voice. 5. To break down; fail: *The defendant's composure began to crack.* 6. To have a mental or physical breakdown. 7. To move or go rapidly. 8. *Chem.* To break into simpler molecules by means of heat. — *tr.* 1. To cause to make a sharp snapping sound. 2. To cause to break without complete separation of parts. 3.a. To break with a sharp snapping sound. See Syns at **break.** b. To crush (wheat, for example) into small pieces. 4. To strike with a sudden sharp sound. 5. *Informal.* a. To break open or into: *crack a safe.* b. To open up or consumption: *crack a book.* c. To break through (an obstacle) in order to win acceptance or acknowledgement. 6. To discover the solution to, esp. after considerable effort. 7. To cause (the voice) to crack. 8. *Informal.* To tell (a joke), esp. on impulse or in an effective manner. 9. To cause to have a mental or physical breakdown. 10. To impair or destroy. 11. To reduce (petroleum) to simpler compounds by cracking. — *n.* 1. A sharp snapping sound, such as the report of a firearm. 2.a. A partial split or break; a fissure. b. A slight narrow space. 3. A sharp resounding blow. 4.a. A mental or physical impairment; a defect. b. A breaking, harshly dissonant vocal tone or sound, as in hoarseness. 5. An attempt or try. 6. A witty or sarcastic remark. 7. A moment; an instant: *at the crack of dawn.* 8. *Slang.* Purified potent cocaine that is smoked through a glass pipe and is considered highly addictive. — *adj.* Excelling in skill or achievement; first-rate: *a crack shot.* — *phrasal verbs.* **crack down.** To act more forcefully to regulate, repress, or restrain. **crack up.** *Informal.* 1. To praise highly: *not the genius he was cracked up to be.* 2.a. To damage or wreck (a vehicle or vessel). b. To wreck a vehicle in an accident. 3. To have a mental or physical breakdown. 4. To experience or cause to experience a great deal of amusement. — *idiom.* **crack the whip.** To behave in a domineering manner; demand hard work from those under one's control. [ME *craken* < OE *cracian*. See **gerə-²*.**]

**crack·brain** (krăk'brān') *n.* A foolish or eccentric person. — **crack'brained'** *adj.*

**crack·down** (krăk'doun') *n.* An act or example of forceful regulation, repression, or restraint: *a crackdown on crime.*

**cracked** (krăkt) *adj.* 1.a. Broken so that fissures appear on the surface: *a cracked mirror.* b. Broken into small or coarse pieces: *cracked corn.* 2. Having a harsh or dissonant tone: *a cracked voice.* 3. *Informal.* Mentally deranged; crazy.

**crack·er** (krăk'ər) *n.* 1. A thin crisp wafer or biscuit, usu. made of unsweetened dough. 2. One that cracks, esp.: a. A firecracker. b. A small cardboard cylinder covered with decorative paper that holds candy or a party favor and pops open. c. The apparatus used in the cracking of petroleum. d. One who makes unauthorized use of a computer, esp. to tamper with data or programs. 3. *Offensive.* Used as a disparaging term for a poor white person of the rural, esp. southeast United States.

**crack·er-bar·rel** (krăk'ər-băr'əl) *adj.* Of or resembling the informal discussions carried on by persons at a country store: *cracker-barrel philosophy.*

**crack·er·jack** (krăk'ər-jăk') also **crack·a·jack** (krăk'ə-) *n. Slang.* Of excellent quality or ability; fine. [Prob. < crack, first-rate + JACK.] — **crack'er·jack'** *n.*

**crack·ers** (krăk'ərz) *adj. Chiefly British.* Insane; mad. [Prob. < CRACKER, firecracker.]

**crack·ing** (krăk'ĭng) *n. Chem.* Thermal decomposition of a complex substance, esp. the breaking of petroleum molecules into shorter molecules to extract low-boiling fractions such as gasoline. — *adj.* Excellent; great. — *adv.* Used as an intensive: *a cracking good show.*

**crack·le** (krăk'əl) *v.* -led, -ling, -les. — *intr.* 1. To make a succession of slight sharp snapping noises. 2. To show liveliness or brilliance. 3. To craze. — *tr.* 1. To crush (paper, for example) with sharp snapping sounds. 2. To craze (china, for example). — *n.* 1. The act or sound of crackling. 2.a. A network of fine cracks on the surface of glazed pottery, china, or glassware. b. Crackleware. [Freq. of CRACK.]

**crack·le·ware** (krăk'əl-wâr') *n.* Glazed pottery or glassware bearing a decorative surface network of fine cracks.

**crack·ling** (krăk'lĭng) *n.* 1. A succession of slight sharp snapping noises. 2. **cracklings.** The crisp bits that remain after rendering fat from meat or frying or roasting the skin, esp. of a pig or a goose. [Sense 2, Du. *krakeling* < obsolete *kraeckelingh* < MDu. *krākelinc* < *krāken*, to crack. See CRACKNEL.]

**crack·ly** (krăk'lē) *adj.* -li·er, -li·est. Likely to crackle; crisp.

**crack·nel** (krăk'nəl) *n.* 1. A hard crisp biscuit. 2. **cracknels.** Crisp bits of fried pork fat; cracklings. [ME *crakenele*, alteration of OFr. *craquelin* < MDu. *krākelinc*, small cake < *krāken*, to crack. See **gerə-²*.**]

**crack·up** or **crack-up** (krăk'ŭp') *n. Informal.* 1. A crash, as of an airplane. 2. A mental or physical breakdown.

**Crac·ow** also **Kra·ków** (krä'kou, krä'kou, -kōō). A city of S Poland on the Vistula R. SSE of Warsaw; national cap. from 1305 to 1595. Pop. 740,300.

**-cracy** *suff.* Government; rule: *meritocracy.* [Fr. *-cratie* < OLat. *-cratia* < Gk. *-kratia* < *kratos*, strength, power. See **kar-*.**]

**cra·dle** (krād'l) *n.* 1. A small low bed for an infant, often furnished with rockers. 2.a. The earliest period of life: *the cradle to the grave.* b. A place of origin; a birthplace: *the cradle of civilization.* 3.a. A framework of wood or steel used to support something. b. A framework used to protect an injured limb. 4. A low flat framework that rolls on casters, used by a mechanic working beneath an automobile. 5. A part of a telephone that contains the connecting switch and which the receiver and mouthpiece unit is supported. 6. A frame projecting above a scythe, used to catch grain as it is cut. b. A scythe equipped with such a frame. 7. A boat-shaped device furnished with rockers, used for washing gold-bearing dirt. — *v.* -dled, -dling, -dles. — *tr.* 1.a. To place or hold in or as if in a cradle. b. To care for or nurture in infancy. c. To hold or support protectively. 2. To reap (grain) with a cradle. 3. To place or support (a ship, for example) in a cradle. 4. To wash (gold-bearing dirt) in a cradle. — *intr.* To lie in or as if in a cradle. [ME *cradel* < OE *cradol.*] — **cra'dler** *n.*

**cradle cap** *n.* A form of dermatitis that occurs in infants and is characterized by heavy, yellow, crusted lesions on the scalp.

**cra·dle·song** (krād'l-sông', -sŏng') *n.* A lullaby.

**craft** (krăft) *n.* 1. Skill in doing or making something, as in the arts; proficiency. 2. Skill in evasion or deception; guile. 3.a. An occupation or trade requiring manual dexterity or skilled artistry. b. The membership of such an occupation or trade; guild. 4. *pl.* **craft.** A boat, ship, or aircraft. — *v.* craft·ed, craft·ing, crafts. 1. To make by hand. 2. To construct (something) in a manner suggesting great care or ingenuity. [ME < OE *cræft.*] — **craft'er** *n.*

**crafts·man** (krăfts'mən) *n.* A man who practices a craft with great skill. — **crafts'man·like'** *adj.* — **crafts'man·ship'** *n.*

**crafts·people** (krăfts'pē'pəl) *n.* Artisans considered as a group.

**crafts·per·son** (krăfts'pûr'sən) *n.* A craftsman or a craftswoman.

**crafts·wom·an** (krăfts'wŏŏm'ən) *n.* A woman who practices a craft with great skill.

**craft union** *n.* A labor union limited in membership to workers engaged in the same craft.

**craft·work** (krăft'wûrk') *n.* Work made or done by craftspeople. — **craft'work'er** *n.*

**craft·y** (krăf'tē) *adj.* -i·er, -i·est. Skilled in or marked by underhandedness, deviousness, or deception. 2. Childishly. Skillful; dexterous. [ME < OE *cræftig*, strong, skillful < *cræft*, skill.] — **craft'i·ly** *adv.* — **craft'i·ness** *n.*

**crag** (krăg) *n.* A steeply projecting mass of rock forming part of a rugged cliff or headland. [ME < Welsh *crag* or Gaelic *creagh.*] — **crag'ged** (krăg'ĭd) *adj.*




cradle
*Top:* 17th-century English oak cradle
*Bottom:* Supporting a boat



crag
Quoddy Head State Park, Maine

crag·gy (krăg'ē) ... ged and un... Craig (crāg), ... producer, ... productions ... Craig·ie (krā ... lexicography ... ford English ... Cra·io·va (kr ... Bucharest; c ... crake (krāk) ... ks. See gerə ... Ralidae, su ... kx. See gerə ... cram (krăm) ... force, press, ... fill too tight ... greedily. 4. ... pending exa ... 2. Informal. ... -n. 1. Ag ... 2. Informal ... commen < ... Cram (krăm), ... designed par ... York City. ... cram·be (krăm ... of the genus ... a useful oil. ... cram·bo (krăm ... which a play ... presented by ... solete cramb ... over) cabbag ... cramp¹ (krămp ... cular contrac ... result of stra ... habitually or ... contractions ... mensuration ... -v. cramped ... of with a cran ... [ME crampe ... cramp² (krămp ... gether; a clan ... straining forc ... part. -tr. ... gether with a ... the physical f ... (the wheels o ... by a short ru ... to read or de ... or prevent fr ... crampe, hook ... cramp·fish (kr ... electric ray. ... cramp iron n. ... both ends, use ... materials used ... cram·pon (krăr ... iron bars for ... 2. A set of sp ... walking on ice ... Cra·nach (krä' ... man painter a ... cran·ber·ry (kr ... (Vaccinium ma ... tart red berrie ... and beverages ... V. oxycoccos. ... crane < MLG ... cranberry bush ... lobum) having ... crane (krān) n. ... family Gruidae ... b. A similar bi ... and having he ... movable boom ... arm. -v. cra ... move with or a ... neck, for exam ... one's neck tow ... attention; hesita ... Crane (krān), (H ... works include ... Crane, Stephen ... Red Badge of ... crane fly n. Any ... of the family T ... cranes·bill (krān ... Cran·ford (krăn ... Pop. 22,624. ... cra·ni·a (krā'nē ...

Inner Heb·ri·des (ĭn′ər hĕb′rĭ-dēz′). See Hebrides.
inner light *n*. In Quaker doctrine, a divine presence believed to act as an enlightening and guiding force in the human soul.
Inner Mon·go·li·a (mŏng-gō′lē-ə, -gōl′yə, mŏn-). See Nei Mongol.
in·ner·most (ĭn′ər-mōst′) *adj*. 1. Situated or occurring farthest within. 2. Most intimate: *innermost feelings.* — *n.* The innermost part.
inner planet *n*. Any of the four planets, Mercury, Venus, Earth, and Mars, whose orbits are closest to the sun.
inner product *n. Math.* See scalar product.
in·ner·sole (ĭn′ər-sōl′) *n*. See insole.
in·ner·spring (ĭn′ər-sprĭng′) *adj*. Having numerous coil springs enclosed by a padded cover: *an innerspring mattress.*
inner tube *n*. A flexible airtight hollow ring, usu. made of rubber, inside a pneumatic tire for holding compressed air.
in·ner·vate (ĭ-nûr′vāt′, ĭn′ər-) *tr.v.* -vat·ed, -vat·ing, -vates. 1. To supply (an organ or a body part) with nerves. 2. To stimulate (a nerve, muscle, or body part) to action. —in′ner·va′tion *n.* — in′ner·va′tion·al (-vā′shə-nəl) *adj*.
in·nerve (ĭ-nûrv′) *tr.v.* -nerved, -nerv·ing, -nerves. To give nervous energy to; stimulate.
In·ness (ĭn′ĭs), George. 1825–94. Amer. painter whose works include *Rainbow after a Storm* (1869).
in·ning (ĭn′ĭng) *n*. 1a. *Baseball.* One of nine periods of a game, in which each team has a turn at bat as limited by three outs. b. Innings. *(used with a sing. v.) Sports.* The period in cricket during which one team is at bat. 2. An opportunity to act or speak out; a chance for accomplishment. Often used in the plural with a singular or plural verb. 3. The reclamation of flooded or marshy land. [ME *innynge,* a getting in < OE *innung,* gerund of *innian,* to put in < *in, in.* See **en**[1].]
inn·keep·er (ĭn′kē′pər) *n*. One that owns or manages an inn or hotel.
in·no·cence (ĭn′ə-səns) *n*. 1. The state, quality, or virtue of being innocent, as: a. Freedom from sin, moral wrong, or guilt through lack of knowledge of evil. b. Guiltlessness of a specific legal crime or offense. c. Freedom from guile, cunning, or deceit; simplicity or artlessness. d. Lack of worldliness or sophistication; naiveté. e. Lack of knowledge or understanding. f. Freedom from harmfulness; inoffensiveness. 2. One that is innocent. 3. *Bot.* See blue-eyed Mary.
in·no·cen·cy (ĭn′ə-sən-sē) *n., pl.* -cies. 1. Innocence. 2. An innocent quality or action.
in·no·cent (ĭn′ə-sənt) *adj*. 1. Uncorrupted by evil, malice, or wrongdoing; sinless. 2a. Not guilty of a specific crime or offense; legally blameless. b. Within, allowed by, or sanctioned by the law; lawful. 3a. Not dangerous or harmful; innocuous. b. Candid; straightforward. 4a. Not experienced or worldly; naive. b. Betraying or suggesting no deception or artifice. 5a. Not exposed to or familiar with something specified; ignorant. b. Unaware. 6. Lacking, deprived, or devoid of something. — *n.* 1. A person, esp. a child, who is free of evil or sin. 2. A simple, guileless, inexperienced, or unsophisticated person. 3. A very young child. [ME *innocent,* from Old French < Lat. *innocēns, innocent- : in-,* not; see **in-**[1] + *nocēns,* p.pr. of *nocēre,* to harm; see **nek-**[1]*.] — *in′no·cent·ly adv.
Innocent III. 1161–1216. Pope (1198–1216) whose reign was marked by the Fourth Crusade.



