1   David P. Dibble, Esq.   #73938
    ZWERDLING DIBBLE, LLP
2   123 F Street, Suite D
    Eureka, CA 95501
3   Telephone:  (707) 444-9330
    Facsimile:  (707) 443-0442

4

    Attorneys for Plaintiff Clarence Jonathon Wood

5

    Zachary E. Zwerdling, Esq.
6   LAW OFFICES OF ZACHARY ZWERDLING
    123 F Street, Suite C
7   Eureka, CA 95501
    Telephone: (707) 445-9628
8   Facsimile: (707) 443-0442

9   Attorneys for Plaintiff Heidi Collingwood

10
                    UNITED STATES DISTRICT COURT
11
                  NORTHERN DISTRICT OF CALIFORNIA
12

13  CLARENCE JONATHON WOOD,              NO.   CV 08 3335 SBA
    HEIDI COLLINGWOOD,
14                                       PLAINTIFFS' INDEX OF EXHIBITS IN
                                         SUPPORT OF THEIR OPPOSITION TO
            Plaintiffs,                  MOTION TO DISMISS COMPLAINT
15                                       OF DEFENDANT SCOTTSDALE
    vs.                                  INDEMNITY COMPANY
16
    SCOTTSDALE INDEMNITY
17  COMPANY and Does 1 through 100,      Date:      September 23, 2006
    inclusive,                           Time:      1:00 pm
18                                       Ctrm:      No. 3, 3rd floor
            Defendants.                  Judge      Hon. Saundra Brown
19                                                  Armstrong

20  _____/

21          Plaintiffs Clarence Jonathan Wood and Heidi Collingwood herewith submit the

22  following Index of Exhibits in Support of Their Opposition to Motion to Dismiss Complaint of

23  Defendant Scottsdale Indemnity Co.

24

25

26

LAW OFFICES OF DAVID DIBBLE
123 F STREET, SUITE D
EUREKA, CA 95501
(707) 444-9330                                1

Plaintiffs' Index of Exhibits in Support of Their Opposition to Motion to Dismiss Complaint of Defendant
Scottsdale Indemnity Co. - CV 08 3335 SBA

| EXHIBIT # | DESCRIPTION |
|---|---|
| 1. | Excerpts of Deposition of Emily Holz. |
| 2. | Excerpts of Deposition of Miranda Lindstrom. |
| 3. | Excerpts of Deposition of Ralph Lindstrom. |
| 4. | Excerpts of Deposition of John Martin Greenlaw. |
| 5. | Webster's New World Dictionary, Third College Edition, page 373. |

Declaration of David P. Dibble in Support of Opposition to Motion to Dismiss.

LAW OFFICES OF DAVID DIBBLE
123 F STREET, SUITE D
EUREKA, CA 95501
(707) 444-9330

2

# EXHIBIT 1

IN THE SUPERIOR COURT OF THE STATE OF CALIFORNIA

IN AND FOR THE COUNTY OF HUMBOLDT

NO. DR 020419

. . .

RECEIVED

JUN 03 2003

LAW OFFICE OF
ZACHARY E. ZWERDLING

HEIDI COLLINGWOOD,

                    Plaintiff,

    vs.

RALPH LINDSTROM, et al.,

                    Defendants.

_____/

D E P O S I T I O N

O F

EMILY MARIE HOLZ

. . .

MONDAY, JUNE 2, 2003

. . .

CERTIFIED
COPY

**FITZGERALD DEPOSITIONS**
730 Seventh Street, Suite C
Eureka, CA 95501
**(707)442-5345**

1      A.    They didn't have one that fit her.

2      Q.    Okay.  I thought you indicated earlier that

3   Ralph also said he thought she was experienced enough.

4      A.    Yes.

5      Q.    Is that right; is that what he said?

6      A.    Yes.

7      Q.    Okay.  What do you remember about the tubes;

8   where -- where did the tubes come from that you ended up

9   going into the river with?

10     A.    From the cabin.

11     Q.    To your knowledge, did they belong to Ralph?

12     A.    Yes.

13     Q.    Had you ever tubed on the river with these same

14  tubes before?

15     A.    Yes.

16     Q.    Okay.  Where did Ralph keep them; in a shed, in

17  a garage or something?

18     A.    No, just on the side of the cabin on the deck.

19     Q.    Okay.  You remember how many he had?

20     A.    No, but he had -- he had probably about ten.

21     Q.    And did you help him in any way either get the

22  tubes ready by blowing them up with air or getting them

23  in the truck or who took care of all that?

24     A.    They were already blown up, so we just picked

25  out which one we wanted.

                                                          21

1    Q.    You picked out which one you wanted?

2    A.    Yes.

3    Q.    Okay.  And then they were loaded into the

4  pickup; is that right?