**Innocent III**
13th-century mosaic

in·noc·u·ous (ĭ-nŏk′yōō-əs) *adj*. 1. Having no adverse effect; harmless. 2. Not likely to offend or provoke to strong emotion; insipid. [< Lat. *innocuus : in-,* not; see **in-**[1] + *nocēre,* to harm; see **nek-**[1]*.] — in·noc′u·ous·ly *adv.* — in·noc′u·ous·ness *n.
in·nom·i·nate (ĭ-nŏm′ə-nĭt) *adj*. 1. Having no name. 2. Anonymous. [LLat. *innōminātus* < Lat. *in-,* not; see **in-**[1] + *nōminātus,* p.part. of *nōmināre,* to name; see NOMINATE.]
innominate bone *n*. See hipbone.
in·no·vate (ĭn′ə-vāt′) *v.* -vat·ed, -vat·ing, -vates. — *tr.* To begin or introduce (something new) for or as if for the first time. — *intr.* To begin or introduce something new. [Fr. *innovare* < Lat. *innovāre, innovāt-,* to renew : *in-,* intensive pref.; see **en**[2] + *novāre,* to make new < *novus,* new; see **newo-**[1]*.] — in′no·va′tor *n.* — in′no·va′to·ry (-və-tôr′ē) *adj*.
in·no·va·tion (ĭn′ə-vā′shən) *n*. 1. The act of introducing something new. 2. Something newly introduced. — in′no·va′tion·al *adj*.
in·no·va·tive (ĭn′ə-vā′tĭv) *adj*. Marked by or given to innovations. — in′no·va′tive·ly *adv.* — in′no·va′tive·ness *n.
Inns·bruck (ĭnz′brook′, ĭns′-). A city of SW Austria WSW of Salzburg; settled c. 1180. Pop. 117,287.
Inns of Court (ĭnz) *pl.n. Law.* 1. The four legal societies in England having the exclusive right to confer the title of barrister on law students. 2. The buildings housing the Inns of Court.
in·nu·en·do (ĭn′yōō-ĕn′dō) *n., pl.* -does. An indirect or subtle, usu. derogatory implication in expression; an insinuation. [< Lat. *innuendō,* by hinting, ablative of *innuendum,* gerund of *innuere,* to nod to : *in-,* to, toward; see **in-**[2] + *-nuere,* to nod.]
In·nu·it (ĭn′yōō-ĭt) *n.* Var. of Inuit.

in·nu·mer·a·ble (ĭ-nōō′mər-ə-bəl, ĭ-nyōō′-) *adj*. Too numerous to be counted; numberless. See Syns at incalculable. — in·nu′mer·a·ble·ness *n.* — in·nu′mer·a·bly *adv.*
in·nu·mer·ate (ĭ-nōō′mər-ĭt, ĭ-nyōō′-) *adj*. Unfamiliar with mathematical concepts and methods. — *n.* One who is innumerate. — in·nu′mer·a·cy *n.*
in·nu·mer·ous (ĭ-nōō′mər-əs) *adj*. Innumerable. [< Lat. *innumerus : in-,* not; see **in-**[1] + *numerus,* number; see NUMBER.]
in·nu·tri·tion (ĭn′nōō-trĭsh′ən, -nyōō-) *n*. Poor nourishment; lack of good nutrition. — in′nu·tri′tious *adj*.
in·ob·ser·vance (ĭn′əb-zûr′vəns) *n*. 1. Lack of heed or attention; disregard. 2. Nonobservance, as of a law or custom. — in′ob·ser′vant *adj*.
in·ob·tru·sive (ĭn′əb-trōō′sĭv) *adj*. Not noticeable; unobtrusive.
in·oc·u·la·ble (ĭ-nŏk′yə-lə-bəl) *adj*. 1. Susceptible to a disease spread by inoculation. 2. That can be used in an inoculation. 3. Transmissible by inoculation. — in·oc′u·la·bil′i·ty *n.*
in·oc·u·lant (ĭ-nŏk′yə-lənt) *n*. See inoculum.
in·oc·u·late (ĭ-nŏk′yə-lāt′) *tr.v.* -lat·ed, -lat·ing, -lates. 1. To introduce a serum, a vaccine, or an antigenic substance into (the body), esp. to produce or boost immunity to a specific disease. 2. To communicate a disease to (a living organism) by transferring its causative agent into the organism. 3. To implant microorganisms or infectious material into (a culture medium). 4. To safeguard as if by inoculation; protect. 5. To introduce an idea or attitude into the mind of. [ME *inoculaten,* to graft a scion < Lat. *inoculāre, inoculāt- : in-,* in; see **in-**[2] + *oculus,* eye, bud; see **okw-**[*].] — in·oc′u·la′tive *adj*. — in·oc′u·la′tor *n.*
in·oc·u·la·tion (ĭ-nŏk′yə-lā′shən) *n*. The act or an instance of inoculating, esp. inoculating the body.
in·oc·u·lum (ĭ-nŏk′yə-ləm) *n., pl.* -la (-lə) or -lums. The material used in an inoculation. [NLat. < Lat. *inoculāre,* to graft a scion. See INOCULATE.]
in·o·dor·ous (ĭn-ō′dər-əs) *adj*. Having no odor.
in·of·fen·sive (ĭn′ə-fĕn′sĭv) *adj*. 1. Giving no offense; unobjectionable. 2. Causing no harm; harmless. — in′of·fen′sive·ly *adv.* — in′of·fen′sive·ness *n.
I·nö·nü (ĭ-nö′nü′, ē′nö-nü′), Ismet. 1884–1973. Turkish politician who served as president (1938–50).
in·op·er·a·ble (ĭn-ŏp′ər-ə-bəl, -ŏp′rə-) *adj*. 1. Not functioning. 2. Unsuitable for surgery. — in·op′er·a·bly *adv.*
in·op·er·a·tive (ĭn-ŏp′ər-ə-tĭv, -ŏp′rə-) *adj*. 1. Not working or functioning. 2. No longer in force, countermanded: *earlier instructions now inoperative.* — in·op′er·a·tive·ness *n.
in·o·per·cu·late (ĭn′ō-pûr′kyə-lĭt) *adj. Biol.* Lacking an operculum. — in·o·per′cu·late *n.
in·op·por·tune (ĭn-ŏp′ər-tōōn′, -tyōōn′) *adj*. Inappropriate or ill-timed; not opportune. — in·op′por·tune′ly *adv.* — in·op′por·tune′ness *n.
in·or·di·nate (ĭn-ôr′dn-ĭt) *adj*. 1. Exceeding reasonable limits; immoderate. See Syns at excessive. 2. Not regulated; disorderly. [ME *inordinat* < Lat. *inōrdinātus,* disordered : *in-,* not; see **in-**[1] + *ōrdinātus,* p.part. of *ōrdināre,* to set in order (< *ōrdō, ōrdin-,* order; see **ar-**[*].)] — in·or′di·nate·ly *adv.* — in·or′di·nate·ness *n.* — in·or′di·na·cy, in·or′di·na·tion *n.
in·or·gan·ic (ĭn′ôr-găn′ĭk) *adj*. 1a. Involving no organic life or the products of organic life. b. Not composed of organic matter. 2. *Chem.* Of or relating to compounds not containing hydrocarbon groups. 3. Not arising in normal growth. 4. Lacking system or structure. — in′or·gan′i·cal·ly *adv.*
in·os·cu·late (ĭn-ŏs′kyə-lāt′) *v.* -lat·ed, -lat·ing, -lates. — *tr.* 1. To unite (blood vessels, nerve fibers, or ducts) by small openings. 2. To make continuous; blend. — *intr.* 1. To open into one another. 2. To unite so as to be continuous; blend. [**in-**[2] + Lat. *ōsculāre, ōsculāt-,* to provide with an opening (< *ōsculum,* dim. of *ōs,* mouth; see **ōs-**[*].)] — in·os′cu·la′tion *n.
in·o·si·tol (ĭn-ō′sĭ-tôl′, -tōl′, ĭ-nō′-) *n*. Any of nine isomeric alcohols, $C_6H_{12}O_6$, esp. one found in plant and animal tissue and classified as a member of the vitamin B complex. [Gk. *inos,* gristle, or *is,* sinew; see **wei-**[*] + *-it(e)*[2] + *-ol.*[1]]
in·o·tro·pic (ĭn′ə-trō′pĭk, -trŏp′ĭk, ĭ′nə-) *adj*. Affecting the contraction of muscle, esp. heart muscle: *an inotropic drug.* [Gk. *is,* in, tendon, sinew; see **wei-**[*] + -TROPIC.]
in·phase (ĭn′fāz′) *adj*. Having the same electrical phase.
in·pos·se (ĭn pŏs′ē) *adv. & adj.* In potential but not in actuality. [Med.Lat. : Lat. *in,* in + Lat. *posse,* to be able.]
in pro·pri·a per·so·na (ĭn prō′prē-ə pər-sō′nə) *adj. Law.* In one's own person, esp. without representation by an attorney. [Med.Lat. *in propriā personā.*]
in·put (ĭn′pŏot′) *n*. 1. Something put into a system or ex-



**Ismet Inönü**

ā pat        oi boy
ā pay        ou out
â care       ŏŏ took
ä father     ŏŏ boot
ĕ pet        ŭ cut
ē be         ûr urge
ĭ pit        th thin
ī pie        th this
î pier       hw which
ŏ pot        zh vision
ō toe        ə about,
ô paw          item

**Stress marks:**
′ (primary);
′ (secondary), as in
dictionary (dĭk′shə-nĕr′ē)

**shin·plas·ter** (shĭn′plăs′tər) *n.* **1.** A piece of paper money issued privately and devalued by poor security or inflation. **2.** A piece of paper money of small value issued by the government, esp. by the U.S. government from 1862 to 1878.

**shin splints** also **shin·splints** (shĭn′splĭnts′) *pl.n.* (*used with a sing. or pl. v.*) Any of various painful conditions of the shins caused by inflammation of the surrounding muscles, frequently occurring among joggers and runners.

**Shin·to** (shĭn′tō) *n.* A religion native to Japan, characterized by veneration of nature spirits and ancestors and by a lack of formal dogma. [J. *shintō* : *shin*, gods (< Chin. *shén*) + *dō*, the Way of Taoism (< Chin. *dào*).] —**Shin′to** *adj.* —**Shin′to·ism** *n.* —**Shin′to·ist** *adj. & n.* —**Shin′to·is′tic** *adj.*

**shin·y** (shī′nē) *adj.* **-i·er, -i·est. 1.** Radiating light; bright. **2.** Bright from reflected light; glistening. **3.** Having a sheen from being rubbed or worn smooth. —**shin′i·ness** *n.*

**ship** (shĭp) *n.* **1.** *Naut. a.* A vessel of considerable size for deep-water navigation. **b.** A sailing vessel having three or more square-rigged masts. **2.** An aircraft or a spacecraft. **3.** The crew of one of these vessels. **4.** One's fortune. — *v.* **shipped, ship·ping, ships.** — *tr.* **1.** *Naut.* To place or receive on board a ship. **2.** To cause to be transported by or as if by ship; send. **3.** To hire (a person) for work on a ship. **4.** *Naut.* To take in (water) over the side of a ship. — *intr. Naut.* **1.** To go aboard a ship; embark. **2.** To travel by ship. **3.** To hire oneself out or enlist for service on a ship. —*phrasal verb.* **ship out. 1.** *Naut.* To accept a position as a crew member on a ship. **2.** To leave, as for a distant place. **3.** To send, as to a distant place. **4.** *Informal.* To quit, resign from, or otherwise vacate a position. [ME < OE *scip.*]

**-ship** *suff.* **1.a.** Quality, state, or condition: *scholarship.* **b.** Something that shows or possesses a quality, state, or condition: *courtship.* **2.** Rank, status, or office: *professorship.* **3.** Art, skill, or craft: *penmanship.* **4.** A collective body: *readership.* [ME < OE *-scipe.*]

**ship biscuit** *n.* See **hardtack.**

**ship·board** (shĭp′bôrd′, -bōrd′) *n.* **1.** *Naut.* The condition of being aboard a ship: *on shipboard.* **2.** *Archaic.* The side of a ship. —*adj. Naut.* Existing or occurring on board a ship.

**ship·borne** (shĭp′bôrn′, -bōrn′) *adj. Naut.* Transported by ship.

**ship·build·ing** (shĭp′bĭl′dĭng) *n.* The art or business of designing and constructing ships. —**ship′build′er** *n.*

**ship canal** *n.* A canal wide and deep enough to serve ships.

**ship fitter** *n.* **1.** One who positions the structural pieces of a ship for riveting and welding. **2.** A sailor in the U.S. Navy who does sheet-metal work and plumbing on board a ship.

**ship·lap** (shĭp′lăp′) *n.* Wooden siding rabbeted so that the edge of one board overlaps the one next to it in a flush joint. —**ship′lapped′** *adj.*

**ship·load** (shĭp′lōd′) *n.* The amount a ship can carry.

**ship·man** (shĭp′mən) *n. Naut.* **1.** A sailor. **2.** A shipmaster.

**ship·mas·ter** (shĭp′măs′tər) *n. Naut.* The officer in command of a merchant ship.

**ship·mate** (shĭp′māt′) *n. Naut.* A sailor serving on the same ship as another.

**ship·ment** (shĭp′mənt) *n.* **1.** The act or an instance of shipping goods. **2.** A quantity of cargo that is shipped together.

**ship of the line** *n., pl.* **ships of the line.** *Naut.* A warship large enough to take a position in the line of battle.

**ship·per** (shĭp′ər) *n.* One that consigns or receives goods for transportation.

**ship·ping** (shĭp′ĭng) *n.* **1.** The act or business of transporting goods. **2.** The body of ships belonging to one port, industry, or country, often referred to in aggregate tonnage. **3.** Passage or transport on a ship.

**shipping clerk** *n.* One who is employed to prepare, pack, receive, or record shipments of goods.

**ship·rigged** (shĭp′rĭgd′) *adj. Naut.* Rigged with three or more masts and square sails.

**ship·shape** (shĭp′shāp′) *adj.* Orderly and neat; tidy. See Syns at **neat.** [< obsolete *shipshapen,* arranged as a ship should be : *ship* + *shapen,* p.part. of *shape.*] —**ship′shape′** *adv.*

**ship·side** (shĭp′sīd′) *n.* The area of a dock adjacent to a ship.

**ship's papers** (shĭps) *pl.n. Naut.* The documents, such as license, logbook, or bills of lading, that a ship must carry under international law and that must be shown on inspection.

**ship·way** (shĭp′wā′) *n.* **1.** The structure supporting a ship during construction or in dry dock. **2.** See **ship canal.**

**ship·worm** (shĭp′wûrm′) *n.* Any of various wormlike marine mollusks of the genera *Teredo* and *Bankia,* having rudimentary bivalve shells with which they bore into wood, esp. the submerged timbers of ships and wharves.

**ship·wreck** (shĭp′rĕk′) *n.* **1.** *Naut. a.* The destruction of a ship, as by storm. **b.** The remains of a wrecked ship. **2.** A complete failure or ruin. — *tr.v.* **-wrecked, -wreck·ing, -wrecks. 1.** *Naut. a.* To cause (a ship) to be destroyed. **b.** To cause (one on a ship) to suffer shipwreck. **2.** To ruin utterly.

**ship·wright** (shĭp′rīt′) *n.* One that builds or repairs ships.

**ship·yard** (shĭp′yärd′) *n.* A yard where ships are built or repaired.



**Shiva**
11th- to 12th-century
Indian bronze

**Shi·ras** (shī′rəs), George. 1832–1924. Amer. jurist; assoc. justice of the U.S. Supreme Court (1892–1903).

**Shi·raz** (shē-räz′). A city of SW-central Iran SSE of Tehrān. It has long noted for its carpets and metalwork. Pop. 800,000.