5    A.    Yes.

6    Q.    And the pickup belonged to --

7    A.    Ralph.

8    Q.    Who loaded them into the pickup?

9    A.    Think my mom and my grandpa.

10    Q.    Your mom and your grandpa?

11    A.    Yes.

12    Q.    Okay.  You remember how many tubes were put

13  into the pickup?

14    A.    Five.

15    Q.    Okay.  Was there any discussion about the

16  actual tubing itself by the adults?  And by that, I mean

17  did they talk about where they were going to go in or

18  what they were going to do on the way, anything of that

19  nature, any type of planning discussion before you left

20  the house?

21        MS. RUDOLPH:  I would object.  Vague as to

22  "adults."

23        MR. ZWERDLING:  Okay.

24        THE WITNESS:  They just asked my mom where she

25  wanted to go, and she said she didn't want to go that far

                                                        22

1    ahead of your mom, she got going pretty close behind you.

2        A.    Yeah.

3        Q.    Was she ever in front of the group as you went

4    down the river or did one person stay in front of the

5    group?

6        A.    Well, me mom and my sister floated in front of

7    us right before Kayla and Miranda got on the rock.

8        Q.    Okay.

9        A.    Right before that.

10       Q.    So your mom and your sister, were they in

11   separate tubes?

12       A.    Yes, but they were holding on to each other.

13       Q.    Okay.  And Kayla and Miranda, were they in

14   separate tubes?

15       A.    Yeah, but all -- me, Kayla and Miranda were

16   tied together.

17       Q.    Okay.  So at some point, you untied your tube

18   from their tube?

19       A.    Yeah, because it kept turning around and --

20       Q.    You kept turning around?

21       A.    My tube kept turning this way, and I would be

22   facing backwards and they would be facing forward.  So I

23   was just inside my tube and was holding on to their

24   tubes.

25       Q.    By using your hand to hold on?

                                                          29

1      A.    Yes.

2      Q.    Was the temperature of the water colder than

3   other times you've been in there?

4      A.    Yes.

5      Q.    Was it quite a bit colder?

6      A.    Yes.

7      Q.    At some point before the accident, did you get

8   out of the tube and just actually swim around in the

9   water?

10     A.    No.

11     Q.    You stayed in the tube the whole time?

12     A.    Yes.

13     Q.    At any point do you remember shivering or

14  having that type of reaction to the temperature of the

15  water?

16     A.    No.

17     Q.    Okay.  At what point in the course of the trip

18  did you separate from the other two girls, from Miranda

19  and Kayla; was it early on, halfway, near the end?

20     A.    Well, my -- it was after my mom and Jessica

21  went in front of us and my mom -- my mom flipped over on

22  her tube and Jessica fell out of her tube; and so I was

23  holding on to Jessica because she was still in the water.

24  And so then they floated more to the side.

25     Q.    What -- did you see how your mom and your

30

# EXHIBIT 2

IN THE SUPERIOR COURT OF THE STATE OF CALIFORNIA

IN AND FOR THE COUNTY OF HUMBOLDT

NO. DR020419

. . .

HEIDI COLLINGWOOD,

                    Plaintiff,

     vs.

RALPH LINDSTROM, et al.,

                    Defendants.

_____/

D E P O S I T I O N

O F

MIRANDA LINDSTROM

. . .

THURSDAY, DECEMBER 12, 2002

. . .

**CERTIFIED
COPY**

---

**FITZGERALD DEPOSITIONS**
730 Seventh Street, Suite C
Eureka, CA 95501
**(707)442-5345**

1        Q.      Okay.  As you were going down the river, do you

2    remember the inner tubes getting stuck on a branch on a

3    log?

4        A.      Yes.

5        Q.      Okay.  And you were able to get out of the

6    inner tube -- out of your inner tube; is that right?

7        A.      Yes.

8        Q.      And were you able to -- you got on a rock?  I

9    heard something about a rock in the river and that you

10   were able to stand on the rock.

11       A.      (Witness nods head.)

12       Q.      Is that right?

13       A.      Yes.

14       Q.      Okay.  Did Kayla get out of her inner tube and

15   stand on the rock with you?

16       A.      No.

17       Q.      Okay.  Did you see her fall out of the inner

18   tube or fall off the inner tube?

19       A.      Yes.

20       Q.      All right.  And she just go right into the

21   water, then, when that happened?

22       A.      No, she got tangled in the ropes.

23       Q.      Okay.  Did she ever get up on the bank, for

24   instance, you know, behind -- on the river I know there's

25   a little cliff there, there's kind of a rock face there.

8

1    A.    Yes.

2          MS. RUDOLPH:   Leading.

3    BY MR. ZWERDLING:

4    Q.    All right.  Did he -- did he do any of the

5    tying?  Did he tie any of the tubes together?

6    A.    No.

7    Q.    Okay.  Who did the tying of the tubes?

8    A.    Emily and Kim.

9    Q.    And Kim?

10   A.    (Witness nods head.)

11   Q.    Okay.  Like, your tube that was tied to Kayla's

12   tube, who did that?  Did Kim do that?