**shire** (shīr) *n.* **1.** A former administrative division of Great Britain, equivalent to a county. **2.** Often **Shire.** A Shire horse. [ME < OE *scīr,* official charge, administrative district.]

**Shire horse** *n.* A large, powerful draft horse first bred in England, having long hair that grows from the knee and hock.

**shire town** *n.* *Chiefly British.* See **county town.**

**shirk** (shûrk) *v.* **shirked, shirk·ing, shirks.** — *tr.* To avoid or neglect (a duty or responsibility). — *intr.* To avoid work or duty. [Perh. < Ger. *Schurke,* scoundrel.] —**shirk′er** *n.*

**Shir·ley** (shûr′lē), **William.** 1694–1771. British governor of Massachusetts (1741–49 and 1753–56).

**Shirley poppy** *n.* A variety of the corn poppy with pink, crimson, or scarlet flowers. [After *Shirley,* district in SE England.]

**shirr** (shûr) *tr.v.* **shirred, shirr·ing, shirrs. 1.** To gather (cloth) into decorative rows by parallel stitching. **2.** To cook (shelled eggs) by baking until set. [?]

**shirt** (shûrt) *n.* **1.** A garment for the upper part of the body, typically having a collar, sleeves, and a front opening. **2.** An undershirt. **3.** A nightshirt. —*Idioms.* **keep (one's) shirt on.** *Slang.* To remain calm. **lose (one's) shirt.** *Slang.* To lose one has. [ME *shirte* < OE *scyrte,* skirt. See **sker-¹.**]

**shirt·dress** also **shirt-dress** (shûrt′drĕs′) *n.* A dress tailored like a shirt with a collar and buttons down the front.

**shirt·ing** (shûr′tĭng) *n.* Fabric suitable for making shirts.

**shirt·sleeve** (shûrt′slēv′) *n.* **1.** The sleeve of a shirt. **2. shirtsleeves.** The state of wearing no outer garment over one's shirt. —*adj.* **1.** Also **shirt-sleeved** (-slēvd′). Dressed without a coat. **2.** Also **shirtsleeves.** Calling for the removal of a coat or jacket. **3.** Also **shirtsleeves.** Marked by plainness or straightforwardness.

**shirt·tail** (shûrt′tāl′) *n.* **1.** The part of a shirt that extends below the waist, esp. in the back. **2.** A brief addition at the end of a newspaper article. —*adj.* **1.** Very young; *shirttail kids.* **2.** Of little value; inadequate or small.

**shirt·waist** (shûrt′wāst′) *n.* **1.** A woman's blouse or bodice styled like a tailored shirt. **2.** See **shirtdress.**

**shirt·y** (shûr′tē) *adj.* **-i·er, -i·est.** *Chiefly British.* Ill-tempered; angry. [Prob. < to *get someone's shirt out,* to annoy, or to *keep one's shirt on,* to keep from being annoyed.]

**shish ke·bab** also **shish ke·bob** or **shish ka·bob** (shĭsh′ kə-bŏb′) *n.* A dish consisting of pieces of seasoned meat and sometimes vegetables roasted on skewers and served with condiments. [Armenian *shish kabab* < Turk. *şiş kebabı* : *şiş,* skewer + *kebap,* roast meat.]

**shit** (shĭt) *Obscene.* — *v.* **shit** also **shat** (shăt), **shit·ting, shits.** — *intr.* To defecate. — *tr.* **1.** To defecate in. **2.** To make a fool of. — *intr.* **1.** Excrement. **2.** The act or an instance of defecating. **3. shits.** Diarrhea. Used with *the.* **4a.** Something considered disgusting, shabby, foolish, or otherwise unacceptable. **b.** A person regarded as mean or contemptible. **5.** A narcotic or an intoxicant, such as heroin. **6.** Things; stuff. **7.** Foolishness; nonsense. **8.** Trouble or difficulty. — *interj.* Used to express surprise, anger, or extreme displeasure. [ME *shiten* < OE *scītan.* See **skei-².**]

**shit-list** also **shit list** (shĭt′lĭst′) *n. Obscene.* A list of persons who are strongly disapproved of.

**shit·tah** (shĭt′ə) *n.* A tree, probably a species of acacia, mentioned frequently in the Bible. [Heb. *šiṭṭâ.*]

**shit·ty** (shĭt′ē) *adj.* **-i·er, -i·est.** *Obscene.* **1.** Of inferior quality; highly inferior. **2.** Contemptible; despicable. **3.** Unfortunate; unpleasant. **4.** Uncomfortable; unhappy; miserable. **5.** Incompetent; inept. **6.** Trivial; insignificant.

**shiv** (shĭv) *n. Slang.* A knife, razor, or other sharp weapon, esp. one used as a weapon. [Prob. Romany *chiv,* blade.]

**shiv·a** also **shiv·ah** or **shib·ah** (shĭv′ə) *n. Judaism.* The seven-day period of formal mourning observed after the burial of a close relative. [Yiddish *shive* < Heb. *šib'â,* seven.]

**Shi·va** (shē′və) also **Si·va** (shē′və, sē′-). *n. Hinduism.* One of the principal Hindu deities, worshiped as the destroyer and restorer of worlds and in numerous other contrasting forms. [Skt. *śivaḥ* < *śiva-,* auspicious, dear.] —**Shi′va·ism** *n.* —**Shi′va·ist** *n.*

**shiv·a·ree** (shĭv′ə-rē′, shĭv′ə-rē′) *n. Midwestern & Western U.S.* A noisy mock serenade for newlyweds; charivari. Also called regionally **belling, horning, serenade.** [Var. of CHARIVARI.]

**Regional Note:** *Shivaree* is the most common American regional form of *charivari,* a French word probably borrowed from French traders and settlers along the Mississippi River, was well established in the United States by the 19th century. The word *shivaree* is especially common along and west of the Mississippi River, giving it an unusual north-south dialect boundary. Some regional equivalents are used in the Northeast: Pennsylvania, West Virginia, and western New York use *belling;* New York, Rhode Island, and western New England use *horning;* and *serenade,* used chiefly in the South Atlantic and Gulf states.

**shiv·er¹** (shĭv′ər) *v.* **-ered, -er·ing, -ers.** —

ice of an owl. **4.** to turn. See •ty (-ĕl′ĭ-tē),

oetic compo- trical compo- **2.** Metrical or try. **3a.** The book of verse • merit. **5.** A blank verse. **v** in the Bible. sify. [ME *vers* < p.part. of

amiliarize by

r experience; languages. • of an angle ssess (sĭng) •

of an angle •nsl. of NLat., of *vertere,* to

iort sentence < Lat. *versi-*

d (-kŭl′ərd) Changing in to turn; see

-fles (-fīz′), . **2.** To treat *ffen* < OFr. ai + *-ficāre,*

ntraction of

one point of • lation from n of the en- variation of work of art adic. **3.** Ma- a desirable such as the ct of turning , of *vertere,*

1 page of a to the recto 3), (with the s, p.part. of

s equivalent Werst, both

f *versus* the ith. [ME < re, to turn.

vegetation forest law. \N, fem. of

) or -bras. the spinal 2•.] ating to, or g of verte- ly adv.

backbone rates or a rtebrata, a bludes the l of which and a dis- ving joints

egments n.:

:/).] **1.** The mountain top of the apparent

**very low frequency** *n.* A band of radio frequencies falling be- tween 3 and 30 kilohertz.

**Ver·y pistol** (vĕr′ē, vĭr′ē) *n.* A pistol used for firing colored signal flares. [After Edward Wilson *Very* (1847–1910), Amer. naval officer.]

**Ve·sa·li·us** (vĭ-sā′lē-əs, -zā′-), **Andreas.** 1514–64. Flemish anatomist considered the founder of modern anatomy.

**ve·si·ca** (və-sī′kə, -sē′-) *n., pl.* **-cae** (-kē, -sē). A bladder, esp. the urinary bladder or the gallbladder. [Lat. *vēsīca.*] —**ves′- i·cal** (vĕs′ĭ-kəl) *adj.*

**ves·i·cant** (vĕs′ĭ-kənt) *n.* A blistering agent, esp. mustard gas, used in chemical warfare. —*adj.* Causing blisters.

**ves·i·cate** (vĕs′ĭ-kāt′) *tr. & intr.v.* **-cat·ed, -cat·ing, -cates.** To blister or become blistered. [NLat. *vēsīcāre, vēsīcāt-* < Lat. *vēsīca,* bladder, blister.] —**ves′i·ca′tion** *n.*

**ves·i·ca·to·ry** (vĕs′ĭ-kə-tôr′ē, -tōr′ē) *adj.* Vesicant. —*n., pl.* **-ries.** A vesicant.

**ves·i·cle** (vĕs′ĭ-kəl) *n.* **1.** A small bladderlike cell or cavity. **2.** *Anat.* A small sac or cyst, esp. one containing fluid. **3.** *Pathol.* A serum-filled blister formed in or beneath the skin. **4.** *Geol.* A small cavity formed in volcanic rock by entrap- ment of a gas bubble during solidification. [ME < OFr. *ve- sicule* < Lat. *vēsīcula,* dim. of *vēsīca,* bladder, blister.]

**ve·sic·u·lar** (və-sĭk′yə-lər, və-) *adj.* **1.** Of or relating to ves- icles. **2.** Composed of or containing vesicles. **3.** Having the form of a vesicle. —**ve·sic′u·lar·ly** *adv.*

**vesicular exanthema** *n.* An acute, highly infectious viral dis- ease of swine characterized by formation of vesicles on the snout, the mucous membranes of the mouth, and the feet.

**vesicular stomatitis** *n.* An acute viral disease of cattle, swine, and horses, transmitted by insects and having symptoms re- sembling those of vesicular exanthema.

**ve·sic·u·late** (və-sĭk′yə-lāt′, və-) *tr. & intr.v.* **-lat·ed, -lat- ing, -lates.** To make or become vesicular. —*adj.* (-lĭt, -lāt′). Full of or bearing vesicles; vesicular. —**ve·sic′u·la′tion** *n.*

**Ves·pa·sian** (vĕs-pā′zhən, -zhē-ən). A.D. 9–79. Emperor of Rome (69–79) who reformed the army.

**ves·per** (vĕs′pər) *n.* **1.** A bell that summons worshipers to vespers. **2. Vesper.** The evening star, esp. Venus. **3.** *Archaic.* Evening. [ME, evening star < Lat., evening. See **wes-pero-**.]

**ves·pers** also **ves·pers** (vĕs′pər-əl) *Eccles.* —*n.* **1.** A book containing the vespers liturgy. **2.** A covering used to protect an altar cloth. —*adj.* Of or relating to vesper or vespers.

**ves·pers** also **Ves·pers** (vĕs′pərz) *pl.n.* (used with a sing. or pl. v.) *Eccles.* **1a.** The sixth of the seven canonical hours. **b.** The evening office of many Western Christian churches. **c.** The time of day appointed for this service. **2.** Evening Prayer. [Ob- solete Fr. *vespres* < OFr. < Med.Lat. *vesperās,* evening ser- vice < Lat., accusative pl. of *vespera,* evening, var. of *vesper.* See **VESPER.**]

**vesper sparrow** *n.* A North American sparrow (*Pooecetes gramineus*) having white markings on its outer tail feathers.

**ves·per·til·i·o·nid** (vĕs′pər-tĭl′ē-ə-nĭd) *n.* Any of various widely distributed insect-eating bats of the family Vespertili- onidae, characterized by a long tail. [< NLat. *Vespertilī- onidae,* family name < *Vespertiliō, Vespertiliōn-,* type genus < Lat. *vespertiliō,* bat < *vesper,* evening. See **wes-pero-**.] —**ves′per·til′i·o·nid** *adj.*

**ves·per·tine** (vĕs′pər-tīn′) also **ves·per·ti·nal** (vĕs′pər-tī′- nəl) *adj.* **1.** Of, relating to, or occurring in the evening. **2.** *Bot.* Opening or blooming in the evening. **3.** *Zool.* Becoming active in the evening, as bats and owls; crepuscular. [Lat. *vespertinus* < *vesper,* evening. See **VESPER.**]

**ves·pi·ar·y** (vĕs′pē-ĕr′ē) *n., pl.* **-ies.** A nest or colony of wasps or hornets. [Lat. *vespa,* wasp + (AP)IARY.]

**ves·pid** (vĕs′pĭd) *n.* Any of various widely distributed social insects of the family Vespidae, which includes certain wasps and yellow jackets. [< NLat. *Vespidae,* family name < *Vespa,* type genus < Lat. *vespa,* wasp.] —**ves′pid** *adj.*

**ves·pine** (vĕs′pīn′) *adj.* Of, relating to, or resembling a wasp. [< Lat. *vespa,* wasp.]

**Ves·puc·ci** (vĕs-pōō′chē, -pyōō′-), **Amerigo.** Latin name Americus Vespucius. 1454–1512. Italian explorer of the South American coast. America was named in his honor.

**ves·sel** (vĕs′əl) *n.* **1.** A hollow utensil, such as a cup, vase, or pitcher, used as a container, esp. for liquids. **2a.** *Naut.* A craft, esp. one larger than a rowboat, designed to navigate on water. **b.** An airship. **3.** *Anat.* A duct, canal, or other tube that contains or conveys a body fluid: *a blood vessel.* **4.** *Bot.* One of the tubular conductive structures of xylem, consisting of dead cylindrical cells attached end to end and connected by perforations. **5.** A person seen as the agent or embodiment, as of a quality: *a vessel of mercy.* [ME < OFr. < Lat. *vāscel- lum,* dim. of *vas, vasculum,* dim. of *vās,* vessel.]

**vest** (vĕst) *n.* **1.** A sleeveless garment, often having buttons down the front, worn usu. over a shirt or blouse. **2.** A waist- length sleeveless garment worn for protection: *a thick down vest.* **3.** A fabric trim worn to fill in the neckline of a woman's garment; a vestee. **4.** *Chiefly British.* An undershirt. **5a.** *Ar- chaic.* Clothing; raiment. **b.** Obsolete. An ecclesiastical vest- ment. —*v.* **vest·ed, vest·ing, vests.** —*tr.* **1.** To place (au- thority, property, or rights, for example) in the control of a

**Usage Note:** In general usage *very* is not used alone to modify a past participle. Thus we may say of a book, for example, that it has been *very much praised* but not that it has been *very praised.* However, many past participle forms do double duty as adjectives, in which case modification by a bare *very,* or by analogous adverbs such as *quite,* is accept- able: Where can be no objection to phrases such as *a very celebrated singer* or *a very polished performance.* In some cases there is disagreement as to whether a particular parti- ciple can be used properly as an adjective. What is more, some participles allow treatment as adjectives in one sense but not another: one may speak of *a very inflated reputation,* for ex- ample, but not, ordinarily, of *a very inflated balloon.* As a rule, there is no sure way to tell which participles may be modified by a bare *very*—syntactic tests such as the use of the participle as an attributive adjective will themselves yield dif- ferent judgments for different speakers—and writers must trust their ears. When in doubt, the use of *very much* is gen- erally the safer alternative.