13   A.    No, Emily did because hers was tied to ours.

14   Q.    All three of you were together --

15   A.    Yeah, but --

16   Q.    -- when you took off?

17   A.    But then she untied it and she rowed to her mom

18   because she didn't want to go on the bank.

19   Q.    Okay.  Was Ralph there?  Did he help you?  Did

20   he help carry the tubes to the water?

21   A.    I don't remember.

22   Q.    Okay.  Did he get out of the pickup?

23   A.    Yeah.

24   Q.    All right.  And did he come over and say

25   good-bye, wave as you -- when you left, anything like

                                                    15

1  fit you with a life vest that day?

2      A.    No.

3          MR. DIBBLE:  I don't have anything further.

4          Thank you.

5          MR. GANS:  Just one question for you, Miranda.

6          My name's Russ Gans.  I'm another attorney here

7  in town.  I just have one quick question, and let you go.

8

9                      EXAMINATION

10  BY MR. GANS:

11      Q.    When you and Kayla heard the rattle-snake sound

12  and got back on your inner tubes could you see Kim at

13  that time?

14      A.    No.

15          MR. GANS:  Okay.  Thank you.

16          MR. ZWERDLING:  You going to ask anything?

17          MS. RUDOLPH:  No.

18          MR. ZWERDLING:  I have one other question.  I'm

19  sorry.

20

21                  FURTHER EXAMINATION

22  BY MR. ZWERDLING:

23      Q.    When you were on the bank how were you -- did

24  you hold the tube with a rope or something?  How did you

25  keep the tubes close to you?

                                                    20

1       A.      We pulled them on the bank.

2       Q.      You had a rope and you were both hanging on to

3  them?

4       A.      (Witness nods head.)

5       Q.      And you were able to get up on the rock bank

6  there?

7       A.      Yeah.

8       Q.      And then you pushed them back in the water and

9  got back into them?

10       A.      Yes.

11       Q.      These pretty big-sized tubes or --

12       A.      Yeah.

13       Q.      -- were you able, yourself, to lift one of

14  those tubes up by yourself?

15       A.      Yeah.

16            MR. ZWERDLING:  Okay.  That's all.

17            Thank you for coming down today, Miranda.  Did

18  a good job.

19            Thanks, Ralph.

20            (Concluded at the hour of 9:26 a.m.)

21                          .   .   .

22

23

24

25

                                                           21

# EXHIBIT 3

IN THE SUPERIOR COURT OF THE STATE OF CALIFORNIA

IN AND FOR THE COUNTY OF HUMBOLDT

NO. DR 020419

. . .

HEIDI COLLINGWOOD,

                    Plaintiff,

        vs.

RALPH LINDSTROM, et al.,

                    Defendants.

_____/

D E P O S I T I O N

O F

RALPH LEONARD LINDSTROM, JR.

. . .

TUESDAY, OCTOBER 15, 2002

. . .

**CERTIFIED COPY**

**FITZGERALD DEPOSITIONS**
730 Seventh Street, Suite C
Eureka, CA 95501
**(707)442-5345**

1    So it's just a series of, like, water slides going down

2    and then hits this wider pool area.

3         And I noticed you made note about was the river

4    quieter down by our beach than it was back at the riffle.

5    Yes, it was because it's two hundred feet wide in that

6    area.  So it's moving much flatter, moving much slower.

7    Q.    My impression from your daughter's testimony

8    was that when she came to the faster water that it was

9    somewhat unusual; it was more speed and she became

10   somewhat alarmed at that moment.

11        Do you know why that particular day it would

12   cause that reaction in her?

13   A.    I don't.  It's just that it's been years since

14   she did it, and sometimes the very first time you go down

15   it seems a little surprising.

16   Q.    Did you do any observation of the river before

17   you dropped the girls off by pulling over on the road or

18   at the airstrip looking at the general conditions on the

19   river that morning?

20   A.    After I dropped them off and they went down

21   this embankment and into this kind of a pool area to get

22   onto their tubes and as they started down the river, I

23   drove up a little ways to the edge of the airport just to

24   observe them and the river; and I saw that they had

25   rafted together, they pulled all the tubes together.  And

24

1    so I felt good about that, that -- but I didn't see

2    anything unusual about the river.  I mean, it was

3    surprisingly clear and not all that high.

4         Q.    Okay.  Did you know anything about releases

5    upstream from the dam into the river on or about that

6    date?

7         A.    No.

8         Q.    Do you know anything about cubic -- whatever

9    the measurement is -- feet per second, flows during that

10   week?

11        A.    Well, I understand that part of it; but I

12   didn't hear anything about it.

13        Q.    Since the accident, have you done any

14   investigation to determine what the flows were on this

15   day?