**vesper sparrow**
*Pooecetes gramineus*



**Amerigo Vespucci**
Portrait by
an unknown artist



**vest**

ă pat     oi boy
ā pay     ou out
âr care   ŏŏ took
ä father  ōō boot
ĕ pet     ŭ cut
ē be      ûr urge
ĭ pit     th thin
ī pie     th this
îr pier   hw which
ŏ pot     zh vision
ō toe     ə about,
ô paw        item

Stress marks:
′ (primary);
′ (secondary), as in
dictionary (dĭk′shə-nĕr′ē)



# **<u>EXHIBIT H</u>**

7-13-04; 8:21AM;                                           ;3                    # 3/ 14

Page 3 of 14 Received on 7/13/2004 8:28:19 AM [US Mountain Standard Time]

# Scottsdale Indemnity Company

Home Office: One Nationwide Plaza • Columbus, Ohio 43215
Administrative Office: 8877 N Gainey Center Drive • Scottsdale, Arizona 85258
1-800-423-7675
A STOCK COMPANY

## PERSONAL UMBRELLA LIABILITY POLICY

Part Two. This Declarations page with "Policy Provisions - Part One" completes the Policy.

| DECLARATIONS | |
|---|---|
| | Policy No. **PUI 0020229** |

**Item 1.** Insured's **RALPH L. & PAMELA W. LINDSTROM06123B**
Name and **2801 MOORE AVE.**
Mailing **EUREKA        CA 95501**
Address

Producer's **PENFOLD-LEAVITT INS AGENCY INC**
Name and **P.O. BOX 1366**
Mailing **EUREKA        CA 95501**
Address

**Item 2.** Policy Period: (Mo. Day Yr.)
From: **05/31/2001**  To: **05/31/2002** Term:  **365 Days**      Prior Policy:
12:01 A.M., standard time at the address of the named insured as stated herein.        G/A No.: **04081**

**Item 3.** The occupation of the insured is: **CONTRACTOR**                   Program No.:

**Item 4.** Location of Coverage - if different than mailing address above.
**See Schedule of Underlying**

Insurance is afforded for Bodily Injury, Personal Injury, and Property Damage Liability. Uninsured Motorists Coverage, subject to the limits of the Company's liability (as indicated in Item 5 of the Declarations) in excess of the retained limit (as indicated in Item 6 of the Declarations) or underlying limit (as indicated in Item 7 of the Declarations).

**Item 5.** Limits of Liability

(a) Bodily Injury, Personal Injury, and Property Damage Liability Coverage    $  **1,000,000** each occurrence
(b) Uninsured Motorists Coverage                                             $     **25,000** each accident

**Item 6.** Retained Limit (Self-Insured Retention)

(a) Bodily Injury, Personal Injury, and Property Damage Liability Coverage    $  **None**
(b) Uninsured Motorists                                                       See Insuring Agreement II

**Item 7.** Schedule of Underlying Insurance
It is agreed by the insured that insurance policies providing the following coverage (1) are in force and will be maintained in force (whether collectible or not) for at least the minimum underlying limits of liability stated hereafter; (2) insure all automobiles owned, or leased by or regularly furnished to the insured; (3) insure all premises owned, leased by, or leased to the insured; (4) insure all watercraft owned by the insured.

| TYPE OF COVERAGE | MINIMUM UNDERLYING LIMITS | |
|---|---|---|
| (a) Comprehensive Personal Liability or Homeowner's<br>See Schedule of Underlying | Bodily Injury and Property Damage Liability<br>or both combined | $  ,000 each occurrence |
| (b) Automobile Liability<br>See Schedule of Underlying | Bodily Injury Liability | $  ,000 each person<br>$  ,000 each occurrence |
| | Property Damage Liability<br>or | $  ,000 each occurrence |
| | Combined Single Limit<br>Bodily Injury and Property Damage Liability | $  ,000 each occurrence |
| (c) Watercraft Liability<br>Excluded | Watercraft with inboard or inboard/outboard power greater than 50 horsepower, outboard power greater than 25 horsepower and sailboats (including auxiliary) 26 feet or more in length. | $  ,000 each occurrence or the amount insured on the hull, whichever is greater |

| Endorsements forming a part of this policy (designated by Endorsement number) | | |
|---|---|---|
| PEL-100 (12-92) PL-U-1 (10-92) PL-U-6 (10-92) PL-U-210 (10-92)<br>PL-U/A-4 (6-00) | Total Premium | $  320.00 |
| | Taxes (if any) | $ |
| | Fully Earned Policy Fee | $  30.00 |
| | | $ |
| | Total Policy Premium | $  350.00 |

NE 1/20/05

**THIS IS A TRUE AND CERTIFIED COPY**    Dated at **06/15/2001**  Countersigned by
DEC 001 (2-01)                          -GENERAL AGENT  Licensed Resident Agent or Authorized Representative

Tillie A. Wilson



## Scottsdale Indemnity Company

Home Office Address:
One Nationwide Plaza • Columbus, Ohio 43215

Administrative Office:
8877 North Gainey Center Drive • Scottsdale, Arizona 85258

A STOCK COMPANY

# PERSONAL EXCESS LIABILITY

## YOUR PERSONAL UMBRELLA POLICY

PEL-100 (12-92)

# Scottsdale Indemnity Company

A Stock Insurance Company, herein called the Company

## PERSONAL EXCESS LIABILITY POLICY
## PART ONE

This is not a complete and valid contract without an accompanying DECLARATIONS PAGE, "Part Two," signed by an authorized representative of the company.

SCOTTSDALE INDEMNITY COMPANY, hereinafter called the Company, in consideration of the payment of the premium, in reliance upon the statements in the Declarations made a part hereof, and subject to all of the terms of this policy, agrees with the named insured as follows:

### I.   INSURING AGREEMENTS

#### COVERAGES

Coverage A – Excess Bodily Injury, Personal Injury and Property Damage Liability.

The Company will pay on behalf of the insured the amount of ultimate net loss, which the insured becomes legally obligated to pay:

1. in excess of the underlying limits (whether collectible or not) because of bodily injury, personal injury, or property damage to which this policy applies, caused by an occurrence; or

2. in excess of the retained limit (self-insured retention) because of bodily injury, personal injury, or property damage to which this policy applies, caused by an occurrence which is not covered by or which is not required to be covered by the underlying insurance.

Coverage B – Excess Uninsured Motorists Insurance

The Company will pay those sums which the insured or his legal representative shall become legally entitled to recover as damages because of bodily injury which is covered by the Uninsured Motorists Insurance (including Underinsured Motorists) of the Automobile Liability policy scheduled in Item 7(b) of the Declarations, less the applicable limits of liability of such Uninsured Motorists Insurance.

### II.   LIMITS OF LIABILITY

Regardless of the number of:

(a)  insureds under this policy;

(b)  persons or organizations that sustain injury or damages;

(c)  claims made or suits brought;

(d)  vehicles covered under this policy;

(e)  vehicles involved in an accident; or

(f)  coverages under this policy;

the Company's liability is limited as follows:

1. The "each occurrence" limit of liability set forth in Item 5(a) of the Declarations is the total liability of the Company for the sum of:

   (i)  all ultimate net loss under Coverage A; and

   (ii)  all damages under Coverage B.

2. Subject to 1. above, the "each accident" limit of liability set forth in Item 5(b) of the Declarations is the total liability of the Company for damages under Coverage B.

For the purpose of determining the limit of the Company's liability, all bodily injury, personal injury, and property damage arising out of the continuous or repeated exposure to substantially the same general conditions, shall be considered as arising out of one occurrence.

### III.   DEFENSE AND SETTLEMENT

A. With respect to occurrences which are covered under Coverage A of this policy but which are not covered or required to be covered by the underlying insurance, the Company, if no other insurer has an obligation to do so, shall defend any suit against the insured seeking damages on account of bodily injury, personal injury, or property damage, even if any of the allegations of the suit are groundless, false, or fraudulent; and the Company shall have the right to make such investigation and settlement of any claims or suit as it deems expedient.

B. Except as specifically provided under A. above, the Company shall have no duty or obligation to assume the responsibility for the investigation, settlement, or defense of:

1. any claim made or suit brought against the insured under Coverage A; or

2. any claim made or suit brought by or on behalf of the insured under Coverage B;

but the Company shall have the right and shall be given the opportunity to investigate and to be associated in the control of any claim or suit which may, in the Company's opinion, create liability on the part of the Company under the terms of this policy.

C. The Company shall not be obligated to pay any claim or judgment or to defend any suit after the applicable limit of the Company's liability has been exhausted by the payment of judgments or settlements.

## IV. SUPPLEMENTARY PAYMENTS

A. The Company will pay, in addition to the applicable limit of liability:

1. All expenses incurred by the Company; and

2. Reasonable expenses incurred by the insured at the Company's request, other than loss of earnings.

B. With respect to occurrences covered under Coverage A, the Company will pay, in addition to the applicable limit of liability;

1. All costs taxed against the insured in any suit defended by the Company's portion of any judgment thereon which accrues after entry of the judgment and before the Company has paid or tendered or deposited in court that part of the judgment which does not exceed the limit of the Company's liability thereon;

2. Premiums on appeal bonds required in any such suit, premiums on bonds to release attachments in an amount not in excess of the applicable limit of liability of this policy, and the cost of bail bonds required of the insured because of accident or traffic law violation arising out of the use of any vehicle to which this policy applies, not to exceed $250 per bail bond, but the Company shall have no obligation to apply for or furnish any such bonds;

provided, however, the Company shall have no obligation to pay Supplementary Payments which are payable under the underlying insurance.

C. In any country where the Company may be prevented by law or otherwise from carrying out this agreement, the Company shall pay any expense incurred with its written consent in accordance with this agreement.

## V. POLICY PERIOD—TERRITORY

A. This policy applies under Coverage A to occurrences happening during the policy period anywhere in the world.

B. This policy applies under Coverage B to bodily injury which is sustained during the policy period within the policy territory defined in the Uninsured Motorists Insurance of the Automobile Liability Policy scheduled in Item 7(b) of the Declarations.

## VI. PERSONS INSURED

A. Each of the following is an insured under Coverage A to the extent set forth below:

1. With respect to automobiles or watercraft to which this policy applies:

a. The named insured, while using any automobile or watercraft;

b. Any relative, which using any automobile or watercraft not owned by or furnished for the regular use of the named insured or any relative, provided such use is with the owner's permission and for the purpose the owner intended;

c. Any of the following, while using the automobile or watercraft owned by or in the care of the named insured;

(i) Any person using an automobile or watercraft with the permission of the named insured and for the purpose intended by the named insured;

(ii) Any person or organization legally responsible for the use of such automobile or watercraft, but only if no other insurance of any kind is available to that person or organization for such liability.

None of the following is an insured under this subsection (c):

(i) Any person or organization that is either employed or engaged in the business of selling, repairing, servicing, renting, towing, transporting,

leasing, parking, storing automobiles or watercraft;

(ii) The owner or lessee (including any agent or employee thereof) of an automobile or watercraft in the care of the named insured, but this provision does not apply to the named insured or any relative;

2. With respect to animals to which this policy applies:

   a. The named insured;

   b. Any relative;

   c. Any other person or organization (other than those providing professional animal care services) legally responsible for animals owned by the named insured or any relative, but only if no other insurance of any kind is available to that person or organization for such liability;

3. Except as provided under (1) and (2) above:

   a. The named insured;

   b. Any relative;

   c. Any person under the age of 21, other than a relative, who is in the care of the named insured or a relative.

B. Any person is an insured under Coverage B who qualifies under the "Persons Insured", "Who Is Insured", or equivalent provisions of the Uninsured Motorists Insurance of the Automobile Liability Policy scheduled in Item 7(b) of the Declarations.

## EXCLUSIONS

A. This policy does not apply under Coverage A:

1. To any obligation for which the insured or any carrier as his insurer may be held liable under any workers' compensation, unemployment compensation or disability benefits law, or under any similar law;

2. To bodily injury or property damage which is expected or intended from the standpoint of the insured, but this exclusion does not apply to bodily injury resulting from the use of reasonable force to protect persons or property;

3. To property damage to:

   a. Property owned by the insured;

b. Aircraft rented to, used by, or in the care, custody, or control of the insured; or

c. Any property rented to, utilized or occupied by, or in the care, custody, or control of the insured, to the extent that the insured has otherwise provided insurance therefor;

4. To bodily injury or property damage arising out of the ownership or use of any aircraft;

5. To bodily injury or property damage occurring away from the premises owned by, rented to, or controlled by the named insured and arising out of the ownership or use of any watercraft owned by the insured, but this exclusion does not apply if minimum primary limits for such watercraft are specified in Item 7(c) of the Declarations and such coverage is in force on the date of the occurrence for which claim is made hereunder;

6. To bodily injury, personal injury, or property damage arising out of the rendering of or failure to render professional services by the insured or by any person for whose acts or omissions the insured is legally responsible;

7. To bodily injury, personal injury, or property damage arising out of:

   a. Business pursuits of the insured; or

   b. Property at or from which a business is conducted by the insured;

8. To bodily injury or property damage arising out of the ownership or use of any automobile or other motor vehicle in the conduct of the insured's business, but this exclusion does not apply to a private passenger automobile registered to the named insured and covered under an Automobile Liability Policy scheduled in Item 7(b) of the Declarations. As used in this exclusion, "Private Passenger Automobile" means:

   a. a motor home; or

   b. any other land motor vehicle designed for carrying not more than ten persons (including the driver) and used for the transportation of persons;

   but "Private Passenger Automobile" does not include:

   (i) a motorcycle; or

   (ii) a motortruck or truck tractor (other than a non-commercial) pick-up truck of less than one ton capacity);

9. To bodily injury or property damage arising out of the ownership or use of any automobile or other motor vehicle while being used as a public livery conveyance, or while carrying persons for a fee or other consideration, expressed or implied;

10. a. To contamination of any environment by pollutants that are introduced at any time, anywhere, in any way;

   b. To any injury, damage, or expense arising out of such contamination, including, but not limited to cleaning up, remedying, or detoxifying such contamination;

   c. To any injury, damage, or expense arising out of any request, demand, or order issued or made pursuant to any environmental protection or environmental liability statute or regulation;

   d. To payment for the investigation or defense of any loss, claim, or damage related to the above.

   As used in this exclusion:

   (i) "Contamination" means any unclean, unsafe, damaging, injurious, or unhealthful condition arising out of the presence of any pollutant or combination of pollutants, whether permanent or transient, in any environment;

   (ii) "Environment" includes, but is not limited to any person, any man-made object or feature, animals, crops and vegetation, land, bodies of water, underground water or water table supplies, air, or any other feature of the Earth or its atmosphere, whether or not altered, developed, or cultivated, and whether or not owned, controlled, or occupied by the insured;

   (iii) "Expense" includes any expense, fine, penalty, or assessment;

   (iv) "Pollutant" means smoke, vapors, soot, fumes, acids, sounds, alkalis, chemicals, liquids, solids, gases, thermal pollutants, waste materials, and all other irritants or contaminants;

11. To any liability of the insured directly or indirectly occasioned by, happening through, or in consequence of war, invasion, acts of foreign enemies, hostilities (whether war be declared or not), civil war, rebellion, revolution, insurrection, military or usurped power, or confiscation or nationalization or requisition or destruction of or damage to property by or under the order of any government or public or local authority;

12. To any liability to an employee or former employee arising out of a contract of employment with any insured, including, but not limited to wrongful termination or discharge;

13. To any liability arising from the insured's activities as a director, officer, committee person, volunteer worker or other activities performed in any official capacity for any corporation, association, public authority, charitable institution or other legal entity regardless of whether such activities are preformed with or without a fee or other consideration; but this exclusion does not apply to bodily injury or property damage arising out of activities performed by the named insured, without fee, for "not for profit" organizations, provided such bodily injury or property damage is also covered under a policy scheduled in Item 7 of the Declarations;

14. To any claim made or suit brought against the insured because of bodily injury or property damage arising out of, contributed to, or resulting from, directly or indirectly:

   a. a disease which is transmitted by an insured through sexual contact; or

   b. the transmission by an insured of the Acquired Immune Deficiency Syndrome (A.I.D.S.) virus by any means;

15. To personal injury, except to the extent that insurance therefor is provided by the underlying insurance;

16. To any liability imposed on the insured or the insured's insurer under any uninsured motorists, underinsured motorists, or automobile no-fault or first party bodily injury or property damage law.