16        A.    No, I haven't.

17        Q.    When you dropped the folks off at the Big Rock

18   area, was there any warning sign on the beach there or

19   any type of warning sign?

20        A.    No.

21        Q.    Has there been a warning sign there?

22        A.    Well, last week when I was up there with the --

23   with Jeff the adjuster, he pointed out there was a little

24   -- there's an eight-and-a-half-by-eleven sheet that's

25   stapled onto this bulletin board; and it'd said "Warning.

25

1       Q.    Is she somebody that you deal with on a regular
2    base?
3       A.    Um-hmm.
4       Q.    Personally, she's the one you talk to about
5    these things?
6       A.    Yes.
7       Q.    You were aware of what the concept of excess
8    liability insurance is?
9       A.    Um-hmm.
10      Q.    You knew that before this accident?
11      A.    Right.
12      Q.    And you understood it provided you and your
13   family with protection against negligence claims,
14   correct?
15      A.    Yes.
16      Q.    And that's what you wanted when you asked for
17   it?
18      A.    That's right.
19      Q.    And you were willing to pay for it?
20      A.    Yes.
21      Q.    And you paid your premiums on time?
22      A.    Yes.
23      Q.    As far as you knew, on May 25th your intention
24   and your understanding was that you had insurance
25   coverage up to two million dollars covering accidents

34

1    arising out at the residence in Willow Creek?

2        A.    Can I restate that?

3        Q.    Sure.

4        A.    The original one-million-dollar policy was

5    placed on my homeowners, which is my home in Eureka; and

6    on Penfold's -- Darlene Penfold's -- recommendation, she

7    felt I should have additional coverage because of the

8    amount of property that we have.  So she suggested I take

9    out the umbrella policy that covers all of the

10   properties.

11            Now, I'm not sure that the two-million limit

12   goes onto the rest of the properties; but I know the

13   one-million limit does.

14       Q.    The one million is The Hartford and the extra

15   million is The Hartford?

16       A.    Correct.

17       Q.    So it's your belief that one-point-three

18   million should cover the residence in Willow Creek?

19       A.    That's my impression, yes.

20       Q.    At the time of this incident, was your daughter

21   receiving any financial support from you?

22       A.    No.

23       Q.    Was she residing with you in any of your

24   residences --

25       A.    No.

35

**EXHIBIT 4**

SUPERIOR COURT OF THE STATE OF CALIFORNIA

IN AND FOR THE COUNTY OF HUMBOLDT

\*   \*   \*

RECEIVED

APR 0 4 2006

LAW OFFICE OF
ZWERD ~~~~ DLE, LLP

CLARENCE JONATHAN WOOD,

         Plaintiff,

vs.                                          No. DR020419

RALPH LINDSTROM, et al.,

         Defendants.

_____/

D E P O S I T I O N

OF

JOHN MARTIN GREENLAW

\*   \*   \*

WEDNESDAY, MARCH 22, 2006

\*   \*   \*

2:12 P.M.

\*   \*   \*

MARCIE L. CONN, CSR 11974

**CRNICH DEPOSITIONS**
626 H STREET, EUREKA, CA. 95501
TELEPHONE 707 443-4879
FAX 707 443 4870
CONFERENCE ROOMS

1    basically the areas that you intend to offer opinion

2    testimony in this matter.

3        A    Well, I would offer opinions in broad

4    categories in terms of the usage of tubes on rivers,

5    particularly in this case the Trinity River.

6        Q    Okay.

7        A    Consideration of safety issues relating to

8    tubing on May 25, 2002, on the Trinity River.

9            The conduct by Kimberly Holz in allowing

10    and escorting the children on the date of the

11    incident from Big Rock to the Lindstroms' property.

12            The conduct of Kayla in terms of her

13    notification to stay on the rock and not come forth

14    from where she was to retrieve the tubes.

15            And the activity itself in terms of going

16    approximately one mile from Big Rock to the

17    Lindstroms' property, which by my review would take

18    approximately twenty or thirty minutes.

19        Q    Is that it?

20        A    I believe so, in broad categories now.

21        Q    Okay.

22        A    That's what you asked me.

23        Q    Let's talk about Opinion Number 1, usage of

24    tubes on rivers.  What opinions do you have in that

25    regard?

1      A    Well, in this particular case, like in all

2   cases involving tubing, it's been going on for, I

3   guess, the turn of last century, 1900s, when people

4   were able to take inner tubes and use them in a body

5   of water, whether it's a river or a lake or even in

6   the ocean area in a sheltered position.

7           In this case the inner tubes were 16 inches

8   in diameter, which would make them, I believe, truck

9   tubes.  So I believe that they were of adequate

10  size.  In addition, the very concept of tubing in

11  itself I do not see as a hazardous activity that

12  would create undue risk to users if the river or

13  other body of water was in a relatively safe

14  condition.

15     Q    Okay.  And so that would cover your

16  opinions regarding usage of tubes on rivers in

17  general?