B. This policy does not apply under Coverage B:

1. To bodily injury occurring at any time during which the named insured does not maintain underlying uninsured motorists insurance;

2. To any injury which is not covered or collectible for any reason under the uninsured motorists insurance of the Automobile Liability Policy scheduled in Item 7(b) of the Declarations.

PEL-100 (12-92)

C. This policy does not apply under Coverage A or Coverage B to fines, penalties, punitive or exemplary damages of any kind.

D. This policy does not apply under any liability coverage:

1. to injury, sickness, disease, death or destruction

   (a) with respect to which an insured under the policy is also an insured under a nuclear energy liability policy issued by Nuclear Energy Liability Insurance Association, Mutual Atomic Energy Liability Underwriters or Nuclear Insurance Association of Canada, or would be an insured under any such policy but for its termination upon exhaustion of its limit of liability; or

   (b) resulting from the hazardous properties of nuclear material and with respect to which

       (1) any person or organization is required to maintain financial protection pursuant to the Atomic Energy Act of 1954, or any law amendatory thereof, or (2) the insured is, or had this policy not been issued would be, entitled to indemnity from the United Sates of America, or any agency thereof, under any agreement entered into by the United States of America, or any agency thereof, with any person or organization.

2. Under any Medical Expense Coverage, to expenses incurred with respect to bodily injury, sickness, disease or death resulting from the hazardous properties of nuclear material and arising out of the operation of a nuclear facility by any person or organization.

3. Under any Liability Coverage, to injury, sickness, disease, death or destruction resulting from the hazardous properties of nuclear material, if

   (a) the nuclear material (1) is at any nuclear facility owned by, or operated by or on behalf of, an insured or (2) has been discharged or dispersed therefrom;

   (b) the nuclear material is contained in spent fuel or waste at any time possessed, handled, used, processed, stored, transported or disposed of by or on behalf of an insured; or

   (c) the injury, sickness, disease, death or destruction arises out of the furnishing by an insured of services, materials, parts or equipment in connection with the planning,

construction, maintenance, operation or use of any nuclear facility, but if such facility is located within the United States of America, its territories or possessions or Canada, this exclusion (c) applies only to injury to or destruction of property at such nuclear facility.

As used in this exclusion:

"hazardous properties" includes radioactive, toxic or explosive properties;

"nuclear material" means source material, special nuclear material or by-product material;

"source material", "special nuclear material" and "by-product material" have the meanings given them in the Atomic Energy Act of 1954 or in any law amendatory thereof;

"spent fuel" means any fuel element or fuel component, solid or liquid, which has been used or exposed to radiation in a nuclear reactor;

"waste" means any waste material (1) containing by-product material and (2) resulting from the operation by any person or organization of any nuclear facility included within the definition of nuclear facility under paragraph (a) or (b) thereof;

"nuclear facility" means

(a) any nuclear reactor;

(b) any equipment or device designed or used for (1) separating the Isotopes of uranium or plutonium, (2) processing or utilizing spent fuel, or (3) handling, processing or packaging waste;

(c) any equipment or device used for the processing, fabricating or alloying of special nuclear material if at any time the total amount of such material in the custody of the insured at the premises where such equipment or device is located consists of or contains more than 25 grams of plutonium or uranium 233 or any combination thereof, or more than 250 grams of uranium 235,

(d) any structure, basin, excavation, premises or place prepared or used for the storage or disposal of waste,

and includes the site on which any of the foregoing is located, all operations conducted on such premises used for such operations;

"nuclear reactor" means any apparatus designed or used to sustain nuclear fission in a self-supporting

PEL-100 (12-92)

chain reaction or to contain a critical mass of fission-able material;

With respect to injury to or destruction of property, the word "Injury" or "destruction" includes all forms of radioactive contamination of property.

## CONDITIONS

A. Premium

The premium for this policy is as stated in the Declarations.

The named insured shall promptly notify the Company in the event:

1. There is a change in the coverage afforded by the underlying insurance, or

2. The named insured acquires or disposes of any premises, automobiles, or watercraft.

Any premium adjustment shall be made as of the date of such change, acquisition, or disposal in accordance with the Company's rules, rates, and rating plans applicable to the insurance afforded herein.

B. Insured's duties in the event of occurrence, claim, or suit

1. Written notice of any injury or damage which appears likely to result in a claim under this policy shall be given to the Company by or for the insured as soon as practicable. Such notice shall contain particulars sufficient to identify the insured and the fullest information available at the time.

2. If claim is made or suit is brought against the insured for injury or damage with respect to which insurance is afforded under this policy, the insured shall immediately forward to the Company copies of every demand, notice, summons, or other process received by him or his representative.

3. The insured shall cooperate with the Company and, upon the Company's request, assist in making settlements, in the conduct of suits, and in enforcing any right of contribution or indemnity against any person or organization who may be liable to the insured because of injury or damage with respect to which insurance is afforded under this policy; and the insured shall attend hearings and trials and assist in securing and giving evidence and obtaining the attendance of witnesses.

4. The insured shall not, except at his own expense, voluntarily make any payment, assume any obligation, or incur any expense.

C. Maintenance of underlying insurance

1. With respect to coverage A, the named insured agrees to maintain insurance in full effect during the policy period for the coverages and minimum underlying limits set forth in Item 7 of the Declarations. Such insurance shall not afford sublimits of liability with respect to any coverage or driver.

Failure of the named insured to comply with this agreement shall not invalidate this policy, but if any portion of the underlying insurance terminates during the policy period, is uncorrectable for any reason, or has applicable limits of liability lower than the minimum required amounts set forth in Item 7 of the Declarations, this policy shall apply in the same manner it would have applied had the underlying insurance been in force, fully collectible, and with the minimum required limits of liability.

2. With the respect to Coverage B, the named insured agrees to maintain uninsured motorists insurance in full effect during the policy period. If such insurance terminates during the policy period or is uncorrectable for any reason, the Excess Uninsured Motorists insurance under this policy does not apply.

D. Appeals

In the event the insured or any other interest elects not to appeal a judgment in excess of the underlying limits, the Company may elect to do so and shall be liable, in addition to the applicable limit of liability hereunder, for the legal expenses at such appeal (including the taxable court costs and interest incidental thereto), but in no evident shall the total liability of the Company exceed the applicable limit of liability set forth in insuring agreement II plus the expenses of such appeal.

E. Action against the Company

1. No action shall lie against the Company under Coverage A unless, as a condition precedent thereto

a. There shall have been full compliance with all of the terms of this policy;

b. The insured shall have paid or shall have become legally obligated to pay the full amount of the underlying limits;

PEL-100 (12-92)

c. Any applicable retained limit (self-insured retention) shall have been paid by or on behalf of the insured;

d. The amount of the insured's obligation to pay ultimate net loss shall have been finally determined.

2. No action shall lie against the Company under Coverage B unless, as a condition precedent thereto:

a. There shall have been full compliance with all the terms of this policy;

b. The insurer of the Uninsured Motorists Insurance shall have paid the insured the full amount of its limit of liability;

c. The amount of the insured's damages shall have been finally determined either by judgment after actual trial or by written agreement of the insured, the applicable primary insurer, and the Company.

d. The insured shall have taken all appropriate legal action against anyone responsible for the injuries.

3. No person or organization shall have any right under this policy to join the Company as a party to any action against the insured, nor shall the Company be impleaded by the insured or his legal representative.

F. Payment of Loss

1. Under Coverage A, the Company will pay on behalf of the insured the amount of ultimate net loss that is within the Company's limit of liability and to which this policy applies

2. Under Coverage B, the Company will pay the insured the amount of damages that is within the Company's limit of liability and to which this policy applies.

3. Any claim against the Company by the insured under either Coverage A or Coverage B of this policy shall be made within twelve months after the insured:

(a) pays or becomes legally obligated to pay an amount of ultimate net loss within the Company's limit of liability under Coverage A; or

(b) becomes legally entitled to recover an amount of damages within the Company's limit of liability under Coverage B.

G. Other insurance

The insurance afforded by this policy shall be excess over any other insurance collectible by the insured, irrespective of whether such other insurance is stated to be primary, contributing, excess, contingent, or otherwise; provided, however, this condition shall not apply to insurance purchased specifically to apply in excess of the Company's limit of liability under this policy.

H. Subrogation

Because this policy provides excess insurance, the insured's right of recovery cannot always be exclusively subrogated to the Company. It is, therefore, agreed that in case of any payment hereunder, the Company will act in concert with all other interests concerned (including the insured), in the enforcement of any subrogation rights or in the recovery of amounts by any other means. The apportioning of any amounts so recovered shall follow the principle that any interest (including the insured) who shall have paid an amount over and above any payment hereunder, shall first be reimbursed up to the amount paid by them. The Company shall then be reimbursed out of any balance then remaining up to the amounts paid under this policy. Lastly, the interests (including the insured) of whom this policy is in excess are entitled to claim any residue remaining. Expenses necessary to the recovery of any such amounts shall be apportioned between the interests concerned (including the insured) in the ratio of their respective recoveries or, in the event of a totally unsuccessfull attempt to recover, in the ratio of the respective amounts sought to be recovered.

I. Changes

Notice to any agent or knowledge possessed by any agent or by any other person shall not effect a waiver or a change in any part of this policy or stop the Company from asserting any right under the terms of this policy; nor shall the terms of this policy be waived or changed, except by endorsement issued to form a part of this policy.

J. Assignment

Assignment of interest under this policy shall not bind the company until its consent is endorsed hereon; if, however, the named insured shall die, such insurance as is afforded by this policy shall apply (1) to the named insured legal representative, as the named insured, but only while acting within the scope of his duties as such, and (2) with respect to

the property of the named insured, to the person having proper temporary custody thereof, as insured, but only until the appointment and qualification of the legal representative.

K.  Liberalization

If the Company makes any changes in Personal Excess Liability policy provisions that extend or broaden the coverages without additional premium, such changes shall apply to this policy, provided the proper insurance regulatory agency approves and allows the changes during the policy period.

L.  Cancellation

1.  This policy may be canceled by the named insured by mailing to the Company written notice stating when thereafter the cancellation shall be effective.

2.  This policy may be canceled by the Company by mailing to the named insured at the address shown in this policy written notice stating when, not less than 30 days thereafter, such cancellation shall become effective.

The mailing of notice as aforesaid shall be sufficient proof of notice. The effective date and hour stated in the notice shall be the end of the policy period. Delivery of such written notice either by the named insured or by the Company shall be the equivalent of mailing.

If the named insured cancels, earned premium shall be computed in accordance with the customary short rate table and procedure. If the Company cancels, earned premium be calculated pro rata. Premium adjustment may be made either at the time cancellation is afforded or as soon as practicable after cancellation becomes effective, but payment or tender of unearned premium is not a condition of cancellation.

M.  Bankruptcy and Insolvency

Bankruptcy or insolvency of the insured or the insured's estate shall not relieve the Company of any of its obligations hereunder.

N.  Representations

By acceptance of this policy, the named insured agrees:

1.  The statements in the application, in the Declarations, and in any subsequent notice relating to underlying insurance are his agreements and representations;

2.  This policy is issued and continued in reliance upon the truth of such statements;

3.  This policy embodies all agreements existing between the named insured and the Company or any of its agents relating to this insurance.

## DEFINITIONS

When used in this policy, including endorsements forming a part hereof:

"Automobile" means any land motor vehicle, trailer, or semi-trailer (including farm tractors, trailers, and implements) used to convey or transport persons or property other than in the conduct of the business of any insured;

"Bodily Injury":

(1)  Under Coverage A "Bodily Injury" means bodily injury, shock, mental anguish, sickness or disease sustained by any person, which occurs during the policy period, including death at any time resulting therefrom;

(2)  Under Coverage B "Bodily Injury" means bodily injury, as defined in the Uninsured Motorists insurance of the underlying insurance, which is sustained during the policy period;

"Business" includes any activity performed for economic gain, including a trade, profession, or occupation;

"Insured" means any person or organization qualifying as an insured in the "Persons Insured" provision of this policy. The insurance afforded applies separately to each insured against whom claim is made or suit is brought, except with respect to the limits of the Company's liability;

"Named Insured" means

(1)  the person named in Item 1 of the Declarations of this policy, and

(2)  the spouse thereof if a resident of the same household.

"Occurrence" means:

(1)  an accident or accidental event, including continuous or repeated exposure to conditions, which results in bodily injury or property damage neither expected nor intended from the standpoint of the insured (other than an intentional act by or at the direction of the insured which results in bodily injury, if such injury arises solely from the use of reasonable force for the purpose of protecting persons or property);

(2)  the commission of an offense set forth in the definition of "Personal Injury" below;

(3)  any combination of (1) or (2) above in a single event or a series of related events;

"Personal Injury" means injury, other than bodily injury or property damage, arising out of one or more of the following offenses committed during the policy period:

(1) false arrest, detention, or imprisonment;

(2) malicious prosecution;

(3) wrongful entry or eviction or other invasion of the right of privacy;

(4) oral or written publication of material which slanders or libels a person or organization;

"Policy Period" means the period set forth in Item 2 of the Declarations, subject to the cancellation condition of this policy;

"Property Damage" means:

(1) physical injury to or destruction of tangible property which occurs during the policy period, including all resulting loss of use of such property;

(2) loss of use of tangible property which has not been physically injured or destroyed, provided such loss of use is caused by an occurrence during the policy period;

"Relative" means any person related to the named insured by blood, adoption, or marriage (other than the spouse of the named insured) who is a resident of the named insured's household.

"Retained Limit (Self-Insured Retention)" means the amount of ultimate net loss set forth in Item 6 of the Declarations, which shall be paid by or on behalf of the insured before liability attaches to the Company.

"Ultimate Net Loss" means the sum actually paid payable in cash as damages, as determined by:

(1) a judgment against the insured in a suit on the merits, or

(2) a settlement of a claim or suit with the prior written consent of the Company,

less all recoveries and salvages; but "ultimate net loss" does not include:

(a) interest on judgments, or

(b) investigation, settlement, and legal expenses, including taxed court costs and premiums on bonds;

"underlying insurance" means the insurance policies scheduled in Item 7 of the Declarations;

"underlying limits" means the greater of:

(1) the amounts set forth in Item 7 of the Declarations as the minimum underlying limits, or

(2) the sum of the applicable limits of liability of all insurance available to the insured for injury or damage to which this policy applies (other than insurance purchased specifically to apply in excess of the Company's limit of liability under this policy);

"use", "uses", "used", and "using" mean maintaining, entrustment to others, operating, loading, or unloading;

"watercraft" means any craft, boat, vessel, or ship designed to transport persons or property on water.