18     A    Yes.

19     Q    Okay.  You said that usage of tubes to

20  float on rivers has been going on for how long?

21     A    Well, I would say since the invention of

22  the pneumatic tube.

23     Q    How long has that been?

24     A    Well, I think we had pneumatic tube tires

25  probably since about 1910 on forward, maybe 1920.  I

1   know initially we didn't, when the invention of the

2   internal combustion engine for cars --

3            MR. HILL:  You said turn of the century.  I

4   think you meant not --

5            THE WITNESS:  Not this century, but the

6   preceding one.

7   BY MR. DIBBLE:

8       Q   1900s.  So people using truck tire inner

9   tubes to float on rivers or bodies of water has been

10  a common occurrence for over a hundred years?

11      A   I would say within that reasonable time

12  period.

13      Q   Okay.  Can we agree that an inner tube,

14  then, would be a watercraft of sorts?

15      A   Yes.

16      Q   Okay.

17           MR. HILL:  Off the record.

18       (There was a discussion off the record.)

19  BY MR. DIBBLE:

20      Q   And where did you get the information that

21  these were 16-inch-diameter truck tire tubes?

22      A   From the deposition material.

23      Q   Do you recall which deposition indicated

24  the size of the truck tires, of the tubes?

25      A   I believe Ralph Lindstrom had mentioned it

**EXHIBIT 5**

# Webster's
# New World
# Dictionary

# Third College Edition

Case 4:08-cv-03335-SBA   Document 20   Filed 08/28/2008   Page 28 of 30

tissue) nonreactive or nonallergic to a substance by removing the antibodies from sensitized cells —**de·sen'si·ti·za'tion** *n.* —**de·sen'si·tiz'er** *n.*

**de·sert'** (di zurt') *vt.* [Fr *déserter* < LL *desertare* < *desertus*, pp. of L *deserere*, to desert, lit., to disjoin < *de-*, from + *serere*, to join < IE base *\*ser-*, to join, place in a row > Gr *eirein*, to fasten in rows, L *series* ] **1** to forsake (someone or something that one ought not to leave); abandon **2** to leave (one's post, military service, etc.) without permission **3** to fail (someone) when most needed —*vi.* to leave one's post, military duty, etc. without permission and with no intent to return, or, in war, in order to avoid hazardous duty —*SYN.* ABANDON —**de·sert'er** *n.*

**de·sert²** (dez'ərt) *n.* [ME < OFr < LL(Ec) *desertum*, a desert, for L *deserta* < *desertus*: see prec. ] **1** an uncultivated region without inhabitants; wilderness **2** a dry, barren, sandy region, naturally incapable of supporting almost any plant or animal life —*adj.* **1** of a desert or deserts **2** wild and uninhabited [a *desert* island] —*SYN.* WASTE

**de·sert³** (di zurt') *n.* [ME & OFr *desert* < *deservir*: see DESERVE ] **1** the fact of deserving reward or punishment **2** [often pl.] deserved reward or punishment [to get one's just *deserts*] **3** the quality of deserving reward; merit

**de·sert·i·fi·ca·tion** (di zurt's fi kā'shən) *n.* [DESERT² + -I- + -FICA-TION ] the change of arable land into a desert either from natural causes or human activity

**de·ser·tion** (di zur'shən) *n.* [ME *desercioun* < OFr *desertion* < L *desertio* ] **1** a deserting or being deserted **2** *Law* the willful abandonment of cohabitation with one's spouse or of the duties of parenthood

**de·serve** (di zurv') *vt.* **-served'**, **-serv'ing** [ME *deserven* < OFr *deservir*, to deserve < L *deservire*, to serve diligently < *de-*, intens. + *servire*, SERVE ] to have a right to because of acts or qualities; be worthy of (reward, punishment, etc.); merit —*vi.* to be worthy

**de·served** (di zurvd') *adj.* rightfully earned or merited; just —**de·serv'ed·ly** (-zur'vid lē) *adv.*

**de·serv·ing** (di zur'viŋ) *adj.* **1** having merit; worthy of aid, a reward, etc. [a *deserving* student] **2** worthy (of) [a subject most *deserving* of attention] —*n.* [Now Rare] desert; merit or demerit

**de Se·ver·sky** (də sə ver'skē), **Alexander P(rocofieff)** 1894-1974; U.S. aeronautical engineer, born in Russia

**de·sex** (dē seks', dē'-) *vt.* **1** to remove the sex organs of **2** to suppress or lessen the sexual characteristics of

**de·sex·u·al·ize** (dē seks'sho͞o al iz', dē'-) *vt.* **-ized'**, **-iz'ing** DESEX —**de·sex'u·al·i·za'tion** *n.*

**Des·ha·bille** (des'ə bēl') *n.* DISHABILLE

**De Si·ca** (də sē'ka; *It* de sē'kä), **Vit·to·rio** (vi tôr'ē ō; *It* vēt tō'ryō) 1901-74; It. motion-picture actor & director