In Witness Whereof, the Company has caused this policy to be signed by its authorized officers, but this policy shall not be valid unless signed by a duly authorized representative of the Company.

Dennis W. Felick          R. Max Williamson

           Secretary                                          President

7-13-04; 8:21AM;                                            ;3                    # 4/ 14

Page 14 of 14 Received on 7/13/2004 8:26:19 AM [US Mountain Standard Time]

# Scottsdale Indemnity Company

**ENDORSEMENT NO. _____**

| ATTACHED TO AND FORMING A PART OF POLICY NUMBER | ENDORSEMENT EFFECTIVE DATE (12:01 A.M. STANDARD TIME) | NAMED INSURED | AGENT NO. |
|---|---|---|---|
| PUI0020229 | 05/31/2001 | RALPH L. & PAMELA W. LINDSTROM | 4081 |

## THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.

### SCHEDULE OF UNDERLYING INSURANCE

In consideration of the premium charged, it is hereby agreed that Item 7, Schedule of Underlying Insurance, as indicated on the Declarations, is amended to read:

**TYPE OF COVERAGE:**

**(a) COMPREHENSIVE PERSONAL LIABILITY OR HOMEOWNERS**

CARRIER: HARTFORD CASUALTY INS.    POLICY NO. 57RB563000    LIMIT: 500,000
LOCATION/DESCRIPTION: 2801 MOORE AVE., EUREKA, CA, 95501

CARRIER:    POLICY NO.    LIMIT:
LOCATION/DESCRIPTION:

**(b) AUTOMOBILE LIABILITY**

CARRIER: HARTFORD    POLICY NO. 57PH865567M    LIMIT: 250/ 500/ 100
LOCATION/DESCRIPTION: 1998, CHEVROLET, K1500

CARRIER: HARTFORD    POLICY NO. 57PH865567M    LIMIT: 250/ 500/ 100
LOCATION/DESCRIPTION: 1999, HONDA, ACCORD

CARRIER: HARTFORD    POLICY NO. 57PH865567M    LIMIT: 250/ 500/ 100
LOCATION/DESCRIPTION: 1998, NISSAN, FRONTIER

CARRIER: HARTFORD    POLICY NO. 57PH865567M    LIMIT: 250/ 500/ 100
LOCATION/DESCRIPTION: 1988, PLYMOUTH

**(c) WATERCRAFT LIABILITY**

CARRIER:    POLICY NO.    LIMIT:
LOCATION/DESCRIPTION:

CARRIER:    POLICY NO.    LIMIT:
LOCATION/DESCRIPTION:

CARRIER:    POLICY NO.    LIMIT:
LOCATION/DESCRIPTION:

**All other terms and conditions remain unchanged.**

_____    /_____
AUTHORIZED REPRESENTATIVE              DATE

PL-U-1 (10-92)

# Scottsdale Indemnity Company

## ENDORSEMENT NO. _____

| ATTACHED TO AND FORMING A PART OF POLICY NUMBER | ENDORSEMENT EFFECTIVE DATE (12:01 A.M. STANDARD TIME) | NAMED INSURED | AGENT NO. |
|---|---|---|---|
| PUI0020229 | 05/31/2001 | RALPH L. & PAMELA W. LINDSTROM | 4081 |

THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.

## SCHEDULES

**TYPE OF COVERAGE:**

### SCHEDULE OF RENTAL UNITS AND APARTMENTS

CARRIER: HARTFORD      POLICY NO. 57RB563000      LIMIT: 500,000
LOCATION/DESCRIPTION: 1522 3RD ST. EUREKA, CA 95501, UNITS=0001

CARRIER: HARTFORD      POLICY NO. 57RB563000      LIMIT: 500,000
LOCATION/DESCRIPTION: 3371 HARRISON AVE., EUREKA, CA 95501, UNITS=0001

CARRIER: HARTFORD      POLICY NO. 57RB563000      LIMIT: 500,000
LOCATION/DESCRIPTION: 1522 3RD ST. BACK UNIT, EUREKA, CA 95501, UNITS=00

### SCHEDULE OF VACANT LAND AND FARMS

CARRIER:      POLICY NO.      LIMIT:
LOCATION/DESCRIPTION:

CARRIER:      POLICY NO.      LIMIT:
LOCATION/DESCRIPTION:

CARRIER:      POLICY NO.      LIMIT:
LOCATION/DESCRIPTION:

### SCHEDULE OF DRIVERS

| NAME: RALPH L. LINDSTROM | LICENSE NO. B1341098, CA | BIRTH: 04/25/1932 |
|---|---|---|
| NAME: PAMELA LINDSTROM | LICENSE NO. J0833105, CA | BIRTH: 05/10/1944 |
| NAME: VANESSA LINDSTROM | LICENSE NO. B6951845, CA | BIRTH: 02/17/1980 |
| NAME: | LICENSE NO. | BIRTH: |
| NAME: | LICENSE NO. | BIRTH: |
| NAME: | LICENSE NO. | BIRTH: |
| NAME: | LICENSE NO. | BIRTH: |
| NAME: | LICENSE NO. | BIRTH: |

**All other terms and conditions remain unchanged.**

AUTHORIZED REPRESENTATIVE         DATE

PL-U-6 (10-92)

Page 6 of 14 Received on 7/13/2004 8:26:19 AM [US Mountain Standard Time]

# Scottsdale Indemnity Company

**ENDORSEMENT
NO. _____**

| ATTACHED TO AND FORMING A PART OF POLICY NUMBER | ENDORSEMENT EFFECTIVE DATE (12:01 A.M. STANDARD TIME) | NAMED INSURED | AGENT NO. |
|---|---|---|---|
| | | | |

THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.

## SEXUAL ABUSE EXCLUSION

## ENDORSEMENT

In consideration of the premium charged, it is agreed that such coverage as is provided by this policy shall not apply to any claim, demand and causes of action arising out of or resulting from either sexual abuse or licentious, immoral, or sexual acts, whether caused by, or at the instigation of, or at the direction of, or omission by, the insured, his employees, patrons, or any causes whatsoever.

**All other terms and conditions remain unchanged.**

_____  /  _____
AUTHORIZED REPRESENTATIVE                          DATE

PL-U-210 (10-92)

7-13-04; 8:21AM;                                           ;3                    #  6/ 14

# Scottsdale Indemnity Company

**ENDORSEMENT NO. _____**

| ATTACHED TO AND FORMING A PART OF POLICY NUMBER | ENDORSEMENT EFFECTIVE DATE (12:01 A.M. STANDARD TIME) | NAMED INSURED | AGENT NO. |
|---|---|---|---|
| PUIO020229 | 05/31/2001 | RALPH L. & PAMELA W. LINDSTROM | 4081 |

THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.

## NOTICE OF INSURANCE INFORMATION PRACTICES
## CANCELLATION, NONRENEWAL AND INCREASE IN PREMIUM-CALIFORNIA

**IF YOU HAVE QUESTIONS.............**

If you have any questions concerning this policy or its coverage, please contact your broker. Your broker does have a copy of your policy and will be able to provide assistance to you.

IN THE EVENT YOUR BROKER IS NOT ABLE TO ADDRESS YOUR CONCERNS IN A SATISFACTORY MANNER, YOU DO HAVE THE OPTION OF CONTACTING THE CALIFORNIA DEPARTMENT OF INSURANCE TO ASSIST YOU.

**California Department of Insurance**
**Consumer Services**
**3450 Wilshire Boulevard**
**Los Angeles, CA 90010**
**Telephone: (800) 927-4357**

### Your Privacy and Its Protection

In order to protect your privacy, we want you to be aware of the following information:

1) Personal Information may be collected from persons other than you or individuals proposed for coverage.

2) If an investigative consumer report is ordered in conjunction with your insurance transaction, you will be given an opportunity to be interviewed in connection with it. You also have a right to obtain a copy of the report. You may also personally review the report by contacting the reporting insurance support organization.

3) You have the right to access and correction with respect to all personal information collected which is contained in our files.

4) Personal Information and other privileged information collected by us or our agents may be in certain circumstances disclosed to certain parties without your authorization, as permitted or required by law.

Scottsdale Indemnity Company is concerned about the protection of your privacy. A more detailed description of our information practices and your right to privacy is available at your request.

Contact:  Scottsdale Indemnity Company
Attention: Personal Lines Underwriting
PO Box 4110
Scottsdale, AZ 85261-7675

PL-U/A-4 (6-00)

Page 1 of 3

Page 6 of 14 Received on 7/13/2004 8:28:19 AM [US Mountain Standard Time]

7->3-04; 8:21AM;                                                      :3                    #  7/ 14

The Cancellation Condition contained in the Conditions section of the policy is deleted in its entirety and is replaced by the following:

## Cancellation, Nonrenewal and Increase In Premium

1. This policy may be canceled by the Named Insured by mailing to the Company written notice stating when thereafter the cancellation shall be effective.

2. When this policy has been in effect for less than sixty (60) days, the policy may be canceled by the Company for any reason by mailing to the Named Insured, at the address shown in the policy, written notice stating when, not less than thirty (30) days thereafter, such cancellation shall become effective.

3. When this policy has been in effect for sixty (60) days or more, or this is a renewal or continuation of a policy issued by the Company, the Company may cancel the policy only for one or more of the following reasons:

   With respect to Automobile Liability:

   a. Nonpayment of premium;

   b. The driver's license or motor vehicle registration of the Named Insured or of any other operator who either resides in the same household or customarily operates an automobile insured under the policy has been under suspension or revocation during the policy period, or if the policy is a renewal, during its policy period or one hundred eighty (180) days immediately preceding its effective date;

   c. Discovery of fraud by the Named Insured in pursuing a claim under the policy provided the Company does not rescind the policy;

   d. Discovery of material misrepresentation of any of the following information concerning the Named Insured or any resident of the same household who customarily operates an automobile insured under the policy:

      (1) Safety Record;

      (2) Annual miles driven in prior years;

      (3) Number of years driving experience;

      (4) Record of prior automobile insurance claims, if any;

      (5) Any other factor found by the Commissioner of Insurance to have a substantial relationship to the risk of loss.

      Any insured who negligently misrepresents information described in paragraph 3.d. may avoid cancellation by furnishing corrected information to the Company within twenty (20) days after receiving notice of cancellation and agreeing to pay any difference in premium for the policy period in which the information remained undisclosed;

   e. A substantial increase in the hazard insured against;

   and with respect to Liability other than Automobile Liability:

   f. Conviction of a crime having as one of its necessary elements an act increasing the hazard insured against;

   g. Discovery of fraud or material misrepresentation by:

      (1) the Named Insured or a representative of the Named Insured in obtaining this policy; or

      (2) the Named Insured in pursuing a claim under this policy; or

   h. Discovery of grossly negligent acts or omissions substantially increasing any of the hazards insured against.

4. If the policy is cancelled in accordance with paragraph 3. above, the Company may cancel this policy by delivering or mailing written notice of cancellation to the Named Insured, at the address shown in this policy, at least:

   a. ten (10) days before the effective date of cancellation if the Company cancels for nonpayment of premium; or

PL-U/A-4 (6-00)

7-13-04; 8:21AM;                                                    ;3                    #  8/ 14

b.  thirty (30) days before the effective date of cancellation if the Company cancels for any of the reasons stated in paragraph 3.b. through 3.h. above.

5.  When this policy is written for a period longer than one year, the Company may cancel for any reason at anniversary by letting the Named Insured know at least forty-five (45) days before the date cancellation takes effect.

6.  Proof of mailing of the cancellation notice will be sufficient proof of notice.

7.  If the Company cancels this policy, the return premium shall be computed pro rata and will be refunded within twenty-five (25) days after the effective date of cancellation. If the Named Insured cancels, the return premium shall be computed in accordance with the customary short rate table and procedures, and will be refunded within a reasonable time after the date cancellation takes effect.

8.  We may elect not to renew this policy, subject to 8.a., 8.b. and 8.c. below, by delivering to the Named Insured, at the address shown in the policy, written notice at least forty-five days prior to the expiration date of this policy. Proof of mailing will be sufficient proof of notice.

   a.  With respect to Automobile Liability, the Company may nonrenew this policy only for one or more of the following reasons:

      (1)  Nonpayment of premium;

      (2)  Fraud or material misrepresentation affecting the policy or insured; or

      (3)  Substantial increase in the hazard insured against.

   b.  With respect to Liability other than Automobile Liability, the Company will not refuse to renew this policy:

      (1)  Solely on the grounds that a claim is pending under the policy; or

      (2)  Solely on the basis of the age of a person insured under this policy.

   c.  With respect to Liability other than Automobile Liability, where this policy is written for a period of less than one year, the Company agrees not to refuse to renew except at the end of an annual period commencing with the original or renewal effective date.

9.  The premium the Named Insured must pay for the policy may be increased for one or more of the following reasons, or for other reasons that are both lawful and not unfairly discriminatory:

   a.  Accident involvement by an insured, and the insured is at fault in the accident.

   b.  A change in, or addition of, an insured vehicle.

   c.  A change in, or addition of, an insured under the policy.

   d.  A change in the location of garaging of an insured vehicle.

   e.  A change in the use of the insured vehicle.

   f.  Convictions for violating any provisions of the Vehicle Code or the Penal Code relating to the operation of a motor vehicle.

   g.  The payment made by an insurer due to a claim filed by an insured or a third party.

_____    /_____
      AUTHORIZED REPRESENTATIVE          DATE

PL-U/A-4 (6-00)

7¬13¬04; 8:21AM;                                    ;3                    #  2/ 14

# Scottsdale Indemnity Company

## ENDORSEMENT NO. _____ 1

| ATTACHED TO AND FORMING A PART OF POLICY NUMBER | ENDORSEMENT EFFECTIVE DATE (12:01 A.M. STANDARD TIME) | NAMED INSURED | AGENT NO. |
|---|---|---|---|
| PUI0020229 | 07-16-2001 | RALPH L. & PAMELA W. LINDSTROM | 4081 |

### THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.

RENTAL UNIT #1 IS HEREBY AMENDED TO READ:

    1522 3RD STREET UNIT A & B, EUREKA, CA

    2 UNITS

JUL 1 9 2001

A&M LOS ANGELES

NEW ANNUAL PREMIUM   $        335.00
PRO-RATA FACTOR               .8740

ADDITIONAL PREMIUM   $         13.00

_____    07/19/2001

      AUTHORIZED REPRESENTATIVE                DATE

# **EXHIBIT I**



SELMAN
BREITMAN LLP
ATTORNEYS

Linda Wendell Hsu
415.979.2024
lhsu@selmanbreitman.com

33 New Montgomery, Sixth Floor
San Francisco, CA 94105-4537

Telephone 415.979.0400
Facsimile  415.979.2099

www.selmanbreitman.com

July 12, 2008

## MEET AND CONFER PURSUANT TO STANDING ORDERS
## OF THE HONORABLE SAUNDRA BROWN ARMSTRONG, U.S. DISTRICT COURT

**Via Facsimile**
**Followed by U.S. Mail**

David P. Dibble, Esq.
LAW OFFICES OF DAVID P. DIBBLE
123 F Street, Suite D
Eureka, CA 95501

Zachary E. Zwerdling, Esq.
LAW OFFICE OF ZACHARY E.
ZWERDLING
123 F Street, Suite C
Eureka, CA 95501

Re:    *Wood, et al. v. Scottsdale Indemnity Company*
       Northern District of California  Case No. CV 08 3335 SBA
       Our File No.    :  380.25532

Dear Counsel:

Please accept this as Scottsdale Indemnity Company's meet and confer letter pursuant to the Standing Orders of the Honorable Saundra Brown Armstrong of the U.S. District Court.