**des·ic·cant** (des'i kənt) *adj.* [L *desiccans*, prp. of *desiccare*: see fol.] drying —*n.* a substance having a great affinity for water and used as a drying agent

**des·ic·cate** (des'i kāt') *vt.* **-cat'ed**, **-cat'ing** [< L *desiccatus*, pp. of *desiccare*, to dry up completely < *de-*, intens. + *siccare*, to dry < *siccus*, dry < IE base *\*seikw-*, to trip, pour out > OE *eon*, to trickle, *sic*, small stream ] **1** to dry completely **2** to preserve (food) by drying —*vi.* to become completely dry —**des·ic·ca·tion** *n.* —**des'ic·ca'tive** (des'i kāt'iv, də sik'ət iv) *adj., n.*

**des·ic·ca·tor** (-ər) *n.* **1** an apparatus for drying foods, etc., esp. by heat **2** a chemist's device containing a water-absorbing material, used to dry or store substances

**de·sid·er·ate** (di zid'ər āt') *vt.* **-at'ed**, **-at'ing** [< L *desideratus*, pp. of *desiderare*: see DESIRE ] to feel the lack of and desire for; want; miss; need —**de·sid'er·a'tion** *n.* —**de·sid'er·a·tive** (di zid'ər ā'tiv, -ər ə tiv) *adj.*

**de·sid·er·a·tum** (di zid'ər ät'əm) *n., pl.* **-ta** [L, neut. of *desideratus*: see prec.] something needed and wanted

**de·sign** (di zin') *vt.* [ME *designen* < L *designare*, to mark out, define < *de-*, out, from + *signare*, to mark < *signum*, a mark, SIGN ] **1** to make preliminary sketches of; sketch a pattern or outline for **2** to plan and carry out, esp. by artistic arrangement or in a skillful way **3** to form (plans, etc.) in the mind; contrive **4** to plan; purpose; intend **5** to intend or set apart for some purpose —*vi.* **1** to make designs **2** to make original plans, sketches, patterns, etc.; work as a designer —*n.* [Fr *dessein* < It *disegno* < *disignare* < L *designare* ] **1** a plan; scheme; project **2** purpose; intention; aim **3** a thing planned for or outcome aimed at **4** a working out by plan, or development according to a plan [to find a *design* in history] **5** [pl.] a secret, usually dishonest or selfish scheme; often with *on* or *upon* [to have *designs* on another's property] **6** a plan or sketch to work from; pattern [a *design* for a house] **7** the art of making designs or patterns **8** the arrangement of parts, details, form, color, etc. so as to produce a complete and artistic unit; artistic or skillful invention [the *design* of a rug] **9** a finished artistic work or decoration —*SYN.* INTEND, PLAN —by **design** with deliberate intent; purposely

**des·ig·nate** (dez'ig nāt'; *for adj.*, -nit, -nāt') *adj.* [ME < L *designatus*, pp. of *designare*: see prec. ] named for an office, etc. but not yet in it [ambassador *designate*] —*vt.* **-nat'ed**, **-nat'ing** **1** to point out; mark out; indicate; specify **2** to refer to by a distinguishing name, title, etc.; name **3** to name for an office or duty; appoint —**des'ig·na'tive** *adj.* —**des'ig·na'tor** *n.*

**designated hitter** *Baseball* a player in the regular batting order who does not play in the field, but has been designated to bat in place of the pitcher

**des·ig·na·tion** (dez'ig nā'shən) *n.* [ME *designacioun* < L *designa-tio* ] **1** a pointing out or marking out; indication **2**

---

a naming or being named for an office, post, or duty **3** a distinguishing name, title, etc.

**de·sign·ed·ly** (di zīn'id lē) *adv.* by design; purposely

**de·sig·nee** (dez'ig nē', dez'ig nē') *n.* a person designated

**de·sign·er** (di zīn'ər) *n.* a person who designs; specif., one who makes original sketches, patterns, etc. [a scene *designer*] —*adj.* designating or of products, esp. fashionable clothing, styled by and often named after a noted designer [*designer* jeans]

**de·sign·ing** (di zīn'iŋ) *adj.* **1** that designs, or makes plans, patterns, etc. **2** scheming; crafty; artful —*n.* the art or work of creating designs, patterns, etc.