## EXTENSION OF TIME TO ANSWER OR OTHERWISE RESPOND

Scottsdale Indemnity Company ("Scottsdale") filed a notice of removal on July 10, 2008 of which notice was provided to you by mail on the same day.  The case was assigned to the Honorable Saundra Brown Armstrong of Courtroom 3 in the Oakland Division of the Northern District of California.  The time in which Scottsdale must respond to the complaint is 5 days after filing the notice of removal or July 15, 2008.

Scottsdale intends on filing a motion to dismiss.  However, upon receiving the Standing Orders of the Honorable Saundra Brown Armstrong after assignment, we found that Judge Armstrong requires a moving party to meet and confer prior to filing a motion.  In an effort to comply with the Judge's standing orders and to meet and confer in good faith, Scottsdale is willing to accept an additional 2 weeks to file the motion so that we can meet and confer with you on the issues raised by the motion to dismiss to be filed by Scottsdale.  If you agree, please sign the enclosed joint stipulation to extend Scottsdale's time to respond to the complaint to July 29, 2008 and return a signed copy to this office **by the end of business Monday, July 14, 2008 via facsimile**.

154097.1  380.25532

Los Angeles   •   San Francisco   •   Orange County/Inland Empire   •   San Diego   •   Las Vegas



SELMAN
BREITMAN LLP
ATTORNEYS

Page 2

## SCOTTSDALE'S INTENDED MOTION TO DISMISS

Scottsdale's motion to dismiss is founded on Federal Rules of Civil Procedure 12(b)(6), failure to state a claim upon which relief can be granted. The basis of the motion is that there was no coverage for Kimberly Holz Lindstrom under Scottsdale Policy Number PUI 0020229 issued to Ralph L. and Pamela W. Lindstrom ("Lindstroms"). As Ms. Holz Lindstrom did not qualify as an insured or, if she did qualify as an insured, an exclusion precluded coverage, she owned no rights against Scottsdale to assign or transfer to Plaintiffs. We believe that you are well familiar with Scottsdale's coverage position based on pre-litigation communications. However, if you would like to discuss the coverage issues further, please feel free to contact us.

Scottsdale intends to attach to its motion to dismiss the complete copy of the Scottsdale personal umbrella policy so that the court may see the specific provisions that show that Ms. Holz Lindstrom was not an insured and to highlight the other relevant policy language. The facts as alleged on the face of the complaint with documents incorporated by reference (the policy and Scottsdale's final denial on June 5, 2008), and those of which the court may take judicial notice, will be sufficient to show that the policy did not provide coverage for Ms. Holz Lindstrom as a matter of law.

## CONCLUSION

As detailed above, the motion to dismiss is straightforward and based on the facts as presented on the face of the complaint. We look forward to further conferring regarding these issues prior to responding to the complaint. **Please also inform us whether you will sign the joint stipulation to extend Scottsdale's time to respond to the complaint by Monday, July 14, 2008.** Otherwise, we will plan to file our motion on July 15th, but remain willing to meet and confer with you thereafter. We thank you for your anticipated professional courtesy and cooperation and look forward to speaking with you.

Very truly yours,

LINDA WENDELL HSU

LWH/sl

154097.1 380.25532

1  LINDA WENDELL HSU   (SBN 162971)
   SELMAN BREITMAN LLP
2  33 New Montgomery, Sixth Floor
   San Francisco, CA  94105
3  Telephone: (415) 979-0400
   Facsimile: (415) 979-2099
4  Email:    lhsu@selmanbreitman.com

5  Attorney for Defendant
   Scottsdale Indemnity Company
6

7              UNITED STATES DISTRICT COURT

8           NORTHERN DISTRICT OF CALIFORNIA

9

10 CLARENCE JONATHON WOOD and HEIDI    CASE NO.   CV 08 3335 SBA
   COLLINGWOOD,
11                                     **STIPULATION TO EXTEND TIME IN**
              Plaintiffs,              **WHICH SCOTTSDALE INDEMNITY**
12                                     **COMPANY MAY RESPOND TO THE**
       v.                              **COMPLAINT**
13
   SCOTTSDALE INDEMNITY CO.; and
14 DOES 1 to 100, inclusive,

15            Defendants.

16

17

18      Pursuant to Local Rules of Practice for the United States

19 District Court, Northern District of California, Local Rule 6-

20 1(a), IT IS HEREBY STIPULATED by and between the parties to this

21 action, through their designated counsel of record, that

22 Defendant Scottsdale Indemnity Company's time to file a

23 responsive pleading to the Plaintiffs' complaint is extended from

24 July 15, 2008 to July 29, 2008.

25      IT IS SO STIPULATED:

26

27

28

                              1

154096.1 380.25532

Selman Breitman LLP
ATTORNEYS AT LAW

1  DATED: July __, 2008        SELMAN BREITMAN LLP

2

3                                    By:_____

4                                        LINDA WENDELL HSU
                                         Attorney for Defendant
5                                        SCOTTSDALE INDEMNITY COMPANY

6  DATED: July __, 2008        LAW OFFICES OF DAVID P. DIBBLE

7

8                                    By:_____

9                                        DAVID P. DIBBLE
                                         Attorney for Plaintiff
10                                       CLARENCE JONATHON WOOD

11  DATED: July __, 2008       LAW OFFICE OF ZACHARY E. ZWERDLING

12

13                                   By:_____

14                                       ZACHARY E. ZWERDLING
                                         Attorney for Plaintiff
15                                       HEIDI COLLINGWOOD

16

17

18

19

20

21

22

23

24

25

26

27

28

2

154096.1 380.25532

```
                        *******************************
                        ***   MULTI TX/RX REPORT   ***
                        *******************************

TX/RX NO          3141
PGS.                 5
TX/RX INCOMPLETE
                     -----
TRANSACTION OK
                  (1)   0625#038025232#17074430442#
                  (2)   0625#038025532#17074430442#
ERROR INFORMATION
                     -----
```

# SELMAN
## ↳BREITMAN LLP
**ATTORNEYS**

33 New Montgomery, Sixth Floor
San Francisco, CA 94105-4537
Telephone: 415.979.0400
Facsimile: 415.979.2099
www.selmanbreitman.com

# Fax Transmission

**DATE:**  July 12, 2008      **TIME:**  2:09 PM         **PAGES (incl. cover sheet):**  5

| RECIPIENT | COMPANY | PHONE | FAX NO. |
|---|---|---|---|
| David P. Dibble | Law Offices of David P. Dibble | (707) 444-9330 | (707) 443-0442 |
| Zachary E. Zwerdling | Law Office of Zachary E. Zwerdling | (707) 445-9628 | (707) 443-0442 |

**FROM**              :   Linda Wendell Hsu

**CASE NAME**         :   Wood, et al. v. Scottsdale Indemnity Company

**CLIENT NAME**       :   Scottsdale Indemnity Company

**OUR FILE NO.**      :   380.25532

**ATTACHED PLEASE FIND** :   Meet and Confer Pursuant to Standing Orders of the Honorable Saundra Brown Armstrong; Stipulation to Extend Time in which Scottsdale Indemnity Company May Respond to the Complaint

**COMMENTS**          :   <u>Via Facsimile</u>
                           <u>Followed by U.S. Mail</u>

SEND:  [X] IMMEDIATELY      ☐ WITHIN THE HOUR      ☐ BY 5:00 P.M. (PST)      ☐ OTHER:

RETURN FAX TO:

# **EXHIBIT J**



**SELMAN BREITMAN** LLP

ATTORNEYS

33 New Montgomery, Sixth Floor
San Francisco, CA 94105-4537

Telephone: 415.979.0400
Facsimile:  415.979.2099

www.selmanbreitman.com

# Fax Transmission

**DATE:**    July 22, 2008        **TIME:    2:09 PM**            **PAGES (incl. cover sheet):    6**

| RECIPIENT | COMPANY | PHONE | FAX NO. |
|---|---|---|---|
| David P. Dibble | Law Offices of David P. Dibble | (707) 444-9330 | (707) 443-0442 |
| Zachary E. Zwerdling | Law Office of Zachary E. Zwerdling | (707) 445-9628 | (707) 443-0442 |

| | | |
|---|---|---|
| **FROM** | : | **Linda Wendell Hsu** |
| **CASE NAME** | : | **Wood, et al. v. Scottsdale Indemnity Company** |
| **CLIENT NAME** | : | **Scottsdale Indemnity Company** |
| **OUR FILE NO.** | : | **380.25532** |
| **ATTACHED PLEASE FIND** | : | **Second Meet and Confer Pursuant to Standing Orders of the Honorable Saundra Brown Armstrong** |

| | | |
|---|---|---|
| **COMMENTS** | : | **Via Facsimile** |

SEND:   ⊠ IMMEDIATELY        ☐ WITHIN THE HOUR        ☐ BY 5:00 P.M. (PST)        ☐ OTHER:

RETURN FAX TO:  _____

### CAUTION: PRIVILEGED AND/OR CONFIDENTIAL INFORMATION

THIS MESSAGE AND DOCUMENTS IN THIS FACSIMILE TRANSMISSION ARE INTENDED ONLY FOR THE USE OF THE INDIVIDUAL OR ENTITY TO WHICH IT IS ADDRESSED. IT MAY CONTAIN INFORMATION THAT IS PRIVILEGED, CONFIDENTIAL, AND EXEMPT FROM DISCLOSURE UNDER APPLICABLE LAW, AND/OR IT MAY CONTAIN CONFIDENTIAL HEALTH INFORMATION THAT IS PRIVILEGED AND LEGALLY PROTECTED FROM DISCLOSURE BY FEDERAL LAW UNDER THE HEALTH INSURANCE PORTABILITY AND ACCOUNTABILITY ACT (HIPAA). IF THE READER OF THIS MESSAGE IS NOT THE INTENDED RECIPIENT OR THE EMPLOYEE OR AGENT RESPONSIBLE FOR DELIVERING THE MESSAGE TO THE INTENDED RECIPIENT, YOU ARE HEREBY NOTIFIED THAT ANY DISSEMINATION, DISTRIBUTION OR COPYING OF THIS COMMUNICATION IS STRICTLY PROHIBITED. IF YOU HAVE RECEIVED THIS COMMUNICATION IN ERROR, PLEASE NOTIFY US IMMEDIATELY BY PHONE, AND RETURN THE ORIGINAL MESSAGE TO US AT THE ABOVE ADDRESS VIA THE U.S. POSTAL SERVICE.

154615.1  380.25532



**Linda Wendell Hsu**
415.979.2024
lhsu@selmanbreitman.com

33 New Montgomery, Sixth Floor
San Francisco, CA 94105-4537

Telephone: 415.979.0400
Facsimile:  415.979.2099

www.selmanbreitman.com

July 22, 2008

### MEET AND CONFER PURSUANT TO STANDING ORDERS
### OF THE HONORABLE SAUNDRA BROWN ARMSTRONG, U.S. DISTRICT COURT

**Via Facsimile**

David P. Dibble, Esq.
LAW OFFICES OF DAVID P. DIBBLE
123 F Street, Suite D
Eureka, CA 95501

Zachary E. Zwerdling, Esq.
LAW OFFICE OF ZACHARY E.
ZWERDLING
123 F Street, Suite C
Eureka, CA 95501

Re:   *Wood, et al. v. Scottsdale Indemnity Company*
      Northern District of California  Case No. CV 08 3335 SBA
      Our File No.    :  380.25532

Dear Counsel:

Please accept this as Scottsdale Indemnity Company's ("Scottsdale") second meet and confer letter regarding its planned motion to dismiss pursuant to the Standing Orders of the Honorable Saundra Brown Armstrong of the U.S. District Court.

## I.    KIMBERLY HOLZ LINDSTROM IS NOT AN INSURED UNDER THE POLICY

As you are aware, it is Scottsdale's position that Kimberly Holz Lindstrom ("Holz Lindstrom") is not an insured under the policy issued to Ralph L. and Pamela W. Lindstrom, Personal Umbrella Policy No. PUI0020229 for the policy period of May 31, 2001 to May 31, 2002 ("Policy"). It is clear that she is not a "relative" as defined by the Policy and that point is agreed upon by all parties.

Scottsdale contends that Holz Lindstrom is also not an insured because the inner tube is not a "watercraft" as defined by the Policy. The Policy defines "watercraft" as "any craft, boat, vessel, or ship designed to transport  persons or property on water." Case authority in California has never found an inner tube to be a "watercraft" or anything in the same category to be a "watercraft". Items found in California to be watercraft include boats, barges, cargo vessels, ocean carrier vessels, jet skis, wave runners, personal watercraft, and skiffs.  Furthermore, dictionary definitions of "craft, boat, vessel, or ship" are consistent with Scottsdale's position. The definitions include ships, boats and vessel larger than an inner tube and do not reference inner tube is any of the definitions.

**SELMAN**
**𝔖BREITMAN** LLP
**ATTORNEYS**

David P. Dibble, Esq.
Zachary E. Zwerdling, Esq.
July 22, 2008
Page 2

Even if an inner tube is a "watercraft", Holz Lindstrom was not "using" the inner tube involved in the accident. She did not "maintain, entrust to others, operate, load or unload" the inner tube and is therefore not an insured under subsection c.(i) of the Persons Insured section of the Policy.

Additionally, Holz Lindstrom had other insurance available, specifically the Hartford and Foremost policies, both of whom defended Holz Lindstrom and paid their policy limits on behalf of Holz Lindstrom. As such, she would not be an insured under c.(ii) of the Persons Insured section.

## II.    EVEN IF HOLZ LINDSTROM IS AN INSURED, SCOTTSDALE HAD NO DUTIES UNDER THE POLICY UNTIL JUDGMENT WAS ENTERED

The Policy contains the following Defense and Settlement section:

III.    DEFENSE AND SETTLEMENT

A.    With respect to occurrences which are covered under Coverage A of this policy but which are not covered or required to be covered by the underlying insurance, the Company, if no other insurer has an obligation to do so, shall defend any suit against the insured seeking damages on account of bodily injury, personal injury, or property damage, even if any of the allegations of the suit are groundless, false, or fraudulent; and the Company shall have the right to make such investigation and settlement of any claims or suit as it deems expedient.

B.    Except as specifically provided under A. above, the Company shall have no duty or obligation to assume the responsibility for the investigation, settlement, or defense of:

1.    any claim made or suit brought against the insured under Coverage A;

. . .

but the Company shall have the right and shall be given the opportunity to investigate and to be associated in the control of any claim or suit which may, in the Company's opinion, create liability on the part of the Company under the terms of this policy.