**de·sir·a·ble** (di zīr'ə bəl) *adj.* [ME < OFr: see fol. & -ABLE ] **1** worth wanting or having; worthwhile, beneficial, expedient, etc. **2** arousing desire; pleasing, attractive, etc. —**de·sir'a·bil'i·ty** or **de·sir'a·ble·ness** *n.* —**de·sir'a·bly** *adv.*

**de·sire** (di zīr') *vt.* **-sired'**, **-sir'ing** [ME *desiren* < OFr *desirer* < L *desiderare*, orig., prob., to await from the stars < *de-*, from + *sidus*, star: see SIDEREAL ] **1** to wish or long for; crave; covet **2** to ask for; request **3** to want sexually —*vi.* to have or feel a desire —*n.* **1** a strong wish or craving **2** sexual appetite; lust **3** an asking for something; request **4** a thing or person desired —*SYN.* —**desire**, generally interchangeable with the other words here in the sense of 'to long for,' stresses intensity or ardor [to *desire* success]; **wish** is not so strong a term as **desire** and has special application when an unrealizable longing is meant [he *wished* summer were here]; **want**, specifically suggesting a longing for something lacking or needed, generally is a more informal equivalent of **wish** [she *wants*, or *wishes*, to go with us]; **crave** suggests desire to gratify a physical appetite or an urgent need [to *crave* affection]

**de·sir·ous** (di zīr'əs) *adj.* [ME < OFr *desireus* < LL *desiderosus* < L *desiderare*: see prec. ] desiring; having or characterized by desire

**de·sist** (di zist', -sist') *vi.* [ME < OFr *desister* < L *desis-tere* < *de-*, from + *sistere*, to cause to stand < *stare*, to STAND ] to cease (from an action); stop; abstain [*desist* from fighting] —*SYN.* STOP —**de·sist'ance** *n.*

**desk** (desk) *n.* [ME *deske* < ML *desca*, a table, ult. < L *discus*: see DISCUS ] **1** a kind of table equipped with drawers, compartments, etc., and a flat or sloping top for writing, drawing, or reading **2** a lectern **3** *a)* the post of a clerk, official, etc. in a department or office *b)* the place in a hotel where guests are registered, mail is picked up, etc. *c)* a division of a newspaper office [the city *desk*] **4** a musician's stand in an orchestra —*adj.* **1** of, for, or on a desk **2** done at a desk [a *desk* job]

**desk·man** (-man') *n., pl.* **-men'** a person who works at a desk, esp. one who edits copy in a newspaper office

**desk·top** (-täp') *n.* the top, or working surface, of a desk —*adj.* designating or of a piece of equipment, as a microcomputer, designed to be used on a desk or table

**des·man** (des'mən) *n., pl.* **-mans** [< Swed *desman-rätta* < *desman*, musk + *rätta*, rat ] a molelike, aquatic insectivore mammal (family Talpidae) with webbed feet and a long, flexible snout: one species (*Desmana moschata*), trapped for its fur, is found in Russia and the other (*Galemys pyrenaicus*) in the Pyrenees

**des·mid** (-mid) *n.* [ModL *desmidium*, dim. < Gr *desmos*, a chain: akin to *dein*, to bind: see DIADEM ] any of a group of microscopic, freshwater green algae having single cells composed of two identical half-cells with the nucleus located between them

**des·moid** (-moid') *adj.* [< Gr *desmos* (see prec.) + -OID ] **1** like a ligament **2** of fibrous texture, as certain tumors

**Des Moines** (də moin') [Fr., lit., of the monks ] **1** river in Iowa, flowing southeast into the Mississippi: c. 325 mi. (523 km) **2** capital of Iowa, in the central part on the Des Moines River: pop. 191,000

**Des·mou·lins** (dā mo͞o laN'), **(Lucie Simplice) Ca·mille (Benoît)** (ka mē'y') 1760-94; Fr. Revolutionary journalist & pamphleteer

**des·o·late** (des'ə lit; *for v.*, -lāt') *adj.* [ME *desolat* < L *desolatus*, pp. of *desolare*, to leave alone, forsake, strip of inhabitants < *de-*, intens. + *solare*, to make lonely < *solus*, SOLE² ] **1** left alone; lonely; solitary **2** uninhabited; deserted **3** made uninhabitable; laid waste; in a ruinous state **4** forlorn; wretched —*vt.* **-lat'ed**, **-lat'ing** [ME *desolaten* < the *adj.* ] **1** to make desolate; rid of inhabitants **2** to make uninhabitable; lay waste; devastate **3** to depopulate **4** to make forlorn, wretched, etc. —**des'o·late·ly** *adv.* —**des'o·late·ness** *n.* —**des'o·la'tor** or **des'o·lat'er** *n.*

**des·o·la·tion** (des'ə lā'shən) *n.* [ME *desolacioun* < OFr *desolation* < LL(Ec) *desolatio* ] **1** a making desolate; laying waste **2** a desolate condition; ruin; waste **3** lonely grief; misery **4** loneliness **5** a desolate place

**de·sorb** (dē sôrb', dē'-) *vt.* [DE- + (AB)SORB ] to remove (an absorbed or absorbed material) by a chemical or physical process —**de·sorp'-tion** (-sôrp'shən) *n.*

**De So·to** or **de So·to** (di sōt'ō), **Her·nan·do** (hər nan'dō) c. 1500-42; Sp. explorer in America: discovered the Mississippi River (1541)