SELMAN
BREITMAN LLP

ATTORNEYS

David P. Dibble, Esq.
Zachary E. Zwerdling, Esq.
July 22, 2008
Page 3

As stated above, Scottsdale has no duties to defend, investigate or settle any suit against an insured where the underlying insurance covered the bodily injury at issued in the suit. Furthermore, if any other insurer has an obligation of defense to the insured, Scottsdale again has no duties to defend, investigate and settle the suit. Holz Lindstrom had underlying insurance through Hartford, which provided a defense and paid its policy limits to settle the suit. Additionally, Foremost lso paid its policy limits to settle the suit. As such, Scottsdale's duties, if any, were not triggered until a judgment was entered against Holz Lindstrom.

Consistent with the Defense and Settlement section, the Action Against The Company subsection of the Conditions portion of the Policy states that "[n]o action shall lie against the Company under Coverage A unless, as a condition precedent thereto...d. [t]he amount of the insured's obligation to pay ultimate net loss shall have been finally determined." Holz Lindstrom's ultimate net loss was not determined until the Humboldt County Superior Court entered judgment in the amount of $5 million plus costs on August 30, 2006. As such, Scottsdale had no alleged duties to Holz Lindstrom and Holz Lindstrom had no action against Scottsdale until August 30, 2006.

## III.   THE CONTRACTUAL LIMITATION ON THE TIME TO MAKE A CLAIM AGAINST SCOTTSDALE WAS TWELVE MONTHS

The Policy also contains the following Payment of Loss provision:

F.   Payment of Loss

1.   Under Coverage A, the Company will pay on behalf of the insured the amount of ultimate net loss that is within the Company's limit of liability and to which this policy applies

. . .

3.   Any claim against the Company by the insured under either Coverage A or Coverage B of this policy shall be made within twelve months after the insured:

(a)   pays or becomes legally obligated to pay an amount of ultimate net loss within the company's limit of liability under Coverage A;

California has long recognized the right of an insurer to limit the time in which an insured may make a claim against the insurer. See Fageol Truck & Coach Co. v. Pacific Indem. Co. (1941) 18 Cal.2d 748, 753; C & H Foods Co. v. Hartford Ins. Co. (1984) 163 Cal.3d 1055, 1064. These

**SELMAN**
**BREITMAN** LLP

ATTORNEYS

David P. Dibble, Esq.
Zachary E. Zwerdling, Esq.
July 22, 2008
Page 4

provisions are enforceable as long as they are clearly stated in the policy and do not shorten the time to an unreasonable time period. Ibid. Such policy-made time limitations are applicable in bad faith actions as well as actions on contract. See Frazier v. Metropolitan Life Ins. Co. (1985) 169 Cal.App.3d 90, 104.

Holz Lindstrom had judgment entered against her for $5 million plus costs on August 30, 2006. Plaintiffs, as assignees to Holz Lindstrom's rights, brought this action against Scottsdale on May 23, 2008. This is well beyond the twelve-month period from the date of the payment obligation of the alleged insured, Holz Lindstrom. Plaintiffs or Holz Lindstrom made no other "claim" after Mr. Dibble's correspondence of June 6, 2006, prior to the judgment on August 30, 2006, until this action was filed on May 23, 2008. Plaintiffs, as assignees of Holz Lindstrom, therefore did not make a timely claim for the payment of the loss.

## IV.    SCOTTSDALE'S CONDUCT IS REASONABLE IN LIGHT OF THE COVERAGE DEFENSES

As you know, the nature and extent of the duties owed under the implied covenant of good faith and fair dealing are variable and depend on the contractual purposes, such that if there is no breach of contract, there can be no bad faith as a matter of law. *Love v. Fire Ins. Exch.* (1990) 221 Cal.App.3d 1136, 1147. Therefore, the cause of action for a tortious breach of the covenant of good faith and fair dealing requires a showing of, first, that the defendant in the underlying action is an insured under the policy from which the insurer's duties arose. Moreover, as detailed above, Scottsdale had no duties to Holz Lindstrom (even if she is an insured) until judgment was entered on August 30, 2006. She or her assignees then had a twelve-month time frame in which to make a claim against Scottsdale for payment of the judgment loss. Neither Holz Lindstrom, nor Plaintiffs as assignees, made any claim for payment of this loss until this suit was filed over twelve months later on May 23, 2008.

## V.    CONCLUSION

As detailed above, Scottsdale's motion to dismiss is based on the facts as presented on the face of the complaint and are based on arguments supported by law. We look forward to further conferring regarding these issues prior to responding to the complaint and look forward to your response. Otherwise, we will plan to file our motion on July 29th, but remain willing to meet and confer with you thereafter.

**SELMAN
SBREITMAN** LLP
ATTORNEYS

David P. Dibble, Esq.
Zachary E. Zwerdling, Esq.
July 22, 2008
Page 5

We thank you for your anticipated professional courtesy and cooperation and look forward to speaking with you.

Very truly yours,

LINDA WENDELL HSU

LWH/sl

154498.1  380.25532

07/22/2008 15:02 FAX  415 979 2009        SELMAN BREITMAN SF                    ☑001

```
                     *******************************
             ***    MULTI TX/RX REPORT    ***
                     *******************************
TX/RX NO                3222
PGS.                     6
TX/RX INCOMPLETE
                        -----
TRANSACTION OK
                    (1)  0625#038025532#17074430442#
                    (2)  0625#0380#25532#17074430442#
ERROR INFORMATION
                        -----
```



**SELMAN**
**BREITMAN** LLP
**ATTORNEYS**

33 New Montgomery, Sixth Floor
San Francisco, CA 94105-4637
Telephone: 415.979.0400
Facsimile: 415.979.2099
www.selmanbreitman.com

# Fax Transmission

**DATE:  July 22, 2008**         **TIME:  2:09 PM**         **PAGES (incl. cover sheet):  6**

| RECIPIENT | COMPANY | PHONE | FAX NO. |
|---|---|---|---|
| David P. Dibble | Law Offices of David P. Dibble | (707) 444-9330 | (707) 443-0442 |
| Zachary E. Zwerdling | Law Office of Zachary E. Zwerdling | (707) 445-9628 | (707) 443-0442 |

| | | |
|---|---|---|
| **FROM** | : | **Linda Wendell Hsu** |
| **CASE NAME** | : | **Wood, et al. v. Scottsdale Indemnity Company** |
| **CLIENT NAME** | : | **Scottsdale Indemnity Company** |
| **OUR FILE NO.** | : | **380.25532** |
| **ATTACHED PLEASE FIND** | : | **Second Meet and Confer Pursuant to Standing Orders of the Honorable Saundra Brown Armstrong** |

| | | |
|---|---|---|
| **COMMENTS** | : | **Via Facsimile** |

SEND:  [X] IMMEDIATELY      ☐ WITHIN THE HOUR      ☐ BY 5:00 P.M. (PST)      ☐ OTHER:

RETURN FAX TO: _____

# **<u>EXHIBIT K</u>**

. From:ZACHARY E. ZWERDLING          707 443 0442          07/28/2008 15:13 #049 P.001/004

# FAX TRANSMISSION

**LAW OFFICES OF DAVID P. DIBBLE**
123 F STREET, Suite D
EUREKA, CA 95501
(707) 444-9330
Fax: (707) 443-0442
e-mail: diblaw1@gmai.com

| | | | |
|---|---|---|---|
| **To:** | Linda Wendell Hsu, Esq. | **Date:** | July 28, 2008 |
| **Fax #:** | (415) 979-2099 | **Pages:** | 4, including this cover sheet. |
| **From:** | David P. Dibble, Esq. | | |
| **Subject:** | *Wood, et al. v. Scottsdale Indemnity Co.* | | |

COMMENTS:

IF YOU DO NOT RECEIVE ALL PAGES OR ARE HAVING TROUBLE, PLEASE CALL
(707) 444-9330. THANK YOU.

LAW OFFICES OF
## DAVID P. DIBBLE
123 F STREET, SUITE C
EUREKA, CALIFORNIA 95501
(707) 445-9628

July 28, 2008

**VIA FACSIMILE TRANSMISSION AND REGULAR MAIL**
Linda Wendell Hsu, Esq.
SELMAN BREITMAN, LLP
33 New Montgomery St., Sixth Floor
San Francisco, CA 94105-4537

        Re:   Wood, et al v. Scottsdale Indemnity Co.
               NDCA #CV 08 0335 SBA

Dear Ms. Hsu:

        Please allow this letter to serve as plaintiff Clarence Jonathan Wood's response to your letter of July 22, 2008 in compliance with the parties' obligation to meet and confer prior to the filing of motions in this matter. We take issue with the conclusions set forth in your letter for, *inter alia,* the following reasons:

## I.   KIMBERLY HOLZ LINDSTROM WAS AN INSURED UNDER THE SCOTTSDALE POLICY

        From previous correspondence with Scottsdale and it's counsel, you are familiar with plaintiffs' position that Kimberly Holtz Lindstrom was an insured under the Scottsdale policy and the reasons therefore. Plaintiffs contend that the subject inner tubes were "watercraft" within the meaning of the insurance policy. As you know, all terms of the policy are construed against the drafter, Scottsdale Indemnity Co. The concept of a "craft ... vessel ... designed to transport persons or property on water" would certainly encompass an inner tube used for the purpose of transporting persons and property over water. This is further reinforced by the fact that Ms. Lindstrom lashed her inner tube to Kayla's; what was designed by them was a craft or vessel intended to transport persons down river. Certainly, had Scottsdale not intended inner tubes to be considered watercraft, it could easily have said so in the policy.

        Further, the fact that these inner tubes were lashed together on the subject tubing trip establishes that Kimberly Holz Lindstrom was, in fact, "using" the inner tubes, including Kayla's. This is in addition to the fact that she alone was entrusted with the use of all of the inner tubes on that trip by her father. Accordingly, there can be no question that she was using these inner tubes within the meaning of the policy.

You further contend that Ms. Lindstrom was not an insured because she had other insurance available through Hartford and Foremost. However, once the Foremost and Hartford limits were paid, that insurance was no longer available. The specific policy language requires other insurance to be presently available to a person legally responsible for the use of such watercraft for the coverage to not be applicable.

## II.    SCOTTSDALE'S DUTIES AROSE UPON PAYMENT OF THE UNDERLYING LIMITS BY FOREMOST AND HARTFORD

You contend that Scottsdale had no duties with respect to the insured in the underlying action until the entry of judgment on August 30, 2006. This ignores Scottsdale's duties arising upon the settlement and payment of the underlying limits by Foremost and Hartford. With the payment of the underlying limits, Scottsdale had duty to defend Ms. Lindstrom. Aetna Cas. & Surety Co. v. Certain Underwriters at Lloyds of London, England (1976) 56 Cal. App.3d 791. Further an excess insurance carrier must deal with settlement demands within the policy limits in good faith. Kelley v. British Commercial Insurance Co. (1963) 221 Cal. App.2d 554. The fact that Scottsdale continues to maintain that it had no duty to Ms. Lindstrom with respect to the claims of plaintiffs prior to the entry of judgment herein simply underscores Scottsdale's bad faith with respect to this matter.

## III    THE TIME LIMITATION IN THE POLICY DOES NOT APPLY TO THIS ACTION

You next contend that the 12 month time for filing claims against Scottsdale contained in the policy bars this action. However, the specific policy language applies to "any claim against the company by the insured" shall be made within 12 months. This action is not brought by the insured but rather by Clarence Jonathan Wood and Heidi Collingwood. Furthermore, to the extent that complaint alleges a breach of the duty of good faith and fair dealing and the consequent entry of judgment in excess of Scottsdale's limits, the action sounds in tort and therefore the contractual limitations period does not apply. Frazier v. Metropolitan Life Ins. Co. (1985) 169 Cal. App. 3d 90; Murphy v. Allstate Insurance Co. (1978) 83 Cal. App. 3d 38.

## IV    REASONABLE CONDUCT, EVEN IF ESTABLISHED, IS NOT A DEFENSE

After the exhaustion of the Hartford and Foremost policies, Scottsdale owed a duty to defend Kimberly Holz Lindstrom. Aetna Cas. & Surety Co. v.

Certain Underwriters at Lloyds of London, England (1976) 56 Cal. App.3d 791. Despite repeated opportunities for Scottsdale to defend Ms. Lindstrom and to settle the underlying action within the limits of the policy, Scottsdale maintained its denial of coverage, refused to provide a defense and refused to participate in settlement negotiations prior to trial. It relied on its denials of coverage in refusing to settle within the policy limits. Should Scottsdale be wrong in its denial of coverage, the reasonableness of its actions is not a defense. Samson Transamerica Ins. Co. (1981) 30 Cal. 3d 220; Johansen v. California State Auto. Ass'n. Inter Ins. Bureau (1975) 15 Cal. 3d 9.

For these and other reasons, we look forward to receipt of the Motion to Dismiss. Mr. Zwerdling is on vacation and will not be returning in time to respond to your letter. Please contact me if there are any questions in this regard.

Sincerely,

David P. Dibble

DPD:nfs
cc:    Zachary E. Zwerdling, Esq.

**PROOF OF SERVICE**

Clarence Jonathon Wood and Heidi Collingwood v. Scottsdale Indemnity Company

United States District Court Northern District of California Case No. CV 08 3335 SBA

I am employed in the County of San Francisco, State of California. I am over the age of 18 years and am not a party to the within action; my business address is 33 New Montgomery, Sixth Floor, San Francisco, CA 94105. On **July 29, 2008**, I served the following document(s) described as **DEFENDANT SCOTTSDALE INDEMNITY COMPANY'S INDEX OF EXHIBITS IN SUPPORT OF ITS MOTION TO DISMISS COMPLAINT** on the interested parties in this action as follows:

by placing a true copy thereof enclosed in sealed envelopes addressed as follows:

David P. Dibble, Esq.
Law Offices of David P. Dibble
123 F Street, Suite D
Eureka, CA 95501
(707) 444-9330

Attorneys For Plaintiff CLARENCE JONATHON WOOD

Zachary E. Zwerdling, Esq.
Law Office Of Zachary E. Zwerdling
123 F Street, Suite C
Eureka, CA 95501
(707) 445-9628

Attorneys For Plaintiff HEIDI COLLINGWOOD

☒ **BY MAIL:** By placing a true copy thereof in a sealed envelope addressed as above, and placing it for collection and mailing following ordinary business practices. I am readily familiar with the firm's practice of collection and processing correspondence, pleadings, and other matters for mailing with the United States Postal service on that same day with postage thereon fully prepaid at San Francisco, California in the ordinary course of business. I am aware that on motion of the party served, service is presumed invalid if the postal cancellation date or postage meter date is more than one day after date of deposit for mailing in affidavit.

☐ **BY OVERNIGHT COURIER:** I caused the above-referenced document(s) to be delivered to FEDERAL EXPRESS for delivery to the addressee(s).

☐ **BY E-MAIL**: I transmitted a copy of the foregoing documents(s) via e-mail to the addressee(s).

☐ **BY FAX**: I transmitted a copy of the foregoing documents(s) via telecopier to the facsimile numbers of the addressee(s), and the transmission was reported as complete and without error.

☐ **BY PERSONAL SERVICE:** I personally delivered such envelope by hand to the offices of the addressee(s).

I declare under penalty of perjury under the laws of the State of California that the foregoing is true and correct.

Executed on **July 29, 2008**, at San Francisco, California.

_Laura Talesnik_
LAURA TALESNIK

Selman Breitman LLP
ATTORNEYS AT LAW

153965.1  380.25532

1