**de·spair** (di sper') *vi.* [ME *despeiren* < OFr *desperer* < L *desperare*, to be without hope < *de-*, without + *sperare*, to hope < *spes*, hope < IE base *\*spēi*, to prosper, expand: see SPEED ] to lose or give up hope; be without hope: usually with *of* —*vt.* [Archaic] to give up hope of —*n.* **1** a despairing; loss of hope **2** a person or thing despaired of or causing despair

---

at, āte, cär; ten, ēve; is, īce; gō, hôrn, look, to͞ol; oil, out; up, fur; *ə* *for unstressed vowels, as ə in* ago, *u in* focus; ' *as in* Latin (lat''n); chin; she; zh *as in* azure (azh'ər); thin, *the*; n *as in* ring (riŋ) [ ] *in etymologies:* \* = unattested; < = derived from; > = from which **☆** = Americanism   **See inside front and back covers**

1  David P. Dibble, Esq.  #73938
   LAW OFFICES OF DAVID DIBBLE
2  123 F Street, Suite D
   Eureka, CA 95501
3  Telephone:  (707) 444-9330
   Facsimile:  (707) 443-0442
4
   Attorneys for Plaintiff Clarence Jonathon Wood
5

6              UNITED STATES DISTRICT COURT

7            NORTHERN DISTRICT OF CALIFORNIA

8
   CLARENCE JONATHON WOOD,           NO.    CV 08 3335 SBA
9  HEIDI COLLINGWOOD,
                                     DECLARATION OF DAVID P.
10      Plaintiffs,                  DIBBLE IN SUPPORT OF
                                     PLAINTIFFS' OPPOSITION TO
11 vs.                              MOTION TO DISMISS

12 SCOTTSDALE INDEMNITY
   COMPANY and Does 1 through 100,
13 inclusive,

14      Defendants.
   _____/
15
   I, DAVID P. DIBBLE, declare:
16
            That I am an attorney at law admitted to practice before all courts of the State of
17
   California and the United States District Court for the Northern District of California, and have my
18
   offices in Eureka, Humboldt County, California, and am one of the attorneys for the plaintiffs in the
19
   within action. That I have personal knowledge of the following facts and if called upon to testify
20
   could competently testify thereto.
21
            That the Exhibits 1 through 5 attached hereto are true and correct copies of the
22
   documents they purport to represent.
23
            I declare under penalty of perjury that the foregoing is true and correct.
24
            Executed this 28th day of August, 2008 at Eureka, Humboldt County, California.
25
                                     _____
26                                   David P. Dibble, Esq.

**PROOF OF SERVICE**

I am a citizen of the United States and a resident of the County of Humboldt. My business address is 123 F Street, Suite C, Eureka, California 95501. I am over the age of 18 years and not a party to the within cause.

On this date, I served the following documents: *Plaintiffs' Index of Exhibits in Support of their Opposition to Motion to Dismiss Complaint of Defendant Scottsdale Indemnity Company*

[X]    **BY MAIL:** By placing a true copy thereof enclosed in a sealed envelope, addressed as shown below and placing the envelope for collection and mailing on the date and at the place shown below, following our ordinary business practices. I am readily familiar with this business' practice for collecting and processing correspondence for mailing. On the same day that correspondence is placed for collection and mailing, it is deposited in the ordinary course of business with the United States Postal Service in a sealed envelope with postage fully prepaid.

[ ]    **BY FAX:** By transmitting a true copy thereof from fax telephone number (707) 443-0442 at _____ a.m./p.m. to the person(s) at the fax number(s) indicated below. The transmission was reported as complete and without error, and such transmission report was properly issued by the transmitting fax machine. A true copy of that transmission report is attached to the original proof of service filed herein.

[ ]    **BY PERSONAL SERVICE:** By placing a true copy thereof enclosed in a sealed envelope, addressed as shown below and delivering same to the individual named below or to that individual in care of a member of his/her office, prior to 5:00 p.m.

[ ]    **BY OVERNIGHT DELIVERY:** By placing a true copy thereof enclosed in a sealed envelope addressed as shown below and depositing said envelope in a box or other facility regularly maintained by the express service carrier, or delivered to an authorized courier or driver authorized by the express service carrier to receive documents, in an envelope or package designated by the express service carrier with delivery fees paid or provided for.

Attorney for Scottsdale Indemnity Company
Linda Wendell Hsu, Esq.
**Selman Breitman LLP**
33 New Montgomery, Sixth Floor
San Francisco, CA 94105

I declare under penalty of perjury under the laws of the State of California that the foregoing is true and correct .

Executed on August 28, 2008 at Eureka, California.

STEPHANIE ESKRA

Zwerdling Dibble, LLP
123 F Street, Suite C
Eureka, CA  95501
(707) 445-9628

Proof of Service

Page 